# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# PECOS DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>    Plaintiff,<br><br>    v.<br><br>**JOSE GOMEZ QUIROZ,**<br><br>    Defendant. | No. P:22-CR-00104-DC |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S RULE 29(C) MOTION & MOTION TO RECONSIDER MOTION TO DISMISS

TABLE OF CONTENTS

Table of Contents ................................................................................................. ii
Introduction ........................................................................................................ 1
Statement of the Case ........................................................................................ 2
    I.   Factual background ............................................................................. 2
    II.  Procedural history ............................................................................... 2
Legal Background ............................................................................................. 3
    I.   18 U.S.C. § 922(n) ............................................................................... 3
    II.  The Second Amendment ..................................................................... 5
    III. Facial constitutional challenge ........................................................... 6
Argument ........................................................................................................... 7
    I.   The Second Amendment's plain text does not cover receipt of a firearm by a person under felony indictment. ..................................... 7
        A.  The party challenging a gun regulation has the burden of showing that the Second Amendment's text covers his conduct. .......................................................... 7
        B.  The right to "keep and bear Arms" does not cover receiving arms while under felony indictment. ............................................. 8
    II.  Section 922(n)'s prohibition of receipt of firearms by a person under felony indictment squares with the nation's historical tradition of gun regulation. ..................... 9
        A.  The nation's historical tradition embraces categorically restricting the gun rights of groups viewed by legislatures as unvirtuous or dangerous. ........................ 10
        B.  Section 922(n) squares with the nation's historical tradition of categorical gun restrictions. ................................................................. 13
Conclusion ....................................................................................................... 17
Certificate of Service ...................................................................................... 18

INTRODUCTION

A jury convicted Quiroz of violating 18 U.S.C. § 922(n) (ECF No. 71), which makes it a crime for a person under felony indictment to "receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." He is set for sentencing in late September. (ECF No. 76.) This Court had previously rejected Quiroz's Second Amendment challenge to § 922(n). (ECF No. 39.) He renews it in his post-verdict motion for judgment of acquittal and for reconsideration of this Court's earlier ruling. (ECF No. 74.)

This Court should again reject Quiroz's Second Amendment challenge. Nothing in the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), casts doubt on § 922(n)'s constitutionality. *Bruen*'s central holding was that a Second Amendment challenge does not call for "means-end" scrutiny (like strict or immediate scrutiny). Under *Bruen*, a gun regulation violates the Second Amendment if (1) the Second Amendment's plain text covers the conduct at issue, unless (2) the government shows that the challenged regulation is consistent with the nation's historical tradition of gun regulation.

Each of *Bruen*'s steps independently sustains § 922(n). First, § 922(n) burdens no conduct covered by the Second Amendment's plain text. It does not interfere with "the right to keep and bear arms" because it does not disarm felony indictees who already had guns and does not prohibit possession or public carry. It imposes only a temporary, narrow restriction on procuring a gun while a felony indictment is pending. Second, § 922(n) squares with the nation's historical tradition of gun regulation. The Second Amendment has always allowed laws restricting the gun rights of groups viewed by legislatures as posing a public-safety risk, including those accused but not convicted of wrongdoing. And restricting indictees' gun rights fits a broader tradition of substantially restricting indictees' liberty while their criminal case is pending. Section 922(n)'s narrow prohibition of receiving firearms while under felony indictment is consistent with those established traditions.

## STATEMENT OF THE CASE

### I. Factual background

Quiroz was indicted in Texas state court for burglary, a second-degree felony. (ECF No. 39 at 1.) *See* Tex. Penal Code § 30.02(c)(2). He pled not guilty and was released on bond. (*Id.*) After he failed to appear for a hearing in his burglary case, he was also indicted for bail jumping/failure to appear, a third-degree felony. (*Id.* at 2) *See* Tex. Penal Code § 38.10(f).

While the state burglary and bail-jumping indictments were pending, Quiroz tried to buy a handgun from a hardware store. (*Id.*) He filled out an ATF Form 4473, on which he denied that he was under felony indictment. (*Id.*) The National Instant Criminal Background Check System (NICS) returned a delayed response, which meant that the store could not give Quiroz the gun until either the background check cleared or seven days passed. (*Id.*) Seven days passed, and so Quiroz picked the gun up from the store. (*Id.*)

The next month, NICS denied the purchase and told the ATF that Quiroz had illegally purchased the gun. (*Id.*)

### II. Procedural history

Quiroz was charged in a two-count federal indictment. (ECF. No. 1.) Count one charged that he falsely stated on the Form 4473 that he was not under felony indictment. (*Id.* at 1–2.) *See* 18 U.S.C. §§ 922(a)(6), 924(a)(2). Count two charged that he knowingly received a firearm while under felony indictment. (*Id.* at 2.) *See* 18 U.S.C. §§ 922(n), 924(a)(1)(D).

Quiroz moved to dismiss the indictment. (ECF No. 23.) He claimed that § 922(n)—the crime charged in count two—violates the Second Amendment. (*Id.* at 3–14.) He also claimed that because Congress could not constitutionally prohibit those under felony indictment from receiving firearms, he could not be convicted of falsely denying that he was under felony indictment on the Form 4473, as count one charged. (*Id.* at 14.)

This Court denied Quiroz's motion. (ECF No. 39.) It ruled that § 922(n) does not facially violate the Second Amendment. (*Id.* at 6–10.) It applied the Fifth Circuit's pre-*Bruen* test, which first asked whether the challenged law reaches conduct within the scope of the Second Amendment

right and, if so, then asks whether the law survives the appropriate level of means-end scrutiny (intermediate or strict). (*Id.* at 6–7 (citing *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, 700 F.3d 185, 194 (5th Cir. 2012)).) At the first step, the Court concluded that because of the presumption of innocence, Quiroz "remain[ed] a law-abiding citizen" who enjoyed Second Amendment rights while his state indictments were pending. (*Id.* at 8.) At the second step, the Court applied intermediate scrutiny because § 922(n)'s prohibition is temporary and applies only to receipt, not possession, and so does not substantially burden a core Second Amendment right. (*Id.* at 8–9.) The Court ruled that § 922(n) survives intermediate scrutiny because it is substantially and directly related to an important public-safety interest. (*Id.* at 9–10.)

Quiroz went to trial (ECF No. 67), and the jury convicted him of both counts (ECF No. 71).

By this post-verdict motion for judgment of acquittal and for reconsideration, Quiroz renews his facial Second Amendment challenge to § 922(n). (ECF No. 74) He relies on *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), which the Supreme Court decided on the same day as the jury verdict in this case. Quiroz notes that *Bruen* announced a "new framework" for Second Amendment challenges that partly displaces the Fifth Circuit's pre-*Bruen* test. (*Id.* at 3.) And he argues that under the new framework, § 922(n) violates the Second Amendment. (*Id.* at 4.)

## Legal Background

### I. 18 U.S.C. § 922(n)

Section 922(n) states: "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to … receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

The federal prohibition in § 922(n) has existed in some form since 1938. That year, Congress first limited gun access by people under indictment as well as by convicted felons. *United States v. Laurent*, 861 F. Supp. 2d 71, 82 (E.D.N.Y. 2011); *see United States v. Skoien*, 614 F.3d

638, 640 (7th Cir. 2010) (noting that the "first federal statute disqualifying felons from possessing firearms was not enacted until 1938" (citing Federal Firearms Act of 1938, ch. 850, § 2(f), 52 Stat. 1250, 1251)). The original federal prohibition reached only those under indictment for or convicted of crimes of violence. *Laurent*, 861 F. Supp. 2d at 82. In 1961, Congress expanded the prohibitions to include all crimes. *Id.* at 83.

Congress later passed the Gun Control Act of 1968, which updated the restrictions on gun access by people under indictment and by convicted felons. *Id.* Among other things, the Gun Control Act "clarified the definition of 'indictment' to include an information or indictment in *any court*—state or federal—if the court had power to prosecute any crime punishable by more than one year in prison." *Id.* (emphasis original). It "reflects a concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons." *Id.* (cleaned up) (quoting *Barrett v. United States*, 423 U.S. 212, 220 (1976)). "In 1986, Congress again revised the statute to combine the provisions of § 922(g)(1) and (h)(1) that dealt with indictees into a single section, § 922(n)." *Id.* at 84. The statutory text has not substantively changed since then.

In contrast to the ban on firearm possession by convicted felons and some other groups, *see, e.g.*, 18 U.S.C. § 922(g), the restrictions on people under felony indictment are narrow. First, "[b]y its own terms, § 922(n) does not prohibit *possession* of a weapon by someone under indictment, but only shipping, transportation, or *receipt*." *Laurent*, 861 F. Supp. 2d at 85 (emphasis original). So it does not prohibit a person under felony indictment from continuing to keep and bear any firearms he had before the indictment. *Id.* at 85–87. "It merely maintains the *status quo* during the pendency of the indictment, a volatile period during which the stakes and stresses of pending criminal charges often motivate defendants to do violence to themselves or others." *United States v. Khatib*, No. 12-CR-190, 2012 WL 6086862, at *4 (E.D. Wis. Dec. 6, 2012), *report and recommendation adopted*, 2012 WL 6707199 (E.D. Wis. Dec. 26, 2012).

Second, unlike the felon-in-possession prohibition, which is permanent, § 922(n)'s prohibition "is temporary. It lasts only from indictment to conviction or acquittal." *Laurent*, 861 F. Supp. 2d at 102. "The prohibition ends with dismissal of the charges or acquittal (or conviction for an

offense that does not bar firearm possession) or becomes permanent if the defendant is, for example, convicted of a felony or a misdemeanor crime of domestic violence." *Khatib*, 2012 WL 6086862, at *4.

## II. The Second Amendment

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment gives law-abiding, responsible citizens a right to keep and bear arms for lawful purposes like self-defense in the home. The Court thus held unconstitutional two District of Columbia laws that effectively banned handgun possession in the home and required all firearms in homes to be kept inoperable and so unavailable for self-defense. *Id.* at 628–34.

But the Court emphasized that the Second Amendment right is "not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. "[N]othing in [the *Heller*] opinion [was to] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (repeating *Heller*'s "assurances" that it "did not cast doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" (cleaned up)). The Court meant its list of "presumptively lawful regulatory measures only as examples," not as exhaustive. *Heller*, 554 U.S. at 627 n.26.

In *Bruen*, the Supreme Court "made the constitutional standard endorsed in *Heller* more explicit." 142 S. Ct. at 2134. It explained: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must

**Government's Opposition to Defendant's Rule 29(c)**                                                                        5
**Motion & Motion to Reconsider Motion to Dismiss**

then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129–30.

Applying that standard, the Court held unconstitutional New York's licensing law, which allowed an applicant to obtain a license to carry a gun outside his home only by proving that "proper cause exists." *Id.* at 2123. New York courts had read "proper cause" as "a special need for self-protection distinguishable from that of the general community." *Id.* First, the Court held that the Second Amendment's plain text covered the conduct at issue. *Id.* at 2134–35. The petitioners—"two ordinary, law-abiding, adult citizens"—were undisputedly among "'the people' whom the Second Amendment protects." *Id.* at 2134. And their proposed conduct—"carrying handguns publicly for self-defense"—fell within "the right to keep and bear arms." *Id.*

Second, the Court surveyed historical data from "medieval to early modern England" through "the late-19th and early-20th centuries" to determine whether New York's licensing law squared with historical tradition. *Id.* at 2135–56. After a "long journey through the Anglo-American history of publ,ic carry, [the Court] conclude[d] that respondents ha[d] not met their burden to identify an American tradition justifying the State's proper-cause requirement." *Id.* at 2156. "Apart from a few late-19th century outlier jurisdictions," the Court summarized, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense" or required a showing of special need for public carry. *Id.*

III. **Facial constitutional challenge**

Quiroz mounts only a facial challenge to § 922(n). The last paragraph of his argument claims that "the statute violates the Second Amendment facially and as applied to" him. (Mot. at 14.) Yet, as in his prior motion, he makes the as-applied challenge only "[i]n a conclusory fashion" without applying "the raised arguments to his particular case." (*See* ECF No. 39 at 5 (declining to separately consider the as-applied claim in Quiroz's prior motion for these reasons) (citing *United States v. Reeder*, No. EP-08-CR-977-DB, 2008 WL 4790114, at *2 (W.D. Tex. Oct. 31, 2008), *aff'd*, 491 F. App'x 487 (5th Cir. 2012)).)

Quiroz's facial challenge faces an uphill fight. "To sustain a facial challenge, the challenger must establish that no set of circumstances exists under which the statute would be valid." *United States v. McGinnis*, 956 F.3d 747, 752 (5th Cir. 2020) (cleaned up). "Facial challenges to the constitutionality of statutes should be granted sparingly and only as a last resort." *Id.* at 752–53.

**ARGUMENT**

Quiroz's facial challenge fails at both steps of *Bruen*'s analysis. The Second Amendment's plain text does not cover his conduct because § 922(n) does not burden "the right to keep and bear arms." But even if it did, § 922(n) would still be constitutional because it squares with the nation's historical tradition of categorically restricting the gun rights of unvirtuous citizens.

### I. The Second Amendment's plain text does not cover receipt of a firearm by a person under felony indictment.

This Court need not consider whether § 922(n) squares with the nation's historical tradition of gun regulation because its modest restriction burdens no conduct covered by the Second Amendment's plain text. Quiroz has the burden at this initial stage of the analysis to show that the Second Amendment covers his conduct. He cannot carry his burden because "the right to keep and bear arms" does not cover the "ship[ping]," "transport[ing]," or "receiv[ing]" of firearms while under felony indictment.

#### A. The party challenging a gun regulation has the burden of showing that the Second Amendment's text covers his conduct.

In *Bruen*, the Supreme Court did not address which party has the burden of showing that the Second Amendment's text covers—and thus "presumptively" protects—the conduct at issue. *See* 142 S. Ct. at 2130. But it implied that the party challenging a gun regulation has that initial burden.

To repeat, the Court's analysis proceeded in two steps: it asked, first, whether the Second Amendment's plain text covers the conduct at issue and, second, whether the regulation squares with the nation's tradition of gun regulation. *See, e.g.*, 142 S. Ct. at 2126, 2130. At step two, the Court assigned the government the burden of offering historical evidence to support the regulation.

**Government's Opposition to Defendant's Rule 29(c)**     7
**Motion & Motion to Reconsider Motion to Dismiss**

*Id.* To do so, the Court analogized to "the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms." *Id.* at 2130 (citing *Heller*, 554 U.S. at 582, 595, 606, 618, 634–635). The Court did not explicitly say which party has the burden at step one. Nor did it need to since the parties did not dispute that the respondents were among "the people" whom the Second Amendment protects and that publicly carrying handguns for protection fell within "the right to keep and bear arms." *Id.* at 2134.

Continuing the Supreme Court's analogy to the First Amendment's burden-shifting framework, the party challenging a gun regulation has the burden at step one. Although the government has the burden of justifying a purported restriction on the freedom of speech, the party challenging the restriction must show that the First Amendment right applies in the first place. *See, e.g.*, *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1147 (10th Cir. 2020) ("Plaintiffs had the initial burden of showing that the First Amendment applies to their conduct." (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n.5 (1984)); *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 (2d Cir. 2004) ("The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies."). Likewise here, Quiroz has the burden of showing that the Second Amendment applies to—and thus presumptively protects—his conduct.

### B. The right to "keep and bear Arms" does not cover receiving arms while under felony indictment.

Quiroz cannot show that the Second Amendment "right to keep and bear arms" covers his conduct: buying a gun while under felony indictment. In *Heller*, the Supreme Court explained that "the most natural reading of 'keep arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582. Section 922(n) does not burden that right: "[b]y its own terms, § 922(n) does not prohibit *possession* of a weapon by someone under indictment." *Laurent*, 861 F. Supp. 2d at 85 (emphasis original). Thus, § 922(n) did not impair Quiroz's ability to "keep" any arms he already had before his indictments. He simply could not "receive" new ones, *see* 18 U.S.C. § 922(n), conduct the Second Amendment's text does not address. *Cf. Heller*, 554 U.S. at 626–27 (noting that

the Court's opinion did not invalidate "laws imposing conditions and qualifications on the commercial sale of arms"); *Nat'l Rifle*, 700 F.3d at 206 (holding that laws did "not severely burden the Second Amendment rights of 18-to-20-year-olds because" they did not ban use or possession but "impose[d] an age qualification on commercial firearm sales").

Similarly, "[a]t the time of the founding, as now, to 'bear' meant to 'carry.'" *Heller*, 554 U.S. at 584. "When used with 'arms,' however, the term has a meaning that refers to carrying for a particular purpose—confrontation." *Id.* In *Bruen*, the Supreme Court confirmed that "[t]his definition of 'bear' naturally encompasses public carry" in addition to carrying a gun in one's home. 142 S. Ct. at 2134. Section 922(n) does not burden this right either. Unlike the New York licensing law that *Bruen* invalidated—which directly restricted citizens' ability to publicly carry guns they otherwise lawfully possessed—§ 922(n)'s "receipt" prohibition does not restrict what citizens can do with their lawfully possessed guns.

In some contexts, courts have suggested that the right to keep and bear arms implies the right to obtain them. *Cf. Nat'l Rifle Ass'n*, 700 F.3d at 204–05 (assuming, despite being inclined to hold otherwise, that the Second Amendment presumptively protects "the ability of 18-to-20-year-olds to purchase handguns from FFLs"). But nothing about that right implies a right of otherwise unarmed citizens to *procure new arms once facing felony charges*, but before a resolution of the charges. Obtaining a firearm in that scenario creates distinct risks because one could reasonably "infer a malevolent intent when an indictee finds it necessary to obtain a firearm during the narrow period during which an indictment is pending knowing that he will have to give it up should he be convicted." *Khatib*, 2012 WL 6086862, at *4. Quiroz cannot show that the founders nevertheless intended for "the right to keep and bear arms" to protect the right to obtain firearms under those circumstances.

II. **Section 922(n)'s prohibition of receipt of firearms by a person under felony indictment squares with the nation's historical tradition of gun regulation.**

Even if the Second Amendment's plain text covers Quiroz's conduct, his Second Amendment claim fails because § 922(n) "is consistent with the Nation's historical tradition of firearm

regulation." *See Bruen*, 142 S. Ct. at 2130. The Second Amendment has always let governments disarm or restrict the gun rights of "unvirtuous" or dangerous citizens. And the historical record shows a longstanding tradition of categorically restricting the gun rights of groups viewed by legislatures as unvirtuous, and of substantially restricting the liberty of those under indictment. Section 922(n) comfortably squares with that tradition.

### A. The nation's historical tradition embraces categorically restricting the gun rights of groups viewed by legislatures as unvirtuous or dangerous.

The Second Amendment sets forth a "right of *law-abiding, responsible* citizens." *Id*. at 2131 (emphasis added) (quoting *Heller*, 554 U.S. at 635). The nation's historical tradition, however, embraces restricting the gun rights of citizens viewed by legislatures as unvirtuous or dangerous.

**1.** The government has always categorically restricted the gun rights of certain groups to promote public safety. "The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle*, 700 F.3d at 200. Those regulations "included safety laws … disarming certain groups and restricting sales to certain groups." *Id.* "For example, several jurisdictions passed laws that confiscated weapons owned by persons who refused to swear an oath of allegiance to the state or to the nation." *Id.*; *see also Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (explaining that "during the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States").

Historical accounts confirm the founders' attitudes towards disarming potentially dangerous citizens. "*Heller* identified … as a 'highly influential' 'precursor' to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (quoting 554 U.S. at 604). That report recognized that the government could disarm potentially dangerous or irresponsible people, stating that "citizens have a personal right to bear arms 'unless for *crimes committed, or real danger of public injury*.'" *Id.* (emphasis added) (quoting 2 Bernard

Schwarz, *The Bill of Rights: A Documentary History* 662, 665 (1971)). Similarly, Samuel Adams offered an amendment at the Massachusetts convention to ratify the Constitution, recommending "that the said Constitution be never construed to authorize Congress … to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." Schwarz, *The Bill of Rights* 674–75, 681 (emphasis added). Thomas M. Cooley's 1868 treatise, which *Heller* described as "massively popular," 554 U.S. at 616, later explained that some classes of people were "almost universally excluded" from exercising certain civic rights like gun rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).

Indeed, "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) (quoting *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (collecting scholarly sources)); *United States v. Carpio-Leon*, 701 F.3d 974, 979–80 (4th Cir. 2012) (same). The Second Amendment thus incorporates "a common-law tradition that permits restrictions directed at citizens who are not law-abiding and responsible" and "'does not preclude laws disarming the unvirtuous (i.e. criminals).'" *United States v. Bena*, 664 F.3d 1180, 1183–84 (8th Cir. 2011) (quoting Don B. Kates, Jr., *The Second Amendment: A Dialogue*, 49 Law & Contemp. Probs. 143, 146 (1986)); *see also United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as … limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." (quoting Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002))).

**2.** The Supreme Court has recognized the historical tradition of disarming unvirtuous or dangerous citizens. In *Heller*, it endorsed "longstanding prohibitions on the possession of firearms by felons and the mentally ill," among others. *Heller*, 544 U.S. at 626–27. The Court "identif[ied]

these presumptively lawful regulatory measures only as examples; [its] list d[id] not purport to be exhaustive." *Id.* at 627 n.26. In *McDonald*, the Court reiterated that *Heller* "did not cast doubt on" those "longstanding regulatory measures." *McDonald*, 561 U.S. at 786. Likewise, nothing in *Bruen* casts doubt on those longstanding regulations. *See Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that the Court's decision "does not expand the categories of people who may lawfully possess a gun"); *id.* at 2162 (Kavanaugh, J., concurring) (reiterating *Heller*'s statements).

Courts relying on this "'virtuous citizen' theory" have upheld "modern laws banning the possession of firearms by illegal aliens and juveniles—classes of people who might otherwise show, on a case-by-case basis, that they are not particularly dangerous." *Medina*, 913 F.3d at 159. In *National Rifle*, the Fifth Circuit rejected a Second Amendment challenge to § 922(b)(1) and (c)(1), which restrict the ability of people under 21 to buy handguns, calling that restriction "firmly historically rooted." 700 F.3d at 204. The court explained that the regulation "is consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety." *Id.* at 203; *see also Rene E.*, 583 F.3d at 16 (rejecting a Second Amendment challenge to § 922(x), which restricts the ability of people under 18 to possess handguns).[1]

Courts have reasoned similarly for other categorical restrictions similar to, but not included in, *Heller*'s nonexhaustive list of presumptively lawful regulations. *See, e.g.*, *United States v. Portillo-Munoz*, 643 F.3d 437, 439–40 (5th Cir. 2011) (holding that § 922(g)(5)'s prohibition of gun possession by illegal aliens does not violate the Second Amendment); *Yancey*, 621 F.3d at 684–87 (same); *Bena*, 664 F.3d at 1184 (holding that § 922(g)(8)'s prohibition of gun possession by people under domestic-violence protective orders "is consistent with a common-law tradition that the right

---

[1] *Bruen* abrogated *National Rifle* to the extent that it held that a gun regulation could survive a Second Amendment challenge under means-end scrutiny, even if it is not consistent with the nation's historical tradition of gun regulations, and to the extent that it upheld § 922(b)(1) and (c)(1) under the means-end step of the analysis. *See* 142 S. Ct. at 2127 n.4. But the Fifth Circuit was "inclined to uphold the challenged federal laws at step one of our analytical framework," *see Nat'l Rifle*, 700 F.3d at 204, which relied on the historical record and was "broadly consistent with *Heller*," *see Bruen*, 142 S. Ct. at 2127. Nothing in *Bruen* abrogates the Fifth Circuit's or other courts' historical analyses, which were typically considered part of "step one" of courts' pre-*Bruen* Second Amendment tests.

to bear arms is limited to peaceable or virtuous citizens"); *Skoien*, 614 F.3d at 640 (same); *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005) ("Prohibiting unlawful drug users from possessing firearms is not inconsistent with the right to bear arms guaranteed by the Second Amendment."). In the only post-*Bruen* decision so far addressing a Second Amendment challenge to a categorical gun restriction, the court ruled that § 922(g)(3)'s prohibition of gun possession by unlawful drug users squares with historical tradition and so remains lawful. *See United States v. Daniels*, No. 1:22-CR-58-LG-RHWR-1, 2022 WL 2654232, at *4 (S.D. Miss. July 8, 2022).

> **B.** **Section 922(n) squares with the nation's historical tradition of categorical gun restrictions.**

Section 922(n) is analogous enough to historical gun regulations to pass constitutional muster. The constitutional question is not whether § 922(n)'s prohibition has existed since the founding. Rather, courts considering present-day gun regulations must "reason[] by analogy." *Id*. "[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis original); *see also Nat'l Rifle*, 700 F.3d at 196 ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue"). "So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Bruen*, 142 S. Ct. at 2133.

**1.** Like the age-based regulation addressed in *National Rifle*, § 922(n) "is consistent with a longstanding tradition of targeting select groups' ability to access … arms for the sake of public safety." *See* 700 F.3d at 203. Section 922(n)'s legislative history shows that, like other categorical restrictions on select groups, it "reflects a concern with keeping firearms out of the hands of categories of potentially irresponsible persons." *Laurent*, 861 F. Supp. 2d at 82. It thus reflects a permissible legislative judgment that felony indictees are among the potentially unvirtuous citizens whose gun rights the government may restrict. Even still, its narrow and temporary prohibition of receipt burdens far less conduct than the categorical prohibition of *possession* by other groups, like convicted felons.

Although a person who has been indicted but not convicted is presumed innocent, a legislature's decision to restrict felony indictees' gun access is consistent with historical public-safety laws. A grand jury has found probable cause to believe that a felony indictee has committed "the most serious category of crime deemed by the legislature to reflect 'grave misjudgment and maladjustment.'" *Medina*, 913 F.3d at 158 (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)). And, as noted, there is often good reason to "infer a malevolent intent when" someone responds to being indicted by procuring a gun. *See Khatib*, 2012 WL 6086862, at *4.

At the founding, moreover, a felony indictment often foretold far severer consequences for the indictee than the loss of gun rights. The standard punishment for a felony was death. *Medina*, 913 F.3d at 158. ("Capital punishment for felonies was ubiquitous in the late Eighteenth Century and was the standard penalty for all serious crimes." (cleaned up)). It is "difficult to conclude" that the founding generation would have understood those standing accused of capital crimes, and thus facing death if convicted, to enjoy unfettered gun rights. *See id.* To the contrary, those under felony indictment were among the "unvirtuous citizens," *see Yancey*, 621 F.3d at 684–85, whom legislatures could lawfully disarm.

Contrary to Quiroz's argument (*see* Mot. at 12–13), it does not matter that a "mid-Twentieth century" law created the modern federal restriction on receipt of firearms by those under felony indictment. Indeed, § 922(g)(1)'s "prohibition[] on the possession of firearms by felons"—which *Heller* expressly endorsed—has exactly the same historical pedigree as § 922(n)'s restriction on felony indictees. *See* 544 U.S. at 626–27. The federal felon-in-possession law too is "of mid-20th century vintage." *Nat'l Rifle*, 700 F.3d at 196. It "was not enacted until 1938, was not expanded to cover non-violent felonies until 1961, and was not re-focused from receipt to possession until 1968." *Id.*; *see also Skoien*, 614 F.3d at 640 (noting that the "first federal statute disqualifying felons from possessing firearms was not enacted until 1938"). Those same 1938, 1961, and 1968 enactments created and revised § 922(n)'s restrictions on indictees. *See Laurent*, 861 F. Supp. 2d 82–84 (describing § 922(n)'s legislative history). *Heller*'s point in endorsing felon-in-possession laws was not that they had existed in their modern form since the founding but that they were

*analogous enough* to historical regulations to be deemed "longstanding." *See* 544 U.S. at 626–27. So too with § 922(n)'s restrictions on indictees.

**2.** Section 922(n) also squares with the longstanding tradition of restricting the rights— including gun rights—of those charged with serious crimes. The government has always been able to impose "substantial liberty restrictions" on indicted defendants (including detention or, alternatively, conditions of pretrial release) when needed to promote "the operation of our criminal justice system." *United States v. Salerno*, 481 U.S. 739, 749 (1987). Thus, among other things, a federal court can order a person on federal pretrial release to "refrain from possessing a firearm, destructive device, or other dangerous weapon" if needed to "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B)(viii).

Section 3142(c)(1)(B)(viii) supplies a longstanding analogue to § 922(n). It is "relevantly similar" to § 922(n), *see Bruen*, 142 S. Ct. at 2132, though it is narrower in some ways and broader in others. Section 3142(c)(1)(B)(viii) is more targeted than § 922(n) because it requires an individualized risk assessment whereas § 922(n) applies categorically. Yet § 3142(c)(1)(B)(viii) applies more broadly in other ways: it covers anyone charged with a federal crime (not just felonies), whether by indictment, information, or complaint (the latter not requiring a probable-cause finding by a grand jury). And when a court imposes the firearm condition on a pretrial releasee, it bans firearm *possession* and thus directly burdens the core Second Amendment right to keep and bear arms, whereas § 922(n) only bars receipt.[2]

---

[2] Quiroz's district-court cases addressing the Adam Walsh Amendments to Bail Reform Act do not support his Second Amendment claim. (*See* Mot. at 14 (citing *United States v. Kennedy*, 593 F. Supp. 2d 1221, 1230 (W.D. Wash. 2008); *United States v. Arzberger*, 592 F. Supp. 2d 590, 601 (S.D.N.Y. 2008); *United States v. Torres*, 566 F. Supp. 2d 591, 601–03 (W.D. Tex. 2008)).) That law mandates certain pretrial release conditions for defendants charged with certain crimes. *See* 18 U.S.C. § 3142(c)(1)(B). The cited cases held that because the law mandates the conditions without procedural safeguards, it violates the defendant's procedural due-process rights under the Fifth Amendment, and in some instances may violate the Eighth Amendment's excessive-bail clause. The analysis conducted in those cases is inapplicable here: the rights asserted in those cases do not limit Congress's power to define criminal conduct. More, those cases did not address the

States also commonly restrict the gun rights of those charged with serious crimes, and the Supreme Court implicitly endorsed those restrictions in *Bruen*. Although the Court invalidated New York's licensing regime giving officials discretion to deny licenses absent a showing of special need, it noted that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes." *Bruen*, 142 S. Ct. at 2138 n.9; *see also id.* at 2161 (Kavanaugh, J. concurring) ("[T]he Court's decision does not affect the existing licensing regimes—known as 'shall-issue' regimes—that are employed in 43 states."). The Court described those shall-issue regimes as setting "narrow, objective, and definite standards" to ensure "that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Id.* at 2138 n.9 (quotation marks omitted).

Those shall-issue regimes, in turn, work analogously to § 922(n). Among their objective eligibility criteria for obtaining a license, they commonly disqualify those under felony indictment. *See, e.g.*, Tex. Gov't Code Ann. § 411.172(a)(4) (requiring that the applicant "is not charged with the commission … of a felony under an information or indictment"); La. Stat. Ann. § 40:1379.3(C)(10) (requiring that the applicant "not be charged under indictment or a bill of information for any crime of violence or any crime punishable by imprisonment for a term of one year or greater"). Those schemes thus defeat—for anyone under felony indictment—what *Bruen* called the core Second Amendment right to bear arms in public for self-defense. *See* 142 S. Ct. at 2134–35. If the Court views those regimes as consistent with the nation's tradition of gun regulation, then surely it would hold the same for § 922(n), which does not burden the right of public carry but merely bars people from receiving guns once under indictment.

Yet another historical example supports categorically restricting the gun rights of those accused but not convicted of wrongdoing. *Bruen* described mid-19th century "surety statutes," which restricted citizens' gun access based on accusations alone. *See* 142 S. Ct. at 2148–49. The surety statutes required people to post a money bond before carrying a gun once they were

---

Second Amendment, let alone consider whether the gun regulations at issue squared with historical tradition (to the extent they specifically considered the gun regulations at all).

"reasonably accused of intending to injure another or breach the peace." *Id.*; *see also Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017) (explaining that English surely laws required a person "reasonably accused of posing a threat" "to post a bond to be used to cover any damage he might do" by carrying a firearm). These laws offer another imperfect but relevantly similar analogue to § 922(n). While an indictee cannot overcome § 922(n)'s restriction by posting a bond, § 922(n) requires a grand jury-finding of probable cause, a more stringent threshold than the accusation required under the surety statutes. And the surety statutes—like pretrial release conditions and shall-issue licensing regimes—more directly burdened core Second Amendment rights by restricting public carry rather than receipt only.

## Conclusion

This Court should deny Quiroz's Rule 29(c) motion for judgment of acquittal and motion to reconsider motion to dismiss.

Respectfully submitted,

Ashley C. Hoff
United States Attorney

*/s/ Matthew Ellis*
Matthew Ellis N.C./S.C. Bar Nos. 56788/104912
Assistant United States Attorney
2500 North Highway 118, Suite A200
Alpine, Texas 79830
(432) 538-6100 (phone)

## CERTIFICATE OF SERVICE

I certify that on July 25, 2022, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will serve all parties of record.

                                                */s/ Matthew Ellis*
                                                Matthew Ellis N.C./S.C. Bar Nos. 56788/104912
                                                Assistant United States Attorney