IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
PECOS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 4:22-CR-000104 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| JOSE GOMEZ QUIROZ, | ) | |
| | ) | |
| Defendant. | ) | Thursday, June 23, 2022 |
| _____ | ) | 8:22 A.M. |

TRANSCRIPT OF JURY TRIAL
**BEFORE THE HONORABLE DAVID COUNTS**
**UNITED STATES DISTRICT JUDGE**

APPEARANCES:

For the Plaintiff:          United States Attorney's Office
                           BY:  MATTHEW ELLIS, ESQUIRE
                                WILLIAM CALVE, ESQUIRE
                           2500 North Highway 118, Suite 200
                           Alpine, Texas 79830

For the Defendant:          Office of the Federal Public Defender
                           BY:  JACK MEREDITH, ESQUIRE
                           108 North 10th Street
                           Alpine, Texas 79830

Deputy Clerk:              Cristina Lerma
                           United States District Court
                           410 South Cedar Street
                           Pecos, Texas 79772

Transcription Service By:  Dipti Patel, CET-997
                           Liberty Transcripts
                           7306 Danwood Drive
                           Austin, Texas 78759
                           (847) 848-4907
                           www.libertytranscripts.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

INDEX

|                                        | PAGE    |
|----------------------------------------|---------|
| Case called                            | 3       |
| Jury Sworn                             | 4       |
| Preliminary Jury Instructions          | 6       |
| Opening Statements                     |         |
|  By: Mr. Ellis                    | 18      |
|  By: Mr. Meredith                 | 22      |
| Government Rests                       | 124     |
| Defense Rests                          | 130     |
| Defense Rule 29 Motion                 | 125/135 |
| Court's Ruling on Rule 29 Motion       | 125/135 |
| Final Jury Instructions                | 141     |
| Closing Arguments                      |         |
|  By: Mr. Ellis                    | 153     |
|  By: Mr. Meredith                 | 158     |
|  By: Mr. Ellis                    | 162     |
| Jury Retires To Deliberate             | 163     |
| Verdict                                | 165     |
| End of Proceedings                     | 167     |
| Certificate of Transcriber             | 167     |

3

INDEX

Page

WITNESSES

FOR THE GOVERNMENT:

ADRIAN ARMENDARIZ
 Direct Examination by Mr. Ellis                   25
 Cross-Examination by Mr. Meredith                 59
 Redirect Examination by Mr. Ellis                 73
 Recross-Examination by Mr. Meredith               81

MICHAEL STALLARD
 Direct Examination by Mr. Ellis                   86
 Cross-Examination by Mr. Meredith                 92
 Redirect Examination by Mr. Ellis                 94
 Recross-Examination by Mr. Meredith               96

MICHAEL PORTILLO
 Direct Examination by Mr. Calve                   99
 Cross-Examination by Mr. Meredith                111

NATE ANDERSON
 Direct Examination by Mr. Calve                  114
 Cross-Examination by Mr. Meredith                119


FOR THE DEFENDANT:

(None)



EXHIBITS:                                    ID      EVD

FOR THE GOVERNMENT:

1             Form 4473              29      31
2 through 13  Case Agent Records     43      43
14            Arraignment Record     54      55
19            Invoice               103     104
23            Stipulation of Fact   124     124

FOR THE DEFENDANT:

(None)

4

1    **Pecos, Texas - Thursday, June 23, 2022**          **(8:22 a.m.)**

2                    **P R O C E E D I N G S**

3                         ---O0O---

4        (Outside the presence of the jury; defendant present)

5              THE CLERK:  All rise.

6              THE COURT:  All right.  We've got everybody here, the

7    defendant here.  Let's go to work.  Let's bring the jury in,

8    please.

9        (Jury in at 8:22 a.m.)

10             THE COURT:  Please wait to be seated.  We're going to

11   swear you in and we'll all sit down.

12       (Pause)

13             THE COURT:  Thank you.  Now we're all going to be

14   seated, and you all stay standing and raise your right hand,

15   please, to be sworn.

16       (Jury sworn)

17             THE COURT:  Thank you.  You all may be seated.  Thank

18   you.

19             All right.  So as you're putting on your juror badges

20   before us, Mr. Lees (phonetic) is up front, right?

21             MR. LEES:  Yes, sir.

22             THE COURT:  Scoffield, is that how you say it?

23             Mr. Green, Mr. Akins, good.  Mr. Martinez, Mr. Ibarra

24   (phonetic).  And then Ms. Harscott (phonetic), okay, very good.

25   Ms. Margado (phonetic), it's you.  Very good.  Mr. Leyva

5

1    (phonetic), Mr. Moore, Mr. Medina (phonetic), Mr. Huey, Mr. --

2    I'm sorry, Leyva, Moore.

3              We have two Medinas.  Are y'all related?

4              MR. MEDINA:  No.

5              THE COURT:  No.  You had to look at him to make sure,

6    right?

7              Okay.  So you're Santiago Medina.  And then you're

8    (indiscernible).  Okay.  And then Mr. Huey, Ms. Griffin.

9              Okay.  Very well.  Thank y'all for being with us.

10   Great to have you.

11             So each time you come and go, we're going to do it in

12   order so that you're not having to -- you know, if Number 2 or 3

13   comes in late, you know, there's no reason to come in late.

14   You'll have to step around people, so we'll come in in order.

15   We'll go out in order.

16             When we come in, we'll all rise for you because you're

17   the judges of the facts in this case.  And much like they do for

18   me, when the judge comes in, we rise.  And so we'll be standing

19   when you come and go.  And then whenever you come in, if you'll

20   stay standing, we will all sit down together and that way we

21   honor everybody who should be honored.

22             Thank you for being with us.  I appreciate y'all coming

23   back.

24             Members of the jury, you now -- I'm sorry.  We did

25   swear them in.  Okay.

6

1          Members of the jury, you've now been sworn as the jury
2     to try this case.  You and you alone are the judges of the facts.
3     By your verdict, you'll decide the disputed issues of fact.  I
4     will decide all questions of law that arise during the trial.
5     And before you retire to deliberate at the close of the case,
6     I'll instruct you on the rules of law that you must follow and
7     apply in deciding on your verdict.

8          Nothing I may say or do during the trial is intended to
9     indicate nor should be taken by you as indicating what your
10    verdict should be.  Your verdict should be based upon your
11    independent assessments of the facts in this case as applied to
12    the law on which the Court instructs you after conclusion of the
13    case.

14         The evidence from which you'll find the facts will
15    consist of the testimony of witnesses, documents, and other
16    things received into the record as exhibits, and any facts the
17    lawyers agree or stipulate to or that the Court may instruct you
18    to find.

19         Certain things are not evidence and must not be
20    considered by you.  Statements, arguments, and questions by
21    lawyers are not evidence.  Objections to questions by lawyers are
22    not evidence.  Lawyers have an obligation to their clients to
23    make an objection when they believe the evidence being offered is
24    improper under the Rules of Evidence.

25         You should not be influenced by the objection or by the

7

1    Court's ruling on it.  If I sustain an objection, ignore the

2    question.  If I overrule an objection, treat the answer like you

3    would any other.  If you're instructed that some item of evidence

4    is received for a limited purpose only, you must follow that

5    instruction.

6         Testimony determined as excluded or I told you to

7    disregard is not evidence and must not be considered.  Anything

8    you may have seen or heard outside the courtroom is not evidence

9    and must be disregarded.  You'll decide the case solely on the

10   evidence presented here in the courtroom.

11        We have two kinds of evidence, direct evidence and

12   circumstantial evidence.  Direct evidence is direct proof of a

13   fact such as testimony from an eyewitness.  Circumstantial

14   evidence is proof of facts from which you may infer or conclude

15   that other facts exist.  I'll give you more instructions on these

16   as well as other matters at the end of the case.  Have in mind

17   that you may consider both kinds of evidence, direct or

18   circumstantial.

19        It will be up to you to decide which witnesses to

20   believe, which witnesses not to believe, and how much of any

21   witness's testimony to accept or reject.  I'll give you some

22   guidelines for determining the credibility of witnesses at the

23   end of the case, as well.

24        You should give careful attention to the testimony and

25   evidence presented for your consideration during the trial, but

8

1    you should not form or express any opinion about the case one way

2    or the other until only you've heard all the evidence, the

3    closing arguments of the lawyers, and my instructions on the

4    applicable law.

5              Exhibits which I have admitted into evidence during the

6    course of the trial will be available to you for your inspection

7    and review during your deliberation on the verdict.  Under no

8    circumstances, a written transcript of the testimony of witnesses

9    can be made available to and for your review during your

10   deliberations, nor under no circumstances can all or any

11   significant portion of the witness's testimony be read to you

12   once you commence your deliberation.

13             It's therefore very important that you pay strict

14   attention to the testimony given by each witness during the trial

15   of the case.

16             If you would like to take notes during the trial, you

17   may do so.  On the other hand, you're not required to take notes.

18   Each of you should make your own decision about this.  We've

19   given you -- provided for you a little steno pad and a pencil,

20   excuse me, and you're welcome to use that.  You don't have to.

21             Some people will put them underneath the chair and

22   never look down again.  Some people will use them and I say "good

23   morning" and they'll write it down.  So that's just whatever

24   makes you feel comfortable.  Whatever you want to do.

25             You'll be leaving your notebooks in here in your chair

9

1    or underneath until I tell you to retire to deliberate the case.

2    And so you'll leave it here every time you come and go.  You

3    won't be taking them with you.

4            If you decide to take notes, be careful not to get so

5    involved in your notetaking that you become distracted from the

6    ongoing proceedings.  I speak from experience on this.  Your

7    notes should be used only as memory aids.  You should not give

8    your notes precedence over your independent recollection of the

9    evidence.

10           If you do not take notes, you should rely upon your

11   independent recollection of the proceedings and you should not be

12   unduly influenced by the notes of other jurors.  Notes are not

13   entitled to any greater weight than the memory or impression of

14   each juror as to what the testimony may have been.

15           Whether you take notes or not, each of you must form or

16   express your own opinion as to the facts of the case.

17           During the trial, you must not discuss the case in any

18   manner among yourselves or with anyone else.  And you must not

19   let anyone attempt to discuss it with you or even in your

20   presence.

21           And insofar as the lawyers are concerned as well as

22   others you may come to recognize as having some connection with

23   the case, you're instructed that in order to avoid any appearance

24   or impropriety, you should have no conversations whatsoever with

25   those persons while serving on the jury.

1          Oftentimes, in fact, if you see me or someone on the

2    court staff, we'll say hello or good morning and you can say

3    hello or good morning back.  A lot of times if you see the

4    lawyers in the hallway, they'll maybe even turn their head away

5    from you.  That's not to be rude.

6          That's because they know that somebody at the other end

7    of the hallway may not know that you're just saying hello.  They

8    may think it's some type of nefarious conversation.  And so

9    that's the appearance of impropriety we're trying to stay away

10   from that we desperately try to do that.

11         You will notice the court security officers, these

12   good-looking gentlemen -- well, most of them are good-looking --

13   in the navy blue jackets and the distinctive ties.  They're here

14   to help you, and they don't (indiscernible).  If you have

15   questions that you need to ask me or feel you need to bring

16   something to my attention, you tell one of them and they'll get

17   that information to me.

18         You may not attempt to conduct any independent

19   investigation concerning this case.  You must avoid reading any

20   articles that might be published about the case now that the

21   trial's in progress.  You must also avoid listening to or

22   observing any broadcast newspaper program, and these days that

23   can be television, radio, or internet, right, because there's a

24   possible mention by (indiscernible) case during such broadcast.

25         Do not research the case on the internet or post about

1  the case on social media.  The reason for these cautions of

2  course lies in the fact that it will be your duty to decide the

3  case solely on the basis of the testimony and the evidence

4  presented during trial without consideration of any other matters

5  whatsoever.

6          At times during the trial I may be called upon to make

7  rulings of law on motions or objections made by the lawyers.  You

8  should not infer or conclude from any ruling that I may make that

9  I have any opinions on the merits of the case favoring one side

10  or the other.  I don't.  If I sustain an objection to a question

11  that goes unanswered by the witness, you should not speculate on

12  what answer might have been given nor should you draw any

13  inferences or conclusions from the question itself.

14          During the trial, it may be necessary for me to confer

15  with the lawyers at times out of your hearing concerning

16  questions of law or the proceeding that require consideration by

17  the Court alone.  Feel free -- if we have a bench conference or a

18  sidebar conference, feel free to stand and stretch quietly during

19  any such conference.

20          On occasion should I think a private conference may

21  take a little bit longer, for your convenience and comfort, I may

22  excuse you from the courtroom just while I discuss the matters

23  with the lawyers.

24          We'll try to limit those interruptions as much as

25  possible.  But you should remember at all times the importance of

12

1   the matter you're here to determine and should be patient even if

2   the case seems to go slowly at times.  I really don't think that

3   it will.

4           We'll take regular comfort breaks, and there are snacks

5   and beverages in the jury room and all the restrooms.  At ant

6   time, however, that you feel you need to take an unscheduled

7   break, simply raise your hand so that I can see it and I'll take

8   a break at the soonest point possible thereafter.  That typically

9   means within the next few minutes or so.  And if I don't see you,

10  Ms. Lerma (indiscernible) and we're all -- she's talking to me

11  and telling me we've got somebody with their hand raised.

12          I will tell you that several -- a few months back we

13  had a lady that I normally would say, okay, I'm going to get to

14  the next best time to break but she was getting ill.  She was

15  getting sick, and so you could tell from the fear on her face,

16  the look on her face that she needed to go.  And so we stopped

17  everything immediately and got everybody out, got her out first.

18          And so if you need to do that, we're not here to --

19  you're not being held captive, I promise.  We'll make that as

20  comfortable and normally gets nauseous or ill.

21          During the trial -- I'm sorry.  I don't think we have

22  -- Mr. Ellis are there any interpreters that we're going to be

23  using at all?

24          MR. ELLIS:  Not for the Government, Your Honor.

25          THE COURT:  Mr. Meredith, anything from --

13

1          MR. MEREDITH:  There may be for one witness --

2          THE COURT:  Okay.

3          MR. MEREDITH:  -- Judge.

4          THE COURT:  Very good.  Good to know.

5          So we may require the service of interpreters.

6    Although someone who may be bilingual and fluent both in  English

7    and Spanish, you cannot allow yourselves to be distracted from

8    your duties by assuming the task of interpreting.  Do not try to

9    second-guess the interpreters or attempt to render your own

10   interpretation of the testimony you may hear if that in fact

11   happens.

12          As the trial begins, the lawyers for each side will be

13   given an opportunity to make opening statements in which they may

14   explain the issues in the case and summarize the facts they

15   expect the evidence will show.  First, the prosecution may make

16   an opening statement which is again simply an outline to help you

17   understand the evidence the prosecution expects to introduce.

18   It's kind of like a roadmap, here's what the road ahead looks

19   like.

20          And next, the defense attorney may elect to make an

21   opening statement or he can defer his opening statement until

22   after the Government rests its case in chief, should the defense

23   wish to make an opening statement.  Neither party is required to

24   make an opening statement.  If they do, they each get the same

25   amount of time.

1          The Government will then present witnesses and counsel

2     for the defendant may cross-examine them.  Following the

3     Government's case, the defense may, should the defense elect, to

4     present witnesses, and the prosecution will have the opportunity

5     to cross-examine those witnesses.  Subsequently, the Government

6     may decide to present rebuttal witnesses.

7          After all the testimony and the evidence has been

8     presented, the lawyer will then be given another opportunity to

9     address you and make their summations or final arguments in the

10    case.  The statements the lawyers are about to make now, which

11    again are just statements as to what they expect the evidence to

12    be, as well as the arguments they present at the end of the trial

13    which is more persuasive argument summations are not to be

14    considered by you either as evidence in the case which comes only

15    from the witnesses and the exhibits or as your instruction on the

16    law which will come only from me.

17          Nevertheless, these statements and arguments are

18    intended to help you understand the issues and the evidence as it

19    comes in as well as the positions taken by both sides.

20          Will the defendant and counsel please rise?

21          Ms. Lerma.

22          THE CLERK:  In Cause Number PE:22-CR-104, United States

23    of America versus Jose Gomez Quiroz, the Grand Jury charges Count

24    1, on or about December 23rd, 2021, in the Western District of

25    Texas, the defendant, Jose Gomez Quiroz, in connection with the

1    acquisition of a firearm; to-wit, an American Tactical Import

2    Model M1911 semi-auto 22-caliber firearm, Serial Number A-907700

3    from DBA Morrison True Value, a licensed dealer of firearms

4    within the meaning of Chapter 44 Title 18 United States Code,

5    knowingly made a false and fictitious written statement to DBA

6    Morrison True Value located at 301 North Fifth Street, Alpine,

7    Texas 79830, which statement was intended and likely to deceive

8    DBA Morrison True Value as to a fact material to the lawfulness

9    of such acquisition of said firearm to the defendant under

10   Chapter 44 Title 18, and in that the defendant did execute a

11   Department of Justice Bureau of Alcohol, Tobacco, Firearms, and

12   Explosives, Form 4473, Firearms Transaction Record to the effect

13   that on Question 22.B, the defendant indicated --

14            THE COURT:  I'm sorry 21.B.

15            THE CLERK:  Oh, 21.B, the defendant indicated he was

16   not under indictment for a felony when in fact he knew he was

17   under two Pecos County, Texas felony indictments, in violation of

18   Title 18 United States Code Sections 922(a)(6) and 924(a)(2).

19            Count 2, on or about December 30th, 2021 in the Western

20   District of Texas, defendant Jose Gomez Quiroz, who knowingly was

21   under indictment for a crime punishable by imprisonment for a

22   term exceeding one year, did willfully receive a firearm, that is

23   an American Tactical Imports Model M1911 semi-auto 22-caliber

24   firearm, Serial Number A-907700, said firearm having been shipped

25   and transported in interstate commerce in violation of Title 18

1  United States Code Sections 922(n) and 924(a)(1)(D), a true bill

2  signed by the foreperson of the Grand Jury.

3           THE COURT:  Counsel, how does the defendant plead to

4  these charges, guilty or not guilty?

5           MR. MEREDITH:  Not guilty, Your Honor.

6           THE COURT:  Thank you.  You gentlemen may be seated.

7           The Court will call on Mr. Calve, I believe, to begin

8  our opening statements.

9           MR. ELLIS:  Your Honor, the Government wishes to invoke

10 the Rule.

11          THE COURT:  If there are any witnesses that are in the

12 -- any witnesses?

13          MR. MEREDITH:  They are out already.

14          THE COURT:  Okay.  They're already out?

15          MR. MEREDITH:  Yes, sir.

16          THE COURT:  Okay.  Can we get them and bring in?  Are

17 they nearby?

18          UNIDENTIFIED SPEAKER:  Yes, they're her.

19          THE COURT:  Mr. Ellis, would you bring all yours, as

20 well?

21          MR. ELLIS:  Yes, Your Honor.

22      (Pause)

23          THE COURT:  Mr. (indiscernible), let's have them all

24 just come in all the way up here and let's have them all come up

25 and line up across the front here.

1          Y'all, come on up anybody who's a witness.  I noticed

2     there were other witnesses listed, more than this.  So we have

3     others in the building?

4          MR. ELLIS:  Yes, Your Honor.

5          THE COURT:  Okay.  So let's -- y'all come on up and

6     just line across here.  Go all the way across, ma'am.  Thank you.

7          Y'all sit tight for me or stand tight.  We got some

8     more coming, I think.  I hope.  And y'all stare at me, please.

9     I'll stare back.

10          Here come at least one more.  Two more.  Three more.

11     It's like a clown car, they just keep getting out.

12     (Pause)

13          THE COURT:  And your case agent, Mr. Ellis, is he going

14     to testify?

15          MR. ELLIS:  Yes, Your Honor.

16          THE COURT:  All right.  Sir, if you'd come on up, as

17     well?

18          Yeah, just on over here.  If everybody will please

19     raise your right hand.

20     (Witnesses sworn)

21          THE COURT:  Thank you.  You may lower your hands.  Each

22     of you has been sworn to testify truthfully in this trial.  The

23     Rule has been invoked which means you're not going to be in the

24     courtroom unless you're testifying.  You're only going to be here

25     when you're testifying with the exception of the case agent.

1          Sir, you'll be at counsel table.

2          And you're not to speak with anyone about the case

3    except for the attorneys for the duration of the trial.  Don't

4    talk about the facts even with each other even among yourselves.

5    All right?

6          With that, I'll have all of you -- you're excused and

7    you can -- except for you, sir.  And we'll go from there.  Thank

8    you.

9       (Witness excused)

10          THE COURT:  All right.  Thank you.

11          Mr. Calve, you may proceed.

12             OPENING STATEMENT BY THE GOVERNMENT

13          MR. CALVE:  Thank you, Your Honor.

14          Ladies and gentlemen of the jury, good morning.

15          This is a case about a lie and how the defendant told

16    that lie so he could illegally receive a firearm.  You see during

17    this trial, we're going to show you that the defendant made a

18    false statement in writing to deceive a local firearms dealer,

19    and it's because of that deception that he received that gun even

20    though he wasn't supposed to.

21          To show you that, we're going to take you back in time

22    just a little bit to December of this past year.  You're going to

23    hear how at that time the defendant went to a local hardware

24    store over in Alpine and he came in to buy a gun.  You're going

25    to hear how the store gave him what's called the ATF Form 4473

1  which is the form that they always give you when you go to

2  purchase firearms.

3       You're going to hear about how on that form the

4  defendant was asked a series of questions like have you ever been

5  convicted of a felony, are you currently under indictment for a

6  felony, and that once he filled that out, there's a process and

7  what's called the NICS.  You have to go through a regular

8  criminal background check just to make sure that he hadn't been

9  convicted of a felony or you're not currently under indictment

10  for some felony and make sure that the store can actually give

11  you the gun.

12       You're going to hear that where the form asked if

13  you've ever been -- if you're currently under indictment for a

14  felony, the defendant checked the box no saying no, he was not

15  under indictment when in reality, he was under indictment for two

16  felonies and he knew it.

17       You're going to hear that at that point, he signed the

18  form giving his word certifying that all of the information he

19  provided on the form was true and correct when it really wasn't.

20       You're going to hear that days later the defendant's

21  criminal background check was still pending, it was delayed.  And

22  the defendant came back to get the gun from the store.

23       You're going to hear that again he falsely certified

24  that all the information he had given over was true and correct

25  and it's because of that deception that the defendant actually

1  received the gun at that time.  And since he had checked no, the

2  workers at the store didn't know that he was under indictment for

3  a felony and they gave him the gun.

4          You're going to hear that it's at that point not long

5  after that the defendant's criminal background check stated that

6  he should have been denied because he was under indictment for

7  felonies.  And that's when special agents with the ATF began

8  investigating just trying to find the defendant so that they

9  could try to get that gun back.

10         But you'll hear that in their investigation, the ATF

11 determined that it seemed like the defendant was evading them,

12 that he didn't want to be found because he knew he made that

13 false statement on the form and he knew that he was currently

14 under indictment and shouldn't have been receiving firearms.

15         You're going to hear that the defendant was finally

16 arrested, and the fun that he lied to get from the dealer was

17 never found.

18         Now the Judge in this case has told you that -- has had

19 the indictment read just a moment ago.  You heard that the

20 defendant is charged with two different crimes.  You heard that

21 the first one is making a false statement in connection with the

22 purchase of a firearm.

23         That's because we're going to show you that the

24 defendant in trying to buy that gun, he made a false statement on

25 the paperwork that I've been talking to you about.  He claimed

1    that he was not under indictment, but he was and he knew it for

2    two different felonies.

3           And we're going to show you that he knew he was under

4    indictment because in those cases, he had been indicted for he

5    was signing paperwork to get bonds and he'd even appeared in

6    front of the judge in connection with his indictment.

7           Now the second crime that the defendant is charged with

8    today is illegally receiving a gun while under indictment.

9    That's because we're going to show you that the defendant did

10   actually receive that gun even though he was under indictment and

11   he knew it.

12          We'll show you that he knew it again through the use of

13   those documents that he had in connection with his indicted

14   cases.  But even in spite of that, he illegally received the

15   firearm.  That's the second count that he's charged with in this

16   particular case.

17          We're also going to show you that ATF once they started

18   looking for him found that he seemed to be evading them, that he

19   knew he was doing wrong and hadn't been supposed to get a hold of

20   that gun.

21          We're going to show to you that both of those crimes

22   were committed by this defendant beyond a reasonable doubt

23   because, after all, this is a case like I told you at the

24   beginning that's all about a lie and how the defendant used that

25   lie to illegally receive a firearm.  That is what the evidence in

22

1   this case is going to show.

2        And that's why at the end of this trial, we're going to

3   come back in front of you and we are going to ask you that you

4   find the defendant guilty on both counts in the indictment.

5        Thank you.

6        THE COURT:  Thank you, Mr. Calve.

7        Mr. Meredith, do you wish to make your opening

8   statement?

9             OPENING STATEMENT BY THE DEFENSE

10       MR. MEREDITH:  Good morning, everyone.

11       I got to get my two different pair of glasses.  I can't

12  do bifocals, so I have to switch back and forth so I can see long

13  distance and short distance.

14       Counsel for the  Government is right and you already

15  heard about what the charges are.  There are two charges, the

16  receipt of a firearm under -- while under indictment for a felony

17  and making a false statement on a document to acquire a firearm

18  while under indictment.  That's the false statement that they're

19  alluding to.

20       This is, just to be clear like what we talked about

21  when we talked the other day, this is a federal charge.  This is

22  a federal prosecution; it's not a state charge.  And the

23  Government's lawyer is correct.

24       I'm sorry, how do you say your last name?

25       MR. CALVE:  Calve.

1          MR. MEREDITH:  Calve.  Was right about the reasonable

2     doubt part that we did also talk about that, as well.

3          And when we get through with the evidence and the Judge

4     gives you the final instructions before you deliberate, he's

5     going -- there's about eight, ten pages of things that he's going

6     to tell you that you need to follow.  And in the part about the

7     guilty-not guilty part, there's the elements -- the parts of the

8     offenses are broken down into different parts.  They call those

9     elements.

10          And there's going to be two or three or four or five

11     different elements.  And the one that I want you to pay close

12     attention to, I mean a lot of things that Mr. Calve talked about

13     are going to be presented.  You're going to see some of that

14     stuff.  But I want you also to think about things that you don't

15     see and pay particular attention to what Mr. Quiroz knew in terms

16     of the evidence that's put forward both by the Government and by

17     the defense.

18          This is a -- the reasons for the presumption of

19     innocence and the requirement to prove every element beyond a

20     reasonable doubt is important.  And in the knowledge part of

21     that, it has to be -- and I'm going to argue this that the

22     Government hasn't met that burden, is that he had to know that he

23     was under indictment and he had to understand what being under

24     indictment meant.

25          Thank you.

24

1          THE COURT:  Thank you, Mr. Meredith.

2          Mr. Ellis, your first witness.

3          THE COURT:  Yes, Your Honor.

4          The Government calls ATF Special Agent Adrian

5     Armendariz.

6          THE COURT:  Agent Armendariz.

7          Mr. Ellis, you may proceed whenever you're ready.

8          MR. MEREDITH:  I'm sorry, Judge.  Can we do some

9     logistical moving stuff around?

10          THE COURT:  Yes, sir.

11          MR. MEREDITH:  So I can see.

12          THE COURT:  Can you all see?

13          MR. MEREDITH:  So I can be able to see --

14          THE COURT:  Absolutely.  Whatever you need to do.

15          You can move your chair around.

16          MR. ELLIS:  I can try and pull it back some.

17          MR. MEREDITH:  If you pull it back, it would be best,

18     really.

19          THE COURT:  Just don't interfere with Mr. Quiroz's --

20          UNIDENTIFIED SPEAKER:  Watch the cord.

21       (Pause)

22          MR. MEREDITH:  That's good.

23          THE COURT:  All right.  Very good.

24          (Indiscernible), Mr. Ellis.

25     ADRIAN ARMENDARIZ, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

1                         DIRECT EXAMINATION

2    BY MR. ELLIS:

3    Q    Good morning.

4    A    Good morning.

5    Q    Can you state your full name for the record and spell it,

6    please?

7    A    Adrian Lopez Armendariz; last name is A-R-M-E-N-D-A-R-I-Z.

8    Q    How are you currently employed?

9    A    I'm a special agent with the Bureau of Alcohol, Tobacco,

10   Firearms, and Explosives.

11   Q    And how long have you been with the ATF?

12   A    A little over six years.

13   Q    Did you have to complete a formal training program to become

14   a federal agent with the ATF?

15   A    Yes, sir.

16   Q    And what was that?

17   A    It was three months of a general investigators course and

18   then an additional four months of specialized ATF investigator.

19   Q    And when you say specialized ATF investigator, what kind of

20   crimes would that specialized training be about?

21   A    Firearms possession, explosives, and arson investigation.

22   Q    Do you have any other law enforcement experience?

23   A    Yes, sir.

24   Q    And what was that with?

25   A    I was -- for over eight and a half years, I was a police

1    officer in Arlington, Texas.

2    Q    So how many total years of law enforcement experience do you

3    have?

4    A    A little over 15 or coming up on 15.

5    Q    And can you briefly explain some of your job duties and

6    responsibilities as an ATF special agent in this area?

7    A    I investigate various federal firearms violations to include

8    persons in possession of illegal or illegally possessing

9    firearms, possessing machine guns, parts that make firearms

10   machine guns.

11       I investigate a lot of gun trafficking investigations where

12   people purchase firearms for other persons and then traffic them

13   either to Mexico or move them to other -- and to other prohibited

14   persons.

15   Q    Were you working as an ATF special agent on January 5th of

16   2022?

17   A    Yes, sir.

18   Q    And can you tell the jury how you became involved in this

19   case personally?

20   A    Yes, sir.

21       I was referred what we call an FBI NICS referral.  What it

22   is is it's a report that states someone purchased a firearm that

23   may or may not be prohibited and it's forwarded for ATF to do

24   further investigation.

25   Q    And you said when they purchase it.  Is there a NICS

Armendariz - Direct/Ellis                    27

1    referral also if they attempt to purchase?

2    A     Correct.

3    Q     Okay.

4          And what was this NICS referral specifically for that you

5    received on the 5th?

6    A     It was for Jose Gomez Quiroz.

7    Q     And what did he do?

8    A     The referral stated that Mr. Quiroz acquired a firearm from

9    a dealer in Alpine, Texas called True Value Morrison or Morrison

10   True Value.  The firearm was -- initially, the purchaser was

11   delayed and then the purchaser actually acquired the firearm

12   after the delayed timed out.

13   Q     And what does that mean by he was delayed?

14   A     When a person acquire or attempts to acquire a firearm, they

15   had to go through an FBI NICS background -- background check.

16         They typically -- the three forms of processing for the FBI

17   NICS is you either get a proceed which is you run your background

18   and it's clear and you receive the firearm.

19         You get denied which means maybe it's something flagged in

20   your criminal history that says you -- there's -- your criminal

21   history reflects you cannot acquire -- you cannot acquire it.

22         And there's another one called delayed.  Delayed is where

23   there's something in your criminal history that requires a little

24   more investigation and either FBI can clear it up or ATF ends up

25   clearing it up and seeing if the person is prohibited or not.

Armendariz - Direct/Ellis                                28

1    Q    And in this case, did he FBI or the ATF clear it up?

2    A    It -- it was forwarded up to ATF to clear it up.

3    Q    And that's how you received it?

4    A    Yes, sir.

5    Q    And in your investigation, did you ever identify the subject

6    that was in the referral?

7    A    Yes, sir.

8    Q    And who was it?

9    A    Jose Gomez Quiroz.

10   Q    And did you personally identify him?

11   A    Yes, sir.

12   Q    And is he in the courtroom today?

13   A    Yes, sir.

14   Q    Could you identify him?

15   A    He's the male in the gray suit.

16           MR. ELLIS:  Your Honor, the Government would have the

17   record reflect that the defendant was identified.

18           THE COURT:  The record shall so reflect.

19   BY MR. ELLIS:

20   Q    And how did you identify him?

21   A    I matched up the driver's license information that was on

22   the form he used, Mr. Quiroz used to complete the form to acquire

23   the firearm and with the driver's license I queried or I received

24   through NCIC.

25   Q    And when you say the form, what form is that?

Armendariz - Direct/Ellis                                    29

1    A    It's called the Firearm Transfer Record and we -- and ATF

2    referred to it as the ATF Form 4473.

3    Q    I would like to direct you to the exhibit folder in front of

4    you to Exhibit Number 1.

5    A    Yes, sir.

6    Q    Do you recognize that?

7    A    Yes, sir.

8    Q    You might have to pull it out of the plastic sleeve --

9    A    Yes, sir.

10   Q    -- that you're holding.

11   A    Gotcha.

12   Q    And if you will just flip through it and take a look at it

13   and let me know when you're finished looking at it.

14   A    (Reviewing document)

15        Yes, sir.

16   Q    Do you recognize that?

17   A    Yes, sir.

18   Q    What is it?

19   A    The first page is a certificate of authenticity or domestic

20   records that was filled out by the custodian of record of the

21   True Value Morrison that was the gun store in which the firearm

22   was acquired.

23   Q    All right.  So that's the first page.  What is also with

24   that page?

25   A    The second page is -- is the firearm transfer record, also

Armendariz - Direct/Ellis                    30

1    known as the 4473.

2    Q    All right.  And was this record made at or near the time in

3    which the form was completed by someone with personal knowledge

4    during the transaction?

5    A    Yes, sir.

6    Q    And was the record kept in the course of a regularly

7    conducted activity of a business?

8    A    Yes, sir.

9    Q    And was this record a regular practice of this activity?

10   A    Yes, sir.

11   Q    And based on your training and experience as an ATF special

12   agent, are federal licensed firearm dealers required to keep

13   these forms in the regular course of their business?

14   A    Yes, sir.

15   Q    And do you have personal knowledge as to who filled this

16   certificate out?

17   A    Yes, sir.

18   Q    And who was that?

19   A    Steve Lazaba (phonetic).

20   Q    And how do you have personal knowledge of him filling it

21   out?

22   A    I was present when he signed and provided me the form.

23           MR. ELLIS:  Your Honor, the Government moves to admit

24   Government's Exhibit 1 into evidence.

25           THE COURT:  Mr. Meredith?

1           MR. MEREDITH:  No objection.

2           THE COURT:  Government's Exhibit 1 is admitted without

3     objection.

4         (Government's Exhibit 1 admitted into evidence)

5           MR. ELLIS:  We'd ask to publish it to the jury.

6           THE COURT:  Yes, sir.  You may.

7     BY MR. ELLIS:

8     Q    I want to direct you to the ATF form.

9     A    Yes, sir.

10    Q    What question was it that you stated -- well, I don't think

11    you have stated it yet.

12         Which question was called into question on this form?

13    A    Question 21.B.

14    Q    Okay.

15          MR. ELLIS:  Could we turn to Page 2.  It would be right

16    there.

17    BY MR. ELLIS:

18    Q    All right.  I'd like to direct you to Question 21.B.

19    A    Yes, sir.

20    Q    Are you able to read it?

21    A    Yes, sir.

22    Q    Can you read what Question 21.B asks?

23    A    "Are you under indictment or information in any court for a

24    felony or any other crime for which the judge could imprison you

25    for more than one year or under -- or are you a current member of

Armendariz - Direct/Ellis                    32

1   the military who has been charged with violations of the Uniform

2   Code of Military Justice, and whose charges have been referred to

3   a General Court Martial."

4   Q    Now see, there's two boxes to the right.  One looks like

5   it's for yes, one looks like it's for no.  Which box is checked?

6   A    No.  No.

7   Q    Okay.  And what does that mean to you?

8   A    The person identified that they were not under felony

9   indictment.

10  Q    Okay.  What if anything did you do after receiving this NICS

11  referral and this copy of the 4473 to verify the information

12  provided?

13  A    I contacted -- I contacted the gun dealer and asked if they

14  had any additional phone numbers in order to contact the person

15  who completed the form which is Mr. Quiroz.  And they provided me

16  several numbers in order to contact Mr. Quiroz.

17  Q    Was there anything else that you did?  Did you review

18  anything about the defendant?

19  A    I requested court records from the county to see if when you

20  receive the referral, it provided -- it provided the indictments

21  -- the indictment information for which he was -- he was flagged

22  for being possibly prohibited.  So I contacted that Court and

23  asked for any and all records showing if Mr. Quiroz was under

24  indictment or convicted of any felon currently -- or convicted of

25  any felonies.

1  Q     What information did you receive?

2  A     I received copies of indictments out of the Pecos County

3  showing that Mr. Quiroz was indicted for burglary of a

4  habitation, felony burglary of a habitation and felony bail

5  jumping, failure to appear.

6  Q     And when you say that you made contact with the True Value

7  store, did you ascertain whether they were a licensed firearm

8  dealer at the time?

9  A     Yes, sir.  We have access to our licensing system, our

10  federal firearms licensee system.  We can see if they're a

11  licensed dealer.  And at the time, he was a licensed dealer.

12  Q     All right.  And when you reached out and spoke with the True

13  Value store, who did you speak with?

14  A     I spoke to a Mr. Portillo who was the actual person who was

15  present when Mr. Quiroz completed the form, and was the employee

16  who actually transferred the firearm to Mr. Quiroz.

17  Q     And did you do anything to verify if the defendant was the

18  actual applicant present at the time that the form was filled

19  out?

20  A     We conducted -- several days later, we conducted a photo

21  lineup with Mr. Portillo.  And Mr. Portillo identified Mr. -- the

22  photo of Mr. Quiroz as the purchaser.

23  Q     What if anything did you do during the photo lineup?

24  A     I provided -- prior to the photo lineup, I provided

25  instruction on how to perform the lineup, how it was going to be

Armendariz - Direct/Ellis                    34

1   performed to both Mr. Portillo and to the blind administrator.

2   Q    So after you conducted the photo lineup and meeting with Mr.

3   Portillo, did you make any attempts to contact the defendant

4   regarding this case?

5   A    Yes, sir.

6   Q    And what actions did you do to try to make contact?

7   A    I made two attempts on two separate days to make contact

8   with Mr. Quiroz.  I went to the address that was listed on the

9   4473, made contact with his mother who stated that he lived, Mr.

10  Quiroz lived in the back portion of the property.  We knocked on

11  -- on the trailer in which she identified as being his residence,

12  then we -- there's some other RVs that were parked in the back of

13  the property.

14       We knocked on all those doors to see if Mr. Quiroz was

15  present.  We made contact with -- on both occasions, we made

16  contact with persons that were living in one of the RVs in the

17  back, but were never able to get in contact with Mr. Quiroz.

18       Each time I presented a -- I left a business card with the

19  persons I contacted asking that they would call -- asking to give

20  to Mr. Quiroz or ask him to tell him to call me back so we can

21  discuss his -- the violation.

22  Q    So I believe you just stated both times.

23  A    Yes, sir.

24  Q    So did you go to his residence more than once?

25  A    Yes, sir.

1   Q    And do you recall speaking to anyone at the residence?

2   A    Yes, sir.  The first time we made contact with his mother.

3   A female identified herself as his mother, and then I gave her a

4   business card.  I explained to her that to please have him --

5   have Mr. Quiroz call me.  And then the second time we met with

6   the mother again, and I asked her if she had received -- I asked

7   her if she -- if she had spoke to her son.  She said she had.

8   And then she said that -- that he had the card that I had left.

9        And then the first time I made contact with the subject that

10  refused to open the door in one of the RVs.  I asked -- told him

11  I was going to leave a business card on his door, to please tell

12  him to give it to him.  And as he was yelling out the RV, he said

13  yes.  Jose lives there in the big trailer.  And he agreed that he

14  would give him the card.

15       The second time we met another subject who is standing

16  outside.  And he again said yeah, Quiroz lives in the back, or in

17  the same trailer.  And we gave him a card and said please give --

18  tell Mr. Quiroz to call or contact us.

19  Q    So based on your training and experience after multiple

20  attempts by telephone and in-person visits, and leaving your

21  business card, what did that indicate to you?

22  A    That he was avoiding a law enforcement contact.

23  Q    And what if anything at that point did you do?

24  A    We spoke with the local law enforcement.  They were with us

25  when we were -- each time we would knock on the door.  They were

1   familiar with Mr. Quiroz.  And I asked them if they knew any

2   other addresses that we could go to to knock and see if he lives

3   with somebody, a girlfriend or something.

4        We went to another address that -- of a female that was

5   supposed to be his girlfriend, made contact with her and some of

6   our relatives, explained the situation again and gave a card to

7   -- to them, as well.

8   Q    And what did you do then?

9   A    After that, I went ahead and referred the case for

10  prosecution to the AUSA's Office.

11  Q    And is that your normal process?

12  A    Yes, sir.

13  Q    And do you always attempt to try to locate the person before

14  referring it for prosecution?

15  A    Yes, sir.

16  Q    And why is that?

17  A    With NICS referrals, a lot of times they are -- there are

18  mistakes.  Sometimes NICS are FBI will say someone -- it looks

19  like someone is prohibited because they're convicted of something

20  when really it was a deferred adjudication, or sometimes it's

21  even mistaken identity.  Someone's first and last name matches,

22  but the Social Security doesn't match, the date of birth doesn't

23  match.

24       So we typically -- we always call the purchaser first, get

25  the whole story.  Sometimes they just don't -- sometimes the NICS

Armendariz - Direct/Ellis                    37

1  referral, it shows to be invalid.  So we end up closing the case

2  out.

3  Q    And then in your six years with the ATF, how many of these

4  cases have you brought forward for prosecution?

5  A    This will be my second.

6  Q    So is it fair to say the vast majority of these you're able

7  to make contact with the purchaser.  And when you do, you do not

8  bring prosecution against them?

9  A    Correct.

10 Q    During your subsequent investigation after being unable to

11 make contact with him, did you verify the defendant was actually

12 under indictment?

13 A    Yes, sir.

14 Q    And where was he under indictment?

15 A    It was out of Pecos County, Texas.

16 Q    And what was he under indictment for?

17 A    One was for burglary of a habitation back in 2020.  And then

18 bail jumping or failure to appear back in 2021.

19 Q    And how did you verify that he was under indictment?

20 A    I received copies of several documents including the copies

21 of the indictments and copies of court dockets.

22 Q    And were these, like, photocopies or were they actual sealed

23 public records from the Court?

24 A    I received both.  The Courts would send me something via

25 email, and then I also requested certified with the seal

Armendariz - Direct/Ellis                    38

1    documents.

2    Q    I'd like to direct you back to the exhibit binder.  If you

3    could please, it's going to take a little bit, could you review

4    Exhibits 2 through 13?

5    A    Yes, sir.

6    Q    Completely and let me know when you have finished reviewing?

7         (Pause)

8              MR. MEREDITH:  Judge, I guess this is a good time to

9    ask to approach.

10             THE COURT:  Yes, sir.

11             Y'all feel free to stand and stretch if you want,

12   you're welcome to.  This will just be real quick.

13        (Bench conference at 9:10 a.m.)

14             THE COURT:  Out of the presence of the jury.  Yes, sir?

15             MR. MEREDITH:  I'm sorry.

16             THE COURT:  It's all right.

17             MR. MEREDITH:  I'm going to object to a number of these

18   exhibits coming up.  And the ones I'm going to object to are 8,

19   9, and 12, and 13.  12 and 13, Judge.

20             THE COURT:  Oh, 12 and 13.  Yeah.

21             MR. MEREDITH:  And the reason for the objection is that

22   these are testimonial -- this is testimonial evidence that's

23   being offered to prove an element of the crime that he was under

24   indictment.

25             My argument is that it violates the confrontation

1  clause, and it violates Crawford because they need to bring the

2  people here who filled those out, and we don't have a chance to

3  cross-examine them.

4          THE COURT:  Mr. Ellis, how do you plan to offer those?

5          MR. ELLIS:  These would be offered as public records,

6  Your Honor.  They're sealed by the County and --

7          THE COURT:  Softer.

8          MR. ELLIS:  -- they're kept in the regular course of

9  business by the Court.  They're not testimonial.  These are the

10  records that are literally kept by the Court when a hearing

11  happens or anything happens.

12          THE COURT:  And you'd offer it through this witness?

13          MR. ELLIS:  Yes, Your Honor.  He's the one -- he

14  received them, he asked for them, the certified copies.  He

15  reviewed them during the course of his investigation.

16          THE COURT:  And did you give most of these to Mr.

17  Meredith?

18          MR. ELLIS:  I did.  Yes, Your Honor.

19          THE COURT:  When?

20          MR. ELLIS:  In our Government's prospective trial

21  exhibit list.  And I notified that we were going to be submitting

22  them through public records.

23          THE COURT:  When was that?

24          MR. ELLIS:  I don't know the exact date, Your Honor.  I

25  would have to --

Armendariz - Direct/Ellis                    40

1          THE COURT:  Was it yesterday or --

2          MR. ELLIS:  No, this was a couple weeks ago.

3          THE COURT:  Okay.  Mr. Meredith?  Do you have any --

4          MR. MEREDITH:  I think that they're --

5          THE COURT:  They're public records.  They're --

6          MR. MEREDITH:  They're using the Rules of Evidence to

7   get this in.  And the Constitution trumps the Rules of Evidence.

8   And I think that's what's Crawford's all about.  And that's why

9   we have to be able to be allowed to cross-examine the person that

10  made the record.

11         THE COURT:  Okay.  Well, I'll overrule your objection

12  as to 8, 9, 12, and 13.  But I haven't heard the -- I mean, they

13  haven't been proved up yet to me.  I mean, you're doing this in

14  anticipation because you've had notice of them.  And so the

15  Defense has had the opportunity to complain.  Have you mentioned

16  any complaints to Mr. Ellis about those, knowing that he was

17  going to prove them as a public record?

18         MR. MEREDITH:  Not up until right now.  I didn't find

19  it out until yesterday that I was going to do this.

20         THE COURT:  Oh, okay.  That you were going to do it,

21  meaning that he was going to.

22         MR. MEREDITH:  Someone who knows the law better than I

23  do told me, Judge.

24         THE COURT:  Throw in that confrontation clause thing.

25         MR. MEREDITH:  Right.

Armendariz - Direct/Ellis                           41

1            THE COURT:  I understand.  So I'll respectfully

2    overrule the objection.  That doesn't keep you from objecting

3    obviously --

4            MR. MEREDITH:  I'll do that when they come up.

5            THE COURT:  Yes, sir.  Thank you.

6       (Bench conference ends at 9:13 p.m.)

7            MR. ELLIS:  Thank you, Your Honor.

8    BY MR. ELLIS:

9    Q    Did you have a chance to examine Exhibits 2 through 13?

10   A    Yes, sir.

11   Q    And what are they?

12   A    They're copies of the judicial documents received during

13   this investigation associated with Mr. Quiroz.

14   Q    And are these documents that you reviewed and relied on

15   during the course of your investigation?

16   A    Yes, sir.

17   Q    Do each of the exhibits bear a seal purporting to be that of

18   the United States, any state district, commonwealth, territory,

19   ancillary possession of the United States or a department,

20   agency, or officer of any entity I previously listed?

21   A    Yes, sir.

22   Q    And which seal would that be of?

23   A    Well, the Seal of the District Court, County of Pecos,

24   Texas.

25   Q    Do each contain a signature purporting to be an execution or

Armendariz - Direct/Ellis                    42

1    attestation?

2    A    Yes, sir.

3    Q    And are you able to read it and tell us what the stamp or

4    who it is that signed it?

5    A    Looks like it's Betty Gutierrez (phonetic) or --

6    Q    And who is that?  Does it state her role?

7    A    District Clerk.

8    Q    The deputy, or the clerk?

9    A    It says District Clerk, Pecos County by Deputy.

10   Q    Deputy, okay.  And are these true and correct copies of the

11   same documents you reviewed during the course of your

12   investigation?

13   A    Yes, sir.

14            MR. ELLIS:  Your Honor, the Government moves to admit

15   Government's Exhibit 2 through 13 into evidence.

16            THE COURT:  Mr. Meredith?

17            MR. MEREDITH:  The Defense is going to object to the

18   Proposed Number 8, 9, 12, and 13 for reasons previously stated.

19            THE COURT:  And as to the remainder, no objection?

20            MR. MEREDITH:  No objection to the others, Your Honor.

21            THE COURT:  Government's Exhibits 2 through 7 are

22   admitted without objection.  8 and 9 are admitted with objection.

23   10 and 11 are admitted without objection.  12 and 13 are admitted

24   -- 10 and 11 are admitted without objection.  12 and 13 are

25   admitted with objection.

Armendariz - Direct/Ellis                    43

1      (Government's Exhibits 2 through 13 admitted into evidence.)

2              THE COURT:  Mr. Meredith, did I get that right?

3              MR. MEREDITH:  Yes, Your Honor.

4              MR. ELLIS:  Yes, Your Honor.

5              THE COURT:  Thank you.

6      BY MR. ELLIS:

7      Q    I'd like to direct your attention to Exhibit 2.

8      A    Yes, sir.  I'm sorry.  I thought you said something, Your

9      Honor.  Are we good to present?

10             THE COURT:  Just one second.

11             THE WITNESS:  I'm sorry.

12     BY MR. ELLIS:

13     Q    Are you at Exhibit 2?

14     A    Yes, sir.

15     Q    What is this?

16     A    It's the indictment for Jose Gomez Quiroz for felony charge

17     of burglary of a habitation.

18     Q    All right.  And what is the cause number for that

19     indictment?

20     A    Cause number is P-4081-112-CR.

21     Q    And how do you know that th is is the indictment for the

22     defendant?

23     A    Because it lists his identify -- or it lists his first and

24     last -- first, middle, and last name and his date of birth.

25             MR. ELLIS:  Your Honor, the Government wishes to

1    publish Exhibit Number 2 to the jury.

2                THE COURT:  You may publish any of these 2 through 13

3    that have been admitted.

4                MR. ELLIS:  Thank you, Your Honor.

5                Can you zoom in on the indictment part?  The title and

6    date.

7    BY MR. ELLIS:

8    Q    It says the defendant.  And what name does it provide?

9    A    Jose Gomez Quiroz.

10   Q    The date of birth?

11   A    June 30th, 1983.

12   Q    And did you verify, is this the defendant's name and date of

13   birth?

14   A    Yes, sir.

15   Q    All right.  And what is the felony charge?

16   A    Burglary of a habitation.

17   Q    All right.  I'll have you flip to -- actually, let's go to

18   the very bottom where the signature is above it.  Yeah, right

19   there.  And is it signed by a presiding juror?

20   A    Yes, sir.

21   Q    And in your experience, what does that mean?

22   A    That means that he was true billed, that the indictment was

23   approved.

24   Q    What does true bill mean?

25   A    that the juror -- that the grand jury felt that there was

 1  probable cause for the charge.

 2  Q     Now I'd like to direct your attention to Exhibit 3.

 3            MR. ELLIS:  If we can zoom in on the same area.

 4  BY MR. ELLIS:

 5  Q     And what is this document?

 6  A     It's also an indictment for Jose Gomez Quiroz.

 7  Q     And what is it an indictment for?

 8  A     Felony charge of bail jumping/failure to appear.

 9  Q     What is the cause number in this indictment?

10  A     P-4248-112-CR.

11  Q     And how do you know that this is an indictment for this

12  defendant?

13  A     It identifies his full name and date of birth.

14  Q     And it's the same as the other?

15  A     Yes, sir.

16  Q     Is it the same name, date of birth that he provided on his

17  ATF form?

18  A     Yes, sir.

19  Q     And is it signed by a presiding juror?

20  A     Yes, sir.

21  Q     And what does that mean to you?

22  A     That there was probable cause for the charge.

23  Q     And do you know roughly how long after the first indictment

24  was the second indictment?

25  A     I knew it was the following year.

Armendariz - Direct/Ellis                          46

1    Q    About a year?

2    A    Yes, sir.

3    Q    All right.  I'll have you turn to Exhibit 4.  And what is

4    this?

5    A    It's bail bond paperwork.

6    Q    And do you know what it's bail bond paperwork for?

7    A    Felony charge of burglary of a habitation for Mr. Jose

8    --Jose Quiroz.

9    Q    And who is listed on this bail bond paperwork as the

10   principal?

11   A    The principal?

12        MR. ELLIS:  You can just zoom back in where you just

13   were.

14        THE WITNESS:  Are we on number --

15   BY MR. ELLIS:

16   Q    I'll direct you.  So right under county district it says,

17   "That we."

18   A    Let me see.  Oh.  Understood.

19   Q    Do you --

20   A    Yes, sir.  Jose Quiroz.

21   Q    So who's listed as the principal?

22   A    Jose Quiroz.

23   Q    And it's for what charge?

24   A    Burglary of a habitation.

25   Q    And does this bail document identify what type of charge

Armendariz - Direct/Ellis                    47

1   that is?

2   A    Yes, sir.

3   Q    What is it?

4   A    Felony as underlined.

5   Q    And is there any other identifying marks on the document

6   that you used during the course of your investigation?

7   A    Sorry.  I don't understand the question.

8   Q    Okay.  So during the course of the investigation, what made

9   you believe that the defendant knew of this document?

10  A    It proves that he signed it.

11  Q    And the address provided?

12  A    Matches the address that was listed on his 4473.

13  Q    And can you please turn to Exhibit 5?

14  A    Sure.

15  Q    What is this document?

16  A    It's bail bond paperwork, as well.

17  Q    And who's listed as the principal in this bail bond?

18  A    Jose Gomez Quiroz.

19  Q    And does this document notate what the bail bond is for?

20  A    Yes, sir.

21  Q    And what is that?

22  A    It says bail jumping, failure to appear.

23  Q    And is there any identifying numbers or marks on the

24  document?

25  A    It provides Mr. Quiroz's driver's license number.

Armendariz - Direct/Ellis                                48

1    Q    Anything else?

2    A    And his date of birth.

3    Q    And --

4    A    And his social.

5    Q    And did you verify that information during the course of

6    your investigation?

7    A    Yes, sir.

8    Q    And was it in fact the defendant's information?

9    A    Yes, sir.

10   Q    I'd like to direct you now to Exhibit 6.  And what is this?

11   A    It is a copy of a criminal docket.

12   Q    Do you know what it's a copy of a criminal docket for?

13   A    Yes, sir.  The offense charge of burglary of a habitation.

14   Q    And how do you know that?

15   A    It's listed under offense.

16   Q    And is there any other numbers that ties it to the

17   defendant?

18   A    Yes, sir.  It lists the defendant's name and also is

19   associated where this is the same case number as the indictment.

20   Q    I'd like to direct you down to the entry for September 15th

21   of 2020.

22   A    Okay.

23   Q    Can you read what that says?

24   A    D present, arraigned, NG entry.

25   Q    And did you know what that meant when you first got the

Armendariz - Direct/Ellis                    49

1   document?

2   A    Initially, no.  Then I had to get clarification.

3   Q    And who'd you get clarification from?

4   A    With one of the clerks from the court.

5   Q    One of the same clerks that would have sent the documents?

6   A    Yes, sir.

7   Q    I'd like to now direct you to Exhibit 8.  And what is this?

8   A    It's a form for discovery.

9   Q    And how do you know this?

10  A    It lists -- it's titled discovery, and it lists the State of

11  Texas vs. Jose Gomez Quiroz.

12  Q    And does it give a cause number?

13  A    Yes, sir.

14  Q    What cause number's given?

15  A    P-4081-112-CR, the same cause number associated to the

16  burglary charge for Mr. Quiroz.

17  Q    I would like to direct you --

18       MR. ELLIS:  If you'll zoom out.

19  BY MR. ELLIS:

20  Q    I would like you to read what the Court has certified as was

21  delivered to the defendant in this case.

22  A    It says the one indictment P12, bond P1A --

23  Q    What did you take that as meaning.

24  A    That Mr. Quiroz's attorney was provided a copy of an

25  indictment and bond paperwork.

1    Q    I'd like to direct you to Exhibit 9.  What is this?

2    A    Discovery paperwork.

3    Q    The same type that we just reviewed?

4    A    Yes, sir.

5    Q    Is it for a different charge?

6    A    Yes, sir.

7    Q    How do you know?

8    A    Because the cause number matches what the cause number for

9    the bail jumping charge.

10   Q    And I would like you to go down again and read one and two

11   as to what was turned over.

12   A    Indictment P1 and bond P1A.

13   Q    And during the course of your investigation, what did you

14   take that as meaning?

15   A    Mr. Quiroz's attorney was provided a copy of the indictment

16   and a bond.

17   Q    All right.  And I'd like to direct you to Exhibit 10.  What

18   is this?

19   A    It's a notice of setting.

20   Q    For what?

21   A    For the State of Texas vs. Jose Gomez Quiroz.

22   Q    And is a cause number provided for this?

23   A    Yes, sir.

24   Q    And what is that cause number?

25   A    It is the same cause number for th burglary of the

Armendariz - Direct/Ellis                              51

1   habitation.

2   Q    And during the course of your investigation, what did you

3   take this as?

4   A    That court was set for Mr. Quiroz related to the burglary

5   charge.

6   Q    I'd like to direct you now to Exhibit 11.  And what is this?

7   A    Notice of setting.

8   Q    And is a cause number provided for this case?

9   A    Yes, sir.

10  Q    What is it?

11  A    The same cause number for the failure to appear charge.

12  Q    And during the course of your investigation, what did you

13  take this document to mean?

14  A    That Mr. Quiroz was set for trial for that charge.

15  Q    I'd like to direct you to Exhibit 12.

16  A    Yes, sir.

17  Q    And what is this?

18  A    A copy of the capias.

19  Q    And do you know what a capias is?

20  A    That it's a notice to arrest a subject for a charge.

21  Q    And what if anything about this document was important to

22  your investigation?

23  A    It lists Jose Gomez Quiroz with the capias.  It associates

24  it to the bail jumping charge.  And it says that it was -- that

25  this -- that Mr. Quiroz was -- let me see here.  That it was

Armendariz - Direct/Ellis                    52

1    executed and served on Mr. Quiroz.

2    Q    And does it state why Mr. Quiroz was being arrested?

3    A    Yes, sir.  For bail jumping and failure to appear.

4    Q    All right.  I'm going to direct you to the last sentence in

5    the first big paragraph.  If you can bring that paragraph up.

6    A    The officers return portion, or?

7    Q    No, no, no.  The very -- the paragraph right after to any

8    peace officer of the State of Texas, greeting.  Can you read?

9    A    You are hereby commanded to arrest Jose Gomez Quiroz and him

10   keep so that you have him before the Honorable 112th District

11   Court of Pecos County, Texas, at the Pecos County Judicial

12   Building of said county in the City of Fort Stockton immediately.

13   Then and there to answer the State of Texas upon indictment

14   pending in said Court charging him with the offenses bail jumping

15   and failure to appear.

16   Q    All right.  And then I'm going to direct you to the

17   officer's return.

18   A    Sure.

19   Q    Can you read that paragraph for me?

20   A    Officer's return came on hand on the 15th day of July, 2021,

21   and executed on the 24th day of August, 2021 by arresting the

22   within named Jose Gomez Quiroz at Fort Stockton in Pecos County,

23   Texas, and taking his bond which is herewith returned, placing

24   him in the county jail of Pecos County, Texas.

25   Q    And what date was it returned?

Armendariz - Direct/Ellis                    53

1    A    Returned on this day, the 24th day of August, 2021.

2    Q    And which deputy returned it?

3    A    T.J. Perkins (phonetic).  I believe that's the sheriff.  Oh,

4    I'm sorry.  Sheriff deputy.  Deputy Pogs (phonetic)?

5    Q    Deputy who?

6    A    Is it Daws (phonetic)?  I can't read the last name.

7    Q    And during the course of your investigation, did you take

8    this signature as meaning that it was served?

9    A    Yes, sir.

10   Q    And what was served?

11   A    The capias.

12   Q    Okay.  I'd like to direct you now to Exhibit 13.

13   A    Yes, sir.

14   Q    And what is this?

15   A    A precept to serve.

16   Q    And do you know what a precept to serve is?

17   A    That the subject was served the indictment.

18   Q    And was he in fact served the indictment according to this

19   document?

20   A    Yes, sir.

21   Q    And did you rely on that information during the course of

22   your investigation?

23   A    Yes, sir.

24   Q    And how do you know he was served a copy of his indictment?

25   A    It notes it in the officer's return portion.

Armendariz - Direct/Ellis                                    54

1    Q    And can you read that section of the return?

2    A    Came on hand on the 15th day of July, 2021 at 11:00 a.m. and

3    executed on the 24th day of August, 2021 at 7:00 p.m. by

4    delivering the precept accompanied by a certified copy of

5    indictment at Pecos County Jail in the County of Pecos in the

6    State of Texas.

7    Q    And was it returned signed by a deputy?

8    A    Yes, sir.

9    Q    All right.  Now I'd like to direct you to Exhibit 14.  And

10   you might have to take that out of your binder.

11   A    Yes, sir.

12   Q    There's a few documents.  Have you reviewed it?

13   A    Yes, sir.

14   Q    Do you recognize it?

15   A    Yes, sir.

16   Q    What is it?

17   A    The first page is a certificate of authenticity and domestic

18   business records.  And the remaining pages is a copy of the

19   record for Mr. Quiroz's arraignment.

20   Q    And the certificate of authenticity, you said is included

21   with it?

22   A    Yes, sir.

23   Q    So was this record made at or near the time in which the

24   form was completed by someone with personal knowledge/

25   A    Yes, sir.

Armendariz - Direct/Ellis                     55

1   Q     And was the record kept in the course of regularly conducted

2   activity or business?

3   A     Yes, sir.

4   Q     Is there a signed certification that this is a true and

5   correct record of the arraignment hearing?

6   A     Yes, sir.

7   Q     And do you have personal knowledge as to who filled out this

8   certificate?

9   A     Yes, sir.

10  Q     And who was that?

11  A     Elizabeth Rusk (phonetic).

12  Q     And how do you have personal knowledge?

13  A     I contacted her in order to get copies of the arraignment

14  record, the minutes of how -- of what was said.

15          MR. ELLIS:  Your Honor, the Government moves to admit

16  Government's Exhibit 14 into evidence.

17          THE COURT:  Mr. Meredith?

18          MR. MEREDITH:  No objection.

19          THE COURT:  Government's Exhibit 14 is admitted without

20  objection.

21       (Government's Exhibit 14 admitted into evidence)

22          MR. ELLIS:  The Government requests it be published to

23  the jury.

24          THE COURT:  Yes, sir.

25  BY MR. ELLIS:

Armendariz - Direct/Ellis                    56

1   Q    I'd like you to turn to Page 4 of the transcript.

2   A    Yes, sir.

3   Q    Can you please read Lines 11 through 18?

4   A    The Court: Is there a Jose Gomez Quiroz in the court?  Jose

5   Gomez Quiroz?

6        Mr. Quiroz: Yes, sir.

7        Mr. Valdez: I believe I hear him.

8        The Court: I hear him.  Do you waive arraignment.  Counsel?

9        Mr. Valdez: We want to have the arraignment.

10  Q    So during the course of the investigation, did you come to

11  know whether or not the defendant was present at his arraignment

12  for this case?

13  A    Yes, sir.

14  Q    How?

15  A    Reading these records show that he was present.

16  Q    Can you flip to Page 5 of the arraignment transcript?

17  A    Yes, sir.

18  Q    Can you please read Lines 5 through 16?

19  A    Five.

20       The Court: Mr. Quiroz?  Mr. Quiroz?  Mr. Quiroz, can you

21  hear me, sir?

22       Mr. Quiroz: Yes.

23       The Court: You stand charged with the offense of burglary of

24  a habitation.  Do you understand that?

25       Mr. Quiroz: Okay.

Armendariz - Direct/Ellis                      57

1          Sorry, what number?

2     Q    Through to 16.

3     A    Okay.

4          The Court: If a person was to be found guilty or guilt of

5     that type of offense, they could be sentenced to anywhere from 2

6     to 20 years in prison and a maximum fine of $10,000.  Do you

7     understand that, sir?

8          Mr. Quiroz: Yes, sir.

9     Q    During the course of your investigation, what did that tell

10    you?

11    A    That Mr. Quiroz had knowledge of the arraignment, or have

12    knowledge of the indictment and the consequences if found guilty.

13    Q    And the question?

14         MR. ELLIS:  Can we back up, Exhibit Number 1?

15    BY MR. ELLIS:

16    Q    The question on the ATF Form 4473 that the defendant was

17    untruthful on was what number?

18    A    21.B.

19    Q    And I'll have you just refresh, what did that question ask

20    again?

21    A    Stand by.  21.B, are you under indictment or information in

22    any court of a felony or any other crime for which the judge

23    could imprison you for more than one year, or are you a current

24    member of the military who has been charged with violations or

25    violations of the Uniform Code of Military Justice, and whose

Armendariz - Direct/Ellis                    58

1    charges have been referred to a General Court Martial?

2    Q     And defendant answered how?

3    A     He answered no.

4    Q     Now based on the arraignment transcript, the Judge told him

5    he faced a sentence of how long?

6    A     Two to twenty years.

7    Q     Based on your training and experience as an ATF federal

8    agent, would this burglary of habitation charge qualify under

9    Question 21.B?

10   A     Yes, sir.

11   Q     Therefore, based on the investigation and the documents you

12   received from the District Court of Pecos, was the Defendant in

13   fact under indictment for the crime punishable by more than one

14   year in prison?

15   A     Yes, sir.

16   Q     And did he have knowledge that he was under said indictment?

17   A     Records show he was.  He did.

18            MR. ELLIS:  Government passes the witness, Your Honor.

19            THE COURT:  Mr. Meredith, your witness.

20            THE WITNESS:  Sorry.  Can I get my bottle of water?  If

21   you don't mind.

22            THE COURT:  Sure.

23                        CROSS-EXAMINATION

24   BY MR. MEREDITH:

25   Q     Good morning.

1    A    Good morning.

2    Q    You testified that you've been working on these cases for a

3    while?

4    A    Yes, sir.

5    Q    And if you could just explain in a little more detail how

6    the process works for someone to pick up a gun that was bought

7    from a different seller, but then has to go through a licensed or

8    approved provider let's call it that can transfer the gun to him.

9    Am I saying that right?

10   A    Firearm transfer.  Yeah.  I think I get what you're asking.

11   Q    So one way is that you can go in and see the gun under the

12   counter and just buy it right from the seller, right?

13   A    Right.

14   Q    But this isn't that case, right?

15   A    Correct.

16   Q    And in this case, it was the seller was not from Alpine.

17   I'm not sure what kind of entity or person that was.  So it had

18   to go through an approved business or person who is authorized to

19   receive the gun.  Is that correct?

20   A    Correct.

21   Q    And so the -- so the True Value gets a notice, or does the

22   person, the purchaser go to True Value and tell them about it?

23   A    Do you mean -- are you asking if gets the notice that the

24   firearm is there, or gets the notice of the --

25   Q    They want to make a transaction and pick it up at True

Armendariz - Cross                                    60

1   Value.  Do you know how that starts?

2   A    What I -- from what I know, it's a person orders a firearm,

3   can order a firearm online.  And then from there, the

4   distributor, either the purchaser or the distributer figures out

5   where to have the firearm shipped to a licensed dealer so it can

6   be -- so it can be transferred to that actual purchaser.

7        From there, I believe the distributor contacts both the

8   purchaser and the FFL, the licensed dealer and lets them know it

9   will be at this place.  Sometimes maybe they'll give a tracking

10  number or something like that.

11  Q    And when you say FFL, is that --

12  A    I'm sorry.  It's Federal Firearms Licensee.

13  Q    So that would be a person that's been approved to make the

14  transaction happen by getting the gun temporarily?

15  A    It's another word for the gun dealer, a licensed gun dealer,

16  an FFL.

17  Q    A licensed gun dealer.

18       And this is part of a process to basically keep people from

19  ordering guns online and sending them to any address and who

20  knows where it ends up.  Is that right?  It's a safety measure?

21  A    Correct.

22  Q    And you talk about the delay part.  And that would be that

23  there's different types of, there's, like, prohibitions and then

24  there's a delay when there's more investigation that needs to be

25  done.  And this was a -- came back as a delay.  Is that what you

Armendariz - Cross                                    61

1    said earlier?

2    A    Yes, sir.  It started off as a delay.

3    Q    How long was the delay for?

4    A    He was delayed the date of purchase, and on December 23rd.

5    And then -- or when he filled out the form, December 23rd.  And

6    then it was actually denied I believe January 4th.

7    Q    And but in terms of him actually picking the gun up, after a

8    certain number of days if nothing happens, then the person -- the

9    delay is lifted and the person can pick up the gun.  Is that

10   right?

11   A    Correct.  It -- delay exists for three days, and then it's

12   up to the dealer if they want to release the firearm to the

13   person.

14   Q    So after a certain amount of time, then the dealer can

15   release it to the person?

16   A    Correct.

17   Q    But during that period of time, that's the time that allows

18   the ATF to do their investigation to see if this person should be

19   allowed to get the gun or not.  Is that right?

20   A    It's for FBI.  FBI will do the initial before it's referred

21   to us.

22   Q    So it's the time for the FBI to look into this?

23   A    Correct, sir.

24   Q    And that didn't happen in this case?

25   A    I'm sorry, what didn't happen?

Armendariz - Cross                                              62

1    Q    It didn't happen before the delay period expired and Mr.

2    Quiroz was allowed to pick up the gun.

3    A    It wasn't resolved if that's what you're asking.

4    Q    Right.  And do you know if in this case, after the delay

5    period expired, did True Value call Mr. Quiroz and advise him

6    that he could come get the gun?

7    A    No, they did not.

8    Q    He went and just asked if he could get it, and they said

9    okay?

10   A    I was told he just, by chance, showed up one day and picked

11   up the firearm.

12   Q    And they said okay?

13   A    Yes, sir.

14   Q    Because the delay period had expired?

15   A    Correct.

16   Q    We're going to just go through the exhibits, I guess.

17   A    All right.  Yes, sir.

18   Q    We're starting out with, we'll just go in the same order,

19   4473.  And --

20             THE COURT:  Which exhibit is that, Mr. Meredith?

21             MR. MEREDITH:  That's 1.

22             THE COURT:  Number 1?

23             MR. MEREDITH:  That's the firearms transaction record.

24   BY MR. MEREDITH:

25   Q    And you went over this a little bit.  It has, on line --

Armendariz - Cross                                    63

1    let's see -- Line 30 what appears to be Mr. Quiroz's signature.

2    Is that right?  Page 3?

3    A    Yes, sir.

4              MR. MEREDITH:  And I'm going to pull these up again or

5    else show them to the jury physically.  I don't know how we could

6    do that.

7              THE CLERK:  Where do you want me to go?

8              MR. MEREDITH:  Line 1, Page 1, close up.

9              THE CLERK:  Line 1, Page 1, or the next page?

10             MR. MEREDITH:  Oh, no.  The Page 1 of the form.  Right

11   there.

12   BY MR. MEREDITH:

13   Q    This handwriting is the handwriting of the guy working at

14   True Value.  Is that right?

15   A    Correct, sir.

16   Q    So the True Value person is the one who filled out the form?

17   A    The -- they fill out portions of the form, not all the form.

18   Q    So, but that part is his hand -- is filled out by someone,

19   not Mr. Quiroz?

20   A    Correct, sir.

21   Q    And do you know which parts were filled out by the person at

22   True Value?

23   A    It would be the portion -- it would be Section A which would

24   be the gun identifying portion on Page 1.

25   Q    Section where?

Armendariz - Cross                                  64

1    A    Section A, what you're looking at there.

2    Q    Right.

3    A    Section A, gun identifying information for the gun portion.

4    It would be Section C on Page 2.  And then --

5    Q    Where's Section C?

6    A    On Page 2, middle part where it says -- should be number 24

7    on.

8    Q    Okay.  I see it.

9    A    Okay.  And then, let's see.  I believe Section 33.  He

10   signs, notes on Page 3, Section E is where he fills that out as

11   well.

12   Q    And you know which parts were filled out by the person at

13   True Value to him?

14   A    Now?

15   Q    how do you know who filled out which parts of the form?

16   A    I spoke to Mr. Portillo, the person who filled it out.

17   Q    And the -- just in terms of clarification, this 1911, and

18   the pistol's a 22 caliber pistol.  Is that right?

19   A    Yes, sir.  That's what's listed.

20   Q    And the 1911 is the famous U.S. Army WWI semiautomatic that

21   is much coveted.  Is that right?

22   A    I believe so, yes.

23   Q    And so this is a copy of that except it's a 22 instead of a

24   45?

25   A    Correct.

Armendariz - Cross                                    65

1    Q    And so Officer Agent Armendariz here, you've had a pretty

2    good familiarity with this form.  Is that right?

3    A    Yes, sir.

4    Q    And after the part that's filled out, there are there pages

5    of notices, instructions, and definitions.  Is that right?

6    A    Correct, sir.

7              MR. MEREDITH:  And can you please flip to -- well let's

8    set up the Page 3 first, and then 4, and then 5, and then 6.

9              THE CLERK:  You have to let me know when you want me to

10   go.

11             MR. MEREDITH:  Okay.  You can keep going to the

12   instructions which start -- can you go down a little bit?  I

13   mean, back to the beginning, towards the beginning, please.

14   Okay.

15   BY MR. MEREDITH:

16   Q    So this is where it starts.  Notices, instructions, and

17   definitions.  And that's where it explains what the form means

18   and what's supposed to be done.  Is that right?

19   A    Correct, sir.

20   Q    And in those pages, there is a warning about a person being

21   under indictment.  Is that right?

22   A    I believe so.  I think it's in Section -- Questions 21.B on

23   Page 4.

24   Q    So let's go to Page 4.

25             THE CLERK:  On the instructions?

Armendariz - Cross                    66

1            MR. MEREDITH:  Yeah.  This page here.  This one.  Yeah,
2     that's it.  That's good.  And so in all this instructions and --
3            THE COURT:  Mr. Meredith, make sure that you --
4            MR. MEREDITH:  -- notices --
5            THE COURT:  Make sure you talk in the microphone.
6            MR. MEREDITH:  Oh, I'm sorry, Judge.
7            THE COURT:  It's okay.  You can stand over there if
8     you'll speak up.
9     BY MR. MEREDITH:
10    Q    On this page which in real life looks like this, it's pretty
11    fine print there.  And at the bottom of that paragraph it says
12    that federal law 18 U.S.C. 922(n) states that it's receipt,
13    transportation of a firearm by person under indictment for a
14    felony.  And so that's the part of the form that would advise a
15    person about that's prohibited by federal law.  Is that right?
16    A    Correct, sir.
17    Q    And that would be in that --
18           MR. MEREDITH:  I don't need to blown up.  That's okay.
19    BY MR. MEREDITH:
20    Q    In that three pages of fine print, the person, if they
21    waited through all that, they would find that section buried in
22    the middle.  Is that right?
23    A    Correct.
24    Q    Let's just go in order with the -- with Mr. Ellis'
25    questioning.  I think that's easier than making up a new order.

1   There were -- we went to Mr. Quiroz's address.  That was the

2   address that was provided on this form, right?  Is that right?

3   A    Yes, sir.

4   Q    And that's the 1018 Cardinal Street?

5   A    Yes, sir.

6   Q    And when you went there, the two times you went there, his

7   mother in the front house, it's an actual house, said that he

8   lived in the back or stayed in the back.  Is that right?

9   A    Correct.

10  Q    So this is like a big lot with the house and then it has two

11  RVs or trailers in the back?

12  A    More than two.  Several.  Several RVs and an actual, like, a

13  single-wide trailer I believe in the back.

14  Q    And you spoke to the mother and a couple of the men that

15  were staying at different trailers in the back.  Is that right?

16  A    Correct.

17  Q    And all of them told you that Mr. Quiroz lived there part of

18  the time.  Is that right?

19  A    They said they lived there, he lived there.  I didn't --

20  Q    So they said he lived there?

21  A    Yes, sir.

22  Q    And the mother said he lived there?

23  A    Yes, sir.

24  Q    So the address that was provided on this form, there's three

25  people who live there that also said that was his actual address?

1    A    Correct.

2    Q    I keep talking about Exhibits 2, 3.  You can look at them

3    real quick.  I can talk about them together.  Those are the

4    indictments that you discussed earlier and were admitted.

5    A    Yes, sir.

6    Q    Were admitted.  State indictments for burglary and failure

7    to appear.  And these are signed by the juror, the presiding

8    juror.  I guess that's the foreperson of the grand jury?

9    A    I believe so.

10   Q    But there's nothing on there that says this had been

11   provided to my client, or my client's acknowledgment or signature

12   is on either one of these.  Is that right?

13   A    Correct, sir.

14   Q    4 and 5 are the bond paperworks?

15   A    4, the bond paperwork for the burglary of habitation.  And 5

16   being the bail jumping.  Yes, sir.

17   Q    And these both are signed, or alleged to be signed by Mr.

18   Quiroz.  Is that right?

19   A    Yes, sir,

20   Q    But it doesn't ever say the word indictment.  It says

21   charged with in both of these bond paperworks.  Is that right?

22   A    Yes, sir.

23   Q    So if you said earlier on direct that this was notice that

24   he had been indicted, that's not strictly correct.  It's just

25   notice that he was charged.

Armendariz - Cross                                    69

1   A    As the form states, correct.  It says charged.

2   Q    Okay.  The Exhibit Number 6 which is kind of a handwritten

3   docket about what's happening in the state case where you said D

4   present, arraigned, NG entered, that would be an example of if

5   not the same case, of the transcript that you read from earlier.

6   Is that right?

7   A    For the burglary?  Yes, sir.

8   Q    Okay.  8 and 9 are discovery letters.  Exhibits 8 and 9 are

9   discovery letters which were provided to Adrian Valdez, Attorney

10  at Law.  Is that right?

11  A    As listed, yes, sir.

12  Q    The description letter says via hand delivery, Adrian

13  Valdez, Attorney at Law.  Is that right?

14  A    Yes, sir.

15  Q    Nowhere on there does it say that it was provided to Mr.

16  Quiroz directly.  Is that right?

17  A    Correct.

18  Q    And then Exhibits 10 and 11, the notices of same, that's

19  just like a notice that there's -- 10, that the jury trial's

20  coming up.  And 11 is the same thing, that trial's coming up.  Is

21  that right?

22  A    Correct, sir.

23  Q    Doesn't say anything in there about indictment.  Doesn't say

24  anything in there about Mr. Quiroz being provided a copy of this.

25  Is that correct?

1    A    Correct.

2    Q    And 12 is the capias, and 13 is the precept to serve, which

3    I think means serve him, serve the person a copy of this paper,

4    the order to serve and a copy of the indictment.  Is that how you

5    read it?

6    A    Yes, sir.

7    Q    Now these were actually served, both of them it says -- the

8    Pecos was served at Fort Stockton in Pecos County.  And the

9    precept and the indictment, it says it was served at Pecos Count

10   Jail.  Is that correct?

11   A    Yes, sir.

12           MR. MEREDITH:  That would be on the -- if we could get

13   that one which is Number 13, the precept.  And just do the

14   officer's return part on the bottom.

15   BY MR. MEREDITH:

16   Q    So that doesn't say it was actually delivered to Mr. Quiroz.

17   It says it was delivered to the Pecos County Jail.  Is that

18   correct?

19   A    Yes, sir.

20   Q    So they could have just handed it to the receptionist at the

21   jail and said this is for Mr. Quiroz, and that would have been

22   enough to satisfy this.  Is that correct?

23   A    It's possible.  Yes, sir.

24           MR. MEREDITH:  Let's move to the transcript.  I don't

25   think we're going to have to pull that up.

Armendariz - Cross                    71

1    BY MR. MEREDITH:

2    Q    There was -- if you could go to the copy of the transcript

3    which is --

4    A    Yes, sir.

5    Q    -- 14 I believe.

6    A    Yes, sir.

7    Q    This was during COVID days.  Is that right?

8    A    Yes, sir.

9    Q    So if you look at the top of Page 4, at the very beginning

10   in parentheses, can you read what that says?

11   A    Parties present via Zoom application.

12   Q    And on Page 5, let's see, Lines 3 and 4 is a response to the

13   Judge by Mr. Quiroz's lawyer.  Can you read what that lawyer

14   said?

15   A    Mr. Valdez: Your Honor, I saw -- or I just saw him on there,

16   and now his screen went dark.  Here he comes back.

17   Q    So it was on Zoom and it was going in and out.  Is that

18   correct?

19   A    It would appear so.

20   Q    But he wasn't physically in the court?

21   A    No, sir.

22   Q    So this is -- let me try to find out which judge it was.

23   Honorable Pedro Gomez, Jr., Judge Presiding.  That's on the cover

24   page.  I'm assuming that that's Judge Gomez is the person who's

25   speaking when we say Court here.  Do you agree with that?

Armendariz - Redirect/Ellis                    72

1   A    It's on Page 1 you said?

2   Q    The very -- the cover page.  Page 1.

3   A    Okay.  Oh, yes, sir.

4   Q    And in his arraignment, the Court says you stand charged

5   with the offense of burglary of a habitation.  Do you understand

6   that?  And Mr. Quiroz said okay.  Is that right?

7   A    What page is that on again, sir?

8   Q    That's on Page 5 in the middle, Lines 8, 9, and 10.  I think

9   you read it all, read it out loud earlier.

10  A    Yes, sir.  That's how it reads.

11  Q    So the Judge says charged.  He doesn't say indicted.  Is

12  that right?

13  A    Yes, sir.

14  Q    So in fact in this whole transcript of the arraignment, the

15  word indicted or indictment is never used by anybody.

16  A    On that person, correct, sir.

17  Q    In this transcript of this arraignment, they never say the

18  word indictment or indicted.  Is that right?

19  A    I don't recall reading, or I don't remember everything on

20  this one.  But in that portion, I don't.  You're correct.  It

21  doesn't say indictment.

22  Q    Well, it's two and a half pages.  I think we can wait a

23  minute to have you look it over.

24  A    Okay.  Yes, sir, you're correct.

25  Q    Were you involved in the arrest on these charges of Mr.

Armendariz - Redirect/Ellis                          73

1    Quiroz?

2    A    No, sir.

3            MR. MEREDITH:  Pass the witness.

4            THE COURT:  Redirect?

5                    REDIRECT EXAMINATION

6    BY MR. ELLIS:

7    Q    I want to direct you back to what you were just asked about

8    the denial and delay process.  Do you recall the questions you

9    were just asked?

10   A    Yes, sir.

11   Q    After a certain amount of time, if the denial does not come

12   in, does that mean the purchaser is automatically approved?

13   A    No.

14   Q    Okay.  So what happens?

15   A    If -- so if you don't hear a response within a couple -- if

16   you don't hear a response -- if a gun dealer doesn't hear a

17   response from FBI NICS within a certain period of time, they'll

18   automatically send the dealer information that it's been delayed.

19   It just depends on the time of day that you buy the gun.

20       If you buy it late at night, then you're probably not going

21   to -- and you have a history that would be flagged and the store

22   is probably going to close before you get a reply.  So some

23   people will just typically come back and check up on it.

24       Or you may get an immediate response of this is delayed

25   because we found something and it needs to be looked into.

Armendariz - Redirect/Ellis                    74

1    Q    Okay.  And if you get a delay, and that time period passes,

2    does that delay then trump the statute that states that you

3    cannot receive that firearm while under indictment?

4    A    No.  You can acquire it.  You can still acquire the firearm.

5    Yes, sir.

6    Q    And by acquiring it, would it still be illegal?

7    A    Yes, sir.

8    Q    And when the firearm was released to the purchaser, the

9    defendant in this case, why was it released?

10   A    I'm sorry.  Can you repeat the question?

11   Q    So why was the firearm released to the defendant?

12   A    It was released because the delay notice timed out.  So

13   after, or after three days, the dealer can still -- it's up to

14   the dealer if they -- if they wan tot release the firearm to the

15   purchaser.  So in this case, the time passed.  He was able to

16   acquire it.  And then January 4th, the FBI NICS notified the

17   dealer that he was actually denied.

18   Q    And going back to the questions about who filled out which

19   sections of the ATF form, were you present when it was filled

20   out?

21   A    No, I was not.

22   Q    so the only way that you know which sections were filled out

23   were how?

24   A    By my interviews with Mr. Portillo.  By that, by my

25   interviews with Mr. Portillo.

Armendariz - Redirect/Ellis                    75

1   Q    And I believe -- I'm going to direct you back to Exhibit 1.

2   A    1?

3   Q    Yes, sir.

4   A    Stand by.  Yes, sir.

5   Q    I believe you asked questions about Page 4 of the ATF form.

6   A    Yes, sir.

7   Q    We're going to get there real quick.  All right.  Did you

8   ask questions about the paragraph Question 21.B and 21.I.  Do you

9   see that?

10  A    Yes, sir.

11          MR. ELLIS:  All right.  Now if you'll zoom back out?

12  BY MR. ELLIS:

13  Q    And you have the actual physical copy in your hand, right?

14  A    Correct.

15  Q    I think a statement was made by the defense that it's down

16  here buried and it's hard to read.  Could you compare Page 4

17  where this paragraph is and compare it to Question 21.B?

18  A    Yes, sir.

19  Q    Is it any more or less legible to you?

20  A    It appears to be the same.

21  Q    Okay.  And as was discussed by the Defense, they asked you

22  does this paragraph contain the information about if you're under

23  indictment?

24  A    Yes, sir.

25  Q    And does it contain information about the indictment?

Armendariz - Redirect/Ellis                    76

1    A     It contains information, yes, sir.

2    Q     All right.  And based on your experience as an ATF agent,

3    which one of these paragraphs are easier to understand, the one

4    on Page 4, or this very clearly written one here, 21.B?

5    A     On I would say 21.B.

6    Q     Okay.  And does 21.B buried on the form?

7    A     No, sir.

8    Q     What page is it on?

9    A     Page 1.

10   Q     Page 1.  Okay.  And now I want to redirect you back to our

11   indictments.  I believe it was Exhibits 2 and 3.

12   A     Yes, sir.  Yes, sir.

13   Q     I believe you were asked there's nothing on the indictment

14   that states the defendant was provided it, correct?

15   A     Correct.

16   Q     And there's nothing on there that says hey, we gave them a

17   copy, right?

18   A     Correct.

19   Q     All right.  So now I'm going to direct you to Exhibits 12

20   and 13.

21   A     Yes, sir.

22   Q     Do you remember these documents?

23   A     Yes, sir.

24   Q     Is there anything on these documents that point to the fact

25   that the defendant was provided the indictment?

1   A    On 13 it does say, on officer return it says precept

2   accompanied by certified copy of indictment at the Pecos County

3   Jail.  And 12 --

4   Q    All right.  And now I'm going to direct you on Exhibit 13,

5   if we'll go up to the top paragraph.  You are hereby commanded.

6   A    Yes, sir.

7   Q    Can you read that paragraph for me?

8   A    You are hereby commanded that you, sir, Jose Gomez Quiroz,

9   the defendant in the above number and entitled cause with the

10  accompanying certified copy of indictment, the present place of

11  residence of the said Jose Gomez Quiroz is unknown.

12  Q    And based on your training and experience as a local, like,

13  a local law enforcement officer and an ATF agent, what does it

14  mean when you serve someone something?

15  A    That you physically give someone something.

16  Q    All right.  So and on this document, the State is commanding

17  that the defendant be served with the indictment, correct?

18  A    Yes, sir.

19  Q    And I'm going to redirect you on to the officer's return.

20  A    Yes, sir.

21  Q    And is the officer's return filled out?

22  A    Yes, sir.

23  Q    Is it signed?

24  A    Yes, sir.

25  Q    What does that mean to you based on your training and

1    experience as a law enforcement officer?

2    A    That the law officer certifies that the document was

3    executed.

4    Q    And what is that --

5    A    Served.  Served.

6    Q    -- in laymen's terms?

7    A    That it was served, that a copy of the indictment was given

8    to the defendant.

9    Q    All right.  Now, besides the capias and the precept, because

10   this capias and precept is for which charge?  Do you recall if

11   you take a look?

12   A    Yes.  This one's for the bail jumping.

13   Q    For the bail jumping.  Do you know why there wouldn't be a

14   capias and a precept for the burglary of a habitation?

15   A    Say again, sir.

16   Q    Do you know, do you have any reason to why there's no capias

17   or precept to serve for the burglar of habitation?

18   A    No.  I don't.

19   Q    Are you familiar with the indictment and the arraignment

20   process?

21   A    Yes, sir.

22   Q    Okay.  So if you're arraigned, what does that mean?

23   A    If you're arraigned, you were read the charge, you were

24   explained your -- your indictment.

25   Q    And when you said read the charge, is that like what

Armendariz - Redirect/Ellis                    79

1   happened earlier this morning when the indictment was read in

2   open court here?

3   A    Yes, sir.

4   Q    So if it's read to you, do you have notice that you're under

5   indictment if someone reads it to you?

6   A    Yes, sir.

7   Q    Okay.  And I'm going to direct you to the arraignment

8   transcript.  I believe that is Exhibit 12.

9   A    It's 14.

10  Q    14.  If you could take that out for me?  I believe you were

11  asked by the defense it was stated something along the lines of

12  it appears the defendant wasn't present, correct.  Was that what

13  you were asked?

14  A    Correct.  I believe so.

15  Q    You believe so?

16  A    Yes, sir.

17  Q    I'm going to direct you to Page 4, please.

18  A    Yes, sir.

19  Q    Can you read Lines 7 to 13?

20  A    Mr. Valdez: This is set for an arraignment.  Mr. Quiroz

21  didn't have internet access.  I anticipate he's going to be in

22  the courtroom there for you.

23       The Court: Is there a Jose Gomez Quiroz in the courtroom?

24  Jose Gomez Quiroz?

25       Mr. Quiroz: Yes, sir.

Armendariz - Recross                           80

1    Q    Was the defendant present in the courtroom?

2    A    Yes, sir.

3    Q    And how do you know?

4    A    He says he is.

5    Q    And one last thing.  I'd like to direct you to Exhibit 5.

6    A    Yes, sir.

7    Q    I think some questions came up about bond paperwork.  In

8    this middle paragraph where it's in capital letters, the

9    condition of the above obligation is such.

10   A    Yes, sir.

11   Q    Can you read down to County in Texas?

12   A    The condition of the above obligation is such that whereas

13   the above-named principal stands charged with the offense of a

14   felony, GSI bail jumping and failure to appear, P-4248-112-CR,

15   and the said above-named principal was required to give bail in

16   the sum of this bond for his personal appearance before the

17   District Court of Pecos County, Texas.

18   Q    And I noticed when you read it, you just charged with the

19   offense of felony.  You didn't read misdemeanor.  Why?

20   A    Because felony is circled.

21   Q    Felony is circled.  And during the course of your

22   investigation, what did that tell you?

23   A    That he was aware of his -- of a felony charge or a felony

24   indictment.

25   Q    All right.  And is there any indication on this form that

1    the defendant personally knew of this?

2    A    Yes, sir.

3    Q    And when was that?

4    A    Mr. Quiroz's identifying information is listed on there, and

5    signed.

6    Q    And it's signed?

7    A    Yes, sir.

8              MR. ELLIS:  Pass the witness, Your Honor.

9              THE COURT:  Mr. Meredith?

10                        RECROSS-EXAMINATION

11   BY MR. MEREDITH:

12   Q    I guess we'll just go backwards because that's the thing

13   that I remember first.  In the exhibit, the bond Exhibit 5 was

14   the one that you were just reading from, the bail jumping, GSI,

15   failure to appear.

16        Is that right?

17   A    Yes, sir.

18   Q    And you ended by saying that that said that he was indicted.

19   But it doesn't really say he's indicted, does it?

20   A    No, sir.

21   Q    And the transcript, which is 14 --

22   A    14?

23   Q    14.

24   A    Yes, sir.

25   Q    It says, like you said earlier, parties present via Zoom.

1   And when the question was asked about present, is the defendant

2   present, the answer is yes, that he's present via Zoom.  Is that

3   correct?  The person can be present via Zoom is what I'm asking.

4   A    I believe so, that he's present via -- via --

5   Q    And this is I guess --

6   A    Yes.  That he's present via Zoom.

7   Q    Thank you.  Let's see.

8            MR. MEREDITH:  If we could show the 4473 please, the 1.

9   And can you pull close ups of two different parts of that, which

10  is going to be 21.B, the important one.  That one closer.  That's

11  fine.  And then move over to Page 4 and pull up -- you can't do

12  it at the same time?

13           THE CLERK:  From a different exhibit I can, but not

14  from the same one.

15           MR. MEREDITH:  I can bring these up physically at a

16  later time, Your Honor.  Pass the witness.

17           THE COURT:  Anything further?

18           MR. ELLIS:  No further questions, Your Honor.

19           THE COURT:  Thank you.  You may step down.

20           THE WITNESS:  Thank you, sir.

21       (Witness excused)

22           THE COURT:  Ladies and gentlemen, we're going to take a

23  morning recess.  Every time we do, of course you're going to

24  leave your notebooks here.  You're going to remember your

25  instructions.  You've not received the case for deliberation.

83

1    I'll make sure you know when that is.  You'll know when that is.

2            Take a short break.  You can talk to each other, that's

3    not -- there's no prohibition against that.  Just don't talk

4    about the case at all.  And let's take -- let's come back at

5    10:30.  It's 10:17.  Let's come back at 10:30 to 10:33.  If

6    you'll be ready, lined up and ready to go, we'll move back in

7    here.

8            We're going to stay and work a little bit.  I'll give

9    them a short break, shorter break.  And we'll see you all back

10   here.  Any questions?  No?  All right.  Let's rise for this jury,

11   please.  Thank you, all.  And just go back out that way, sir.

12           (Jury out at 10:17 a.m.)

13           THE COURT:  Let's have a seat, please.  Outside the

14   presence of the jury.  Just to follow up on our bench conference,

15   Mr. -- as to Government's Exhibits 10 through 13, when they were

16   being offered in mass, in bulk there, Mr. Meredith had objections

17   to Number 8, Number 9, Number 12, and Number 13.

18           The Court finds all these documents, 2 through 13,

19   Exhibits 2 through 13 are public records.  They're all

20   self-authenticating.  Adequate and sufficient notice was given.

21   And just in case, you know, I didn't make a clear enough ruling

22   at the time, any identification issues would go to the weight of

23   the evidence, not the admissibility.

24           Mr. Ellis, who's your next witness?

25           MR. ELLIS:  Based on the testimony that just came out,

1    we believe we're going to call a rebuttal witness.  He is noticed

2    on our witness list, but he wasn't going to be --

3              THE COURT:  Okay.  This is your case in chief, though.

4    It wouldn't be a rebuttal witness at this time.

5              MR. ELLIS:  That's right.  So we'll be calling Michael

6    Stallard.

7              THE COURT:  Okay.  Mr. Stallard?  Okay.  If you will,

8    when we come back in, have -- so whoever your next witness is,

9    have them up here ready to go.

10             MR. ELLIS:  Yes, Your Honor.

11             THE COURT:  When we come back.  Anything else you want

12   to take up outside the presence?

13             MR. ELLIS:  No, Your Honor.

14             THE COURT:  Mr. Meredith?

15             MR. MEREDITH:  No, Your Honor.

16             THE COURT:  All right.  Let's take a break.  We'll be

17   back, let's come back at 10:30.

18             THE DEPUTY:  All rise.

19        (Recess at 10:20 a.m./Reconvened at 10:30 a.m.)

20        (Outside the presence of the jury; defendant present)

21             THE CLERK:  All rise.

22             THE COURT:  All right.  We're all back.  Outside the

23   presence of the jury.  Mr. Ellis, anything you need to take up?

24             MR. ELLIS:  Just, Your Honor, this witness is not

25   sworn.

85

1          THE COURT:  Okay.

2          MR. ELLIS:  We were saving him for a rebuttal witness.

3    He'll need to be sworn.

4          THE COURT:  Okay.  I'll tell everybody to sit down.

5    You stay standing, okay, and we'll swear at you and you can sit

6    down.

7          MR. STALLARD:  Okay.

8          THE COURT:  Mr. Meredith, anything you want to take up

9    outside the presence?

10          MR. MEREDITH:  No, Your Honor.

11          THE COURT:  Very good.  Let's bring the jury in,

12    please.

13          THE DEPUTY:  Sir, we still got one or two, we're

14    waiting.

15          THE COURT:  Oh, okay.  Let's let them finish and wash

16    their hands.

17     (Pause)

18          THE COURT:  Ms. Martinez, I think you need to work on

19    your skills.  I thought, like, Mr. Meredith, I thought you could

20    surely pull up a split screen or something.

21          MS. MARTINEZ:  I can pull -- sorry.  I can do a split

22    screen if it's two different exhibits.

23          THE COURT:  Oh.  But not the same one?

24          MS. MARTINEZ:  I can divide the screen into two.  But

25    if it's the same document, I can't make two different pages.  But

Stallard - Direct/Ellis                    86

1    I will work on it.  I'll see what I can do.

2             THE COURT:  All right.

3        (Jury in at 10:33 a.m.)

4             THE COURT:  Thank you.  Please be seated.  Mr. Ellis,

5    your next witness is?

6             MR. ELLIS:  Government calls Pecos County Jailer

7    Michael Stallard.

8             THE COURT:  Sir, if you'd raise your right hand.

9             MR. STALLARD:  Yes, sir.

10       MICHAEL STALLARD, GOVERNMENT'S WITNESS, SWORN

11            THE COURT:  You may have a seat.

12            THE WITNESS:  Yes, sir.

13            THE COURT:  Adjust yourself to that microphone if you

14   would.  I'll just tell you the rule's been invoked which means

15   you'll only be in here when you're testifying.  And don't speak

16   with anybody about the facts of the case except the attorneys for

17   the duration of the trial.  Okay?

18            THE WITNESS:  Yes, sir.

19            THE COURT:  Thank you, sir.

20            Mr. Ellis, you may proceed.

21            MR. ELLIS:  Thank you, Your Honor.

22                       DIRECT EXAMINATION

23   BY MR. ELLIS:

24   Q    Mr. Stallard, can you state your full name for the record

25   and spell your last name?

Stallard - Direct/Ellis                    87

1    A    Michael Dale Stallard, S-T-A-L-L-A-R-D.

2    Q    And how are you employed?

3    A    I am employed as a jailer at the Pecos County Sheriff's

4    Office.  I was employed there in 2009.

5    Q    So how many years of law enforcement experience do you have?

6    A    It'd be about 13 years so far.

7    Q    And I just want to ask some brief questions about your role

8    as a jailer in the Pecos County Sheriff's Office.

9    A    Yes, sir.

10   Q    What role, if any, do jailers at the Pecos County Sheriff's

11   Office play in the service of capiases and precepts to serve by

12   the Sheriff's Office?

13   A    When, you know, a defendant's brought into jail, we usually

14   have to go up front.

15        We pull off all the warrants for the back, and we have them

16   with us in-hand.  When they're brought in, these are usually are

17   handed to the deputy, PD or DPS.  Precepts are only signed by the

18   deputies only.  But we are handed them, these papers.  They're

19   signed, given back to us.

20   Q    And is that how every jailer is trained to do it?

21   A    Correct, sir.

22   Q    And is that how you've always done it in your entire career?

23   A    That's the way I've done it ever since I've started working

24   there.

25   Q    All right.  I would like to direct you to, there should be

Stallard - Direct/Ellis                                   88

1    an exhibit binder in front of you.

2    A    Yes, sir.

3    Q    Do you see that?  If you flip to Exhibit 12?

4    A    Correct, sir?

5    Q    All right.  Do you recognize what this is?

6    A    It's a capias warrant which would have been signed by the

7    PD, or in this case the Sheriff's Office, officer warrant.  And

8    if this was the -- this is the original.  If there had been a

9    copy, or a signed defendant copy, then that copy would have also

10   been signed, at which time these papers, if they're handed back

11   to me, I get all my information off the capias.

12        And if the defendant's copy's handed to me, then I hand that

13   to the defendant where it's in his possession.  And then during

14   that time he has it, he can either take it with him when we --

15   after we book him into the cell, or I ask him do you want me to

16   put it into your property and it's put in his property.

17   Therefore, it's given to him when he's released.

18   Q    All right.  And I'm going to direct you to the date on this

19   capias down on the officer's return.  Based on your training and

20   experience, can you tell what date that was actually served on

21   the defendant?

22   A    It states July 15th, 2021.

23   Q    Okay.  It says came --

24   A    Executed on the 24th day of August, 2021.

25   Q    And when it says executed on, what does that mean based on

1  your training and experience?

2  A    Executed means on that day, this person was brought into our

3  custody.  This paper was signed, and was therefore given to me.

4  And I gave it to the defendant, his copy.

5  Q    And do you recall if you were working the night of the 24th

6  day of August?

7  A    Yes, sir.

8  Q    All right.

9  A    I work night shift.

10  Q    And if you were there, how would you have handed this?  Or

11  let me rephrase that.  If you were there when this return

12  happened, what role if any would you have had on the process?

13        MR. MEREDITH:  I'm going to object.  We're getting a

14  little speculative here about --

15        MR. ELLIS:  He was --

16        THE COURT:  I'll overrule the objection as to his

17  training and experience, and his knowledge as to his training and

18  experience.  Not that he's speculating what this officer did and

19  how it was done, but what he would typically do.

20        MR. ELLIS:  Yes, Your Honor.

21        THE COURT:  All right.

22  BY MR. ELLIS:

23  Q    What if any would you have had in this process?

24  A    In this process, again, if there was a precept to be served

25  which would have a copy, then this would have been signed.

Stallard - Direct/Ellis                              90

1      If given back to me with the other warrants, then that

2  precept I would hand to the defendant because it is his copy.

3  And he has option.  If he wants to keep it in his hands, he can.

4  Or before he goes into his cell, if he doesn't want to keep it,

5  I'll ask him and I'll put it in the property so it's in their

6  property so when they're released, it's still in -- they have

7  their custody, it's in their hands.

8  Q    Okay.  And you -- I believe you just said that if there was

9  a precept to serve.

10 A    That's right.

11 Q    That would have been with it, correct?

12 A    Yes, sir.

13 Q    I'd like you to flip to the next exhibit in your book,

14 Exhibit Number 13.

15 A    Precept to serve.

16 Q    Is that what this document is?

17 A    Yes, sir.

18      Precept to serve is the one where it shows that the warrant

19 was, again, signed on that date by the deputy.  That precept, the

20 original goes into file.  The copy of the precept is given to the

21 defendant.

22      If there's -- if all these papers are handed to me, then I

23 go through and that precept I hand to them.  Again, it's in their

24 -- they have it.  And if they don't want to keep it in their

25 hands, then I put it in their property.  It's their option.

1   Q    All right.  And can I then focus down at the officer's

2   return again?

3   A    Yes, sir.

4   Q    What date was this executed on?

5   A    The 24th of August, 2021.

6   Q    At what time?

7   A    It says at 7:00 p.m.

8   Q    Were you working on that date?

9   A    Yes, sir.

10       My shift starts at seven to seven.  And I'm usually in there

11  by quarter 'til seven.  And, you know, as inmates start coming in

12  earlier, I just go out ahead and start booking.  So the preceding

13  shift can leave.

14  Q    And just one final question on the last exhibit and this

15  one.  It's signed by I believe it's Power 613.  Do you have

16  personal knowledge as to who that is?

17  A    Yes, sir.

18       That's Deputy Powers (phonetic).  He has since gone on to

19  working in another city, another department.  But that's Deputy

20  Powers, and he was number 613.

21  Q    And on this date and at this time, would he have had the

22  authority to serve these types of documents?

23  A    Correct, sir.  He would.

24           MR. ELLIS:  Pass the witness, Your Honor.

25           THE COURT:  Mr. Meredith, your witness.

1                       CROSS EXAMINATION

2     BY MR. MEREDITH:

3     Q    Good morning, Mr. Stallard.

4     A    Morning, sir.

5     Q    We're going to talk about these exhibits a little bit more.

6     The capias like this just means it's like arrest, isn't it?  Is

7     that what it is?

8     A    The capias is the warrant.  Yes, sir.

9     Q    And when you read that it was executed on the 24th day of

10    August, executed means that he was arrested.  Is that right?

11    A    That's the day he was brought in.  Yes, sir.

12    Q    Okay.  And you also mentioned that in your experience, the

13    way you have done it is there's a defendant's copy?

14    A    Yes, sir.

15    Q    And does the defendant sign that copy?

16    A    No, sir.

17    Q    Does the defendant sign anything?

18    A    No, sir.  The only time a defendant will sign the papers is

19    when we're through booking and it's the normal booking papers.

20    Q    And this would have been August of last year, nine months

21    ago about.  Is that right?

22    A    Correct, sir.

23    Q    What days of the week were you working back then?

24    A    I have to see what days.  But my shift was -- if you showed

25    me a calendar, I could tell you perfect.  If this was

Stallard - Redirect/Ellis                    93

1    Monday-Tuesday, or Wednesday-Thursday, those shifts, we alternate

2    days.

3    Q    Okay.

4    A    S to he exact date without having the date specified.  But

5    --

6    Q    But here we do have the date specified.  Was that one of the

7    days of the week that you were working?

8    A    Yes, sir.

9    Q    How do you know that?

10   A    Because I'm -- I looked.  I was told.  I looked at that on

11   the booking sheet.  And it's my signature of booking him in.

12   Q    But you didn't sign either one of these exhibits.  Is that

13   right?

14   A     No, sir.  No, sir.  These are signed only by a deputy.

15   Q    So did you physically witness Deputy Powers handing these

16   documents to Mr. Quiroz?

17   A    To say personally handed, I cannot say yes or no because

18   many times, these documents are signed, given to us as jailers,

19   and we hand it to them.

20   Q    But you don't have any direct experience about what happened

21   with these two documents with Deputy Powers on August 24th last

22   year, do you?

23   A    As far as the deputy?  No, sir, I cannot fully say.  All I

24   can say is what I've said is --

25   Q    That's fine.  That's good.  But -- and there's nothing on

1  either one of these documents that may or may not have been

2  provided to Mr. Quiroz that explains what indictment means, is

3  there?

4  A    The indictment would be -- would say on these -- no, sorry,

5  it would be on the charges that all of them are precept.

6  Q    Right.  But you don't go through it and explain to him what

7  an indictment means to him in your experience.  Is that right?

8  A    No, sir.

9            MR. ELLIS:  Objection, Your Honor.

10           MR. MEREDITH:  Pass the witness.

11           THE COURT:  Redirect?

12           MR. ELLIS:  Briefly, Your Honor.

13                     REDIRECT EXAMINATION

14  BY MR. ELLIS:

15  Q    Mr. Stallard, based on your training and experience as a

16  jailer --

17  A    Yes, sir.

18  Q    -- conducting this process over how many years again?

19  A    Thirteen.

20  Q    Thirteen.  Does a defendant need to sign either of these

21  forms to receive it or have knowledge of it?

22  A    Does he have to sign it?  No, sir.

23  Q    All right.  And I believe you were just asked if you

24  personally knew this -- what this deputy did at the time.  And I

25  believe you said no, correct?

Stallard - Redirect/Ellis                    95

1   A    That I could say definite, yes or no?  No, I cannot say that

2   he handed it to him.  I will say that if he did not hand it to

3   him at all, the papers were handed to me and we always -- I'm not

4   the only jailer.  We always handed those copies that say

5   defendant, and especially with the precepts, there to the person

6   coming in.

7        And again, they have it in their possession.  If they want

8   it, fine.  If not, then we take that and put it in the property.

9   Q    And when they leave the jail, what happens?

10  A    That property goes with them.  It's there for them.

11  Q    Now you just stated that you always do it this way?

12  A    Yes, sir.

13  Q    And that's based on your training and experience?

14  A    Yes, sir.  Every time.  It's the way I was taught, it's the

15  way I do it.

16  Q    So even if you don't remember, you know, three years ago a

17  case, because you do it always the same way --

18  A    Yes, sir.

19  Q    -- are you confident that that's the way you did it this

20  time?

21  A    Yes, sir.

22            MR. ELLIS:  Pass the witness, Your Honor.

23            THE COURT:  Mr. Meredith?

24                     RECROSS-EXAMINATION

25  BY MR. MEREDITH:

Stallard - Recross                                    96

1   Q    Did you say -- did you witness the property being returned

2   to Mr. Quiroz when he got out?

3   A    I would not say that because I do not know what date he got

4   out.

5   Q    You don't remember doing it is what I'm saying.

6   A    Again, if I wasn't the jailer on duty, then he -- I wasn't

7   there when he got out and his property was handed to him.

8   Q    Right.  But the question is do you have any memory of your

9   own experience handing him that document at any time, those

10  documents?

11  A    When he booked in, as again I said, I hand the documents to

12  them, ask them if they want to keep it.  If not, it goes in their

13  property.  That's the last I can tell you that I get as far as

14  when you're asking when he got out.  If I was not on duty, I

15  cannot say.

16  Q    Right.  But I'm not asking what you normally do or what

17  you've done all your work history.  I'm just asking you if you

18  have any memory of handing Mr. Quiroz these documents.

19  A    At the time he was booked in?

20  Q    At the time that he got out.

21  A    At the -- again, no, sir.

22           MR. ELLIS:  Objection, Your Honor.  Asked and answered.

23           MR. MEREDITH:  He's being --

24           THE COURT:  He just answered again.  He said no, sir.

25  He said no.

97

1          MR. MEREDITH:  Oh, he said no?  Okay.

2          THE COURT:  I think y'all were talking.

3          MR. MEREDITH:  I didn't hear.

4          THE COURT:  I'm sorry.

5          MR. MEREDITH:  All right.  Okay.  Where does that leave

6   us?

7          THE COURT:  Any other questions?

8          MR. MEREDITH:  Pass the witness.

9          THE COURT:  Anything else?

10          MR. ELLIS:  Nothing further, Your Honor.

11          THE COURT:  Sir, thank you for being here.  I

12   appreciate it.

13          THE WITNESS:  You're welcome.  Thank you.

14          THE COURT:  Mr. Meredith, may this witness be excused?

15          MR. ELLIS:  Yes, Your Honor.

16          THE COURT:  Thank you.

17       (Witness excused)

18          THE COURT:  Next witness.

19          MR. ELLIS:  Government calls Michael Portillo.

20          THE COURT:  Portillo.

21          MR. MEREDITH:  Maybe we can save some time if we

22   approach briefly, Judge, instead of in a few minutes.

23          THE COURT:  Sure.

24       (Bench conference at 10:49 a.m.)

25          THE COURT:  Outside the presence of the jury.  Yes,

1   sir.

2          MR. MEREDITH:  Are you going to try to do that line up?

3   Are you going to try to get the lineup in as an exhibit?

4          MR. ELLIS:  Yes, because that's how we identified him.

5          MR. MEREDITH:  But if just admit it's him?

6          MR. ELLIS:  I'm --

7          MR. MEREDITH:  We don't have to do that lineup because

8   --

9          THE COURT:  Testimony on the lineup?

10          MR. ELLIS:  I'm fine if you say -- if we, like,

11   stipulate basically that he was identified by him?

12          MR. MEREDITH:  Yeah.

13          MR. CALVE:  And that was him that went in and -- on the

14   information on the form and signed it.

15          MR. MEREDITH:  Yeah, he was the one that was in there.

16          MR. CALVE:  All right.

17          MR. MEREDITH:  Yeah, we don't need the --

18          UNIDENTIFIED SPEAKER:  You don't need this guy?

19          MR. ELLIS:  I still need him.  I mean -- I think we

20   still --

21          THE COURT:  Okay.

22          MR. ELLIS:  But it will cut it in half.  I don't need

23   to ask him the full questions.  But I want to make sure.

24          MR. MEREDITH:  Just ask him to point him out and say

25   that's him sitting over there.  I mean, we don't have to do -- I

 1  mean, he can do it right now.

 2           THE COURT:  Yes, sir.

 3           MR. MEREDITH:  We don't have to do the lineup.

 4           MR. ELLIS:  I think it's kind of bolstering.

 5           THE COURT:  Okay.

 6           MR. ELLIS:  Okay.

 7           THE COURT:  (Indiscernible) then you got it.

 8      (Bench conference ends at 10:50 a.m.)

 9           THE COURT:  Sir, were you sworn?

10           MR. PORTILLO:  Yes, sir.

11           THE COURT:  You may have a seat.  My apologies.  I

12  didn't know you were standing there.  I thought you were already

13  sitting down.

14           MR. PORTILLO:  It's all good.

15           THE COURT:  You can adjust yourself a little bit.  Once

16  you start talking, if you're too close I'll tell you to back up.

17           Mr. Ellis, you may proceed.

18           MR. ELLIS:  Thank you, Your Honor.

19      MICHAEL PORTILLO, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

20                       DIRECT EXAMINATION

21  BY MR. ELLIS:

22  Q    Mr. Portillo, can you please state your name for the record

23  and spell your last name?

24  A    Michael Portillo, P-O-R-T-I-L-L-O.

25  Q    Where are you currently employed?

Portillo - Direct/Calve                                    100

1    A    True Value in Alpine, Texas.

2    Q    And what are your job duties at the True Value?

3    A    Sales clerk at the sporting goods department.

4    Q    And sales clerk, what kind of sales clerk are you?

5    A    Over the sporting good sales, firearms.

6    Q    And based on your knowledge as a firearm or a gun salesman,

7    is True Value a licensed firearm dealer?

8    A    Yes, sir.  We're a licensed FFO.

9    Q    And how do you know that?

10   A    Our license is behind us in the gun counter.

11   Q    I'd like to direct you to the date of December 23rd, 2021.

12   Were you working that day?

13   A    Yes, sir.

14   Q    Do you recall anything out of the ordinary occurring that

15   day?

16   A    We had a gentleman come in that had ordered a firearm and

17   was there to pick it up.

18   Q    And what was out of the ordinary about that?  Why does that

19   stick out to you?

20   A    It was just -- I don't know.  It was just -- it was just

21   when he came up to the counter, he was just -- he just asked for

22   his firearm, but he had to do his paperwork first.

23   Q    And I mean, during that time, did anything specifically

24   about the defendant stick out to you that looked out of place or

25   anything?

Portillo - Direct/Calve                    101

1    A    He looked kind of, how can I put it, like he was from Fort

2    Stockton.

3    Q    And what does that mean?

4    A    That it was just things that stick out to me that that's

5    where he was from.

6    Q    And what's that based on?

7    A    The way he was -- the way he was dressed and stuff like

8    that.  I mean, I've been around people from Fort Stockton.

9    That's how I perceive them.

10   Q    And it's just something that I guess locals would know?

11   A    Yeah.  Yes, sir.

12   Q    Sir, do you personally remember this customer or event

13   because it ultimately involved an ATF investigation, or did you

14   remember it before, or when the agents reached out to you, did

15   you already remember?

16   A    Yes, sir.

17        THE COURT:  I'm sorry.  Can you repeat that question?

18   What was it?

19        MR. ELLIS:  Yes, Your Honor.

20   BY MR. ELLIS:

21   Q    So do you remember this customer yourself, so you just

22   remember him when ATF reached out, or did you go back and have to

23   review documents to identify who the guy was ATF was reaching out

24   to you about?

25   A    No, I remembered him.  It was just something about him that

Portillo - Direct/Calve                    102

1    I remembered.

2    Q    And was he acting in any strange ways?  Was he doing

3    anything out of the ordinary?

4    A    No, sir.  He didn't act any different.  But I just, there

5    was just something about him that I remember.

6    Q    And is the person who came in to purchase that firearm, or

7    fill that form out, is he in the courtroom today?

8    A    Yes, sir.

9    Q    And where's he at?  Can you point him out?

10   A    He's right there behind you.

11          MR. ELLIS:  Your Honor, the Government would ask that

12   the record reflect that the witness pointed out the defendant.

13          THE COURT:  The record shall so reflect.

14   BY MR. ELLIS:

15   Q    Now I believe a minute ago you stated that this customer

16   came in to pick up a firearm?

17   A    Yes, sir.

18   Q    And what does that mean?  Why wasn't he buying it from your

19   store?

20   A    He had an order online from Cheaper Than Dirt.  And it came

21   into our store.

22   Q    And if he purchased it online, why was he at the True Value

23   to get it?  Why didn't he have it, like, shipped to his house?

24   A    By ATF laws, you have to have it shipped to an FFL dealer so

25   you can go in there and do your 4473.

1    Q    I'd like to direct you to the exhibit binder in front of

2    you.  Could you flip to 19?

3    A    Which one?

4    Q    19.

5    A    Okay.

6    Q    Do you recognize this?

7    A    Yes, sir.

8    Q    And what is it?

9    A    It's the invoice that came in with the gun.

10   Q    And is this a fair and accurate representation of the

11   invoice that came with the gun that you had with the firearm on

12   December 23rd of 2021?

13   A    Yes, sir.

14   Q    All right.  Is this in fact the actual receipt for the

15   firearm that the defendant applied for?

16   A    Yes, sir.

17   Q    And how do you know this?

18   A    It has his name on there, all his information.  It has our

19   information for the store, Morrison's True Value.  And it -- and

20   the name of the company where he ordered it from.

21   Q    And do you have personal knowledge, do you remember

22   reviewing this receipt --

23   A    Yes, sir.

24   Q    -- after getting questioned?

25   A    Yes, sir.

1          MR. ELLIS:  Your Honor, the Government moves to enter

2   Exhibit 19 into evidence.

3          THE COURT:  Mr. Meredith?

4          MR. MEREDITH:  No objection.

5          THE COURT:  Government's Exhibit 19 is admitted without

6   objection.

7       (Government's Exhibit 19 admitted into evidence)

8   BY MR. ELLIS:

9   Q    Can you tell the jury what type of firearm is listed on the

10  receipt?

11  A    It's an ATI semiautomatic 22.  It's a 1911 style.

12  Q    And what does ATI mean?

13  A    That it's the brand, American Tactical.

14  Q    And is this the firearm that the defendant had shipped to

15  your actual store?

16  A    Yes, sir.

17  Q    Now I'd like to direct you to the exhibit folder in front of

18  you again to Exhibit 1 this time.  You might have to pull it out

19  of the sleeve to look at all of the -- sorry about that.

20  A    Okay.

21  Q    All right.  Do you recognize this?

22  A    Yes, sir.

23  Q    What is it?

24  A    It's the ATF 4473.

25  Q    And is this a true and accurate representation of the actual

1  form the defendant filled out on December 23rd, 2021, in your

2  presence?

3  A    Yes, sir.

4  Q    And how do you know this?

5  A    If you look on the other page, that's where on 26 -- 24 --

6  on Section C, if you look down there, that's my handwriting and

7  my signatures and all that.

8  Q    And Section C, which page is that on so we can --

9  A    Second page, sir.

10 Q    Second page.

11 A    and that's all the information that I need to fill out.

12 Q    And so you said that's your handwriting?

13 A    Yes, sir.

14 Q    You filled out all of Section C?

15 A    Yes, sir.

16 Q    And do you know who filled out numbers 1 through 23 on the

17 form?

18 A    Mr. Quiroz.

19 Q    How do you know he filled those sections out?

20 A    Because I was there when he was doing it.  And that's what

21 he has to fill out whenever he goes and picks up the gun.

22 Q    And did you help him with the form?

23 A    No, sir.

24 Q    And did the defendant ever ask you any questions about the

25 form while he was filling it out?

Portillo - Direct/Calve                                   106

1   A     No, sir.

2   Q     So what were you doing while he filled the form out?

3   A     I was to the side waiting for him to finish.

4   Q     And after the form was filled out, what if anything did you

5   do?

6   A     I got his ID, I checked his ID, looked over the information

7   that he wrote down, make sure it coincides with what's on his ID.

8   Then I proceeded to do it on the computer, put everything in the

9   computer to the FBI.  Then I sent it off.

10  Q     And did you verify his ID or his driver's license with any

11  other documents?

12  A     With the receipt that came in with the gun.

13         MR. ELLIS:  Your Honor, I'd ask that the Exhibit 19 be

14  published to the jury.

15         THE COURT:  Yes, sir, you may.

16         MR. ELLIS:  and if you'll zoom in at the top where his

17  personal information is.

18  BY MR. ELLIS:

19  Q     This is the information you verified off his ID?

20  A     Yes, sir.

21  Q     And so his name, Jose Quiroz, that was on his driver's

22  license?

23  A     Yes, sir.

24  Q     And that was his valid address on his driver's license?

25  A     Yes, sir.

1    Q    And what did you do with the form after it was completely

2    filled out, you had the driver's license information here, what

3    if anything did you do?

4    A    I waited for the -- after I put it in the computer and

5    everything, I waited for the response from ATF, well from the

6    FBI.

7    Q    When you said you put it in the computer, what does that

8    mean?

9    A    I mean, I typed everything, all his information into the

10   computer because we got to do that.  We look at this and we go

11   back in and put it in through the computer.  All the information

12   that writes down, that's what we put in into the -- it's almost

13   like a 4473 that's on the computer.  We go through all that.

14         We got to go back and verify his last name, and first name

15   and middle name.  Put all that in there and then send it out to

16   the FBI.  And we sit there and we wait.  We wait for a response

17   from them.

18   Q    And when you say wait for a response, what response did you

19   get in this case?

20   A    A delay.

21   Q    What does that mean to you?

22   A    That they're still researching his information through all

23   the information he put in there.  They're researching his

24   background check, I guess.

25   Q    So was he allowed to take the firearm that day?

Portillo - Direct/Calve                              108

1    A     No, sir.

2    Q     Why not?

3    A     Because he's on delay.  I mean, until I get a response from

4    the FBI, he can't take the gun.

5    Q     All right.  And how long does this delay last?

6    A     I mean, they give us a date, and that's what we put on here

7    when it says delay.  And they have to wait until that day.

8    Q     And once that day comes, what can occur then?

9    A     What's that?  Excuse me?

10   Q     Once the day comes, the date that you put down, I believe --

11   A     12/30.

12   Q     Go to Exhibit 1.  I think it's 27C.

13   A     Yeah, it's 12/30/21.

14   Q     So it says he's delayed.  And can you read that next

15   portion?  You should have it right in front of you.

16   A     Yeah, 12/30 delay (indiscernible) be transferred on 12/30/21

17   if state law permits.

18   Q     And based on your experience as a gun salesman in the State

19   of Texas, was he permitted to pick the gun up on 12/31/21?

20   A     Yes, sir.

21   Q     All right.  Does this delay, based on your experience, mean

22   that if he is under indictment or if he does not qualify with

23   these questions, that that delay notice trumps these restrictions

24   on him?

25   A     No, sir.  I mean, they're just researching what the rest of

Portillo - Direct/Calve                    109

1   his information.

2   Q    And after he had the delay, what if anything did the

3   defendant do at that point?

4   A    He ended up going home.  He came back on that day and picked

5   up the firearm.

6   Q    And did you call and speak with him and say hey, your delay

7   is up, you can come and get it?

8   A    No, sir.

9   Q    And so how did he arrive back at the store?

10  A    I mean, I gave him that date whenever he got the delay. A dn

11  then that's how he knew he could come and pick up that gun on

12  that day.

13  Q    And did the defendant actually return?

14  A    Yes, sir.

15  Q    What did he return to the store for?

16  A    Pick up his gun.

17  Q    And was the firearm transferred to the defendant?

18  A    Yes, sir.

19  Q    After he took possession of the firearm, was he ever

20  approved through the NICS system?

21  A    No, sir.  Two days, two, three days later he was denied.

22  Q    And what if anything did you do as a gun salesman once that

23  happens?

24  A    We get calls from the ATF letting us know that.  I mean,

25  there's -- I mean, like, the gun sales, I mean, we do what we do.

1  We go by what they gave us -- the dates that they give us.  On

2  that day, since we had no respond, by that Brady law we were --

3  we could -- we were able to give him the gun.  Two day -- two or

4  three days later he got denied.

5  Q    And can I have you zoom in to 27D?  And if you would look at

6  27D in front of you --

7  A    Yes, sir.

8  Q    -- on Page 2.  What date was the defendant actually denied

9  on?

10 A    1/4 of 2022.

11 Q    And after he was denied, did you or anyone at True Value

12 call the ATF about this denial?

13 A    No, sir.  They're the ones that call us.

14 Q    Do you recall when the ATF agents reached out to you?

15 A    Yes, sir.

16 Q    When was that?

17 A    I don't remember.  Maybe the -- I think it was a couple of

18 days after that.

19 Q    And then what happened when they reached out to you?

20 A    We got together and did a photo lineup.

21 Q    And did you positively identify the defendant?

22 A    Yes, sir.

23 Q    And did any of the agents direct you to pick anybody out in

24 particular?

25 A    No.  No, sir.

1          MR. ELLIS:  Pass the witness, Your Honor.

2          THE COURT:  Mr. Meredith, your witness.

3                    CROSS-EXAMINATION

4     BY MR. MEREDITH:

5     Q    Good morning, Mr. Portillo.

6     A    How are you doing, sir?

7     Q    Pretty good.  Did you grow up around here?

8     A    In Alpine.

9     Q    In Alpine?  And what makes you feel like you can pick

10    someone out from Fort Stockton?

11    A    I used to work there.  I used to live there for four years.

12    Q    Can you describe anything specific about how they dress or

13    behave or anything that makes you think oh, that guy's from Fort

14    Stockton?

15    A    Certain ways they use their cowboy hats, because he was

16    wearing a cowboy hat that day when he showed up.

17    Q    And so it's a Fort Stockton way of having a cowboy hat?

18    A    Yes, sir.

19    Q    Is there anything else that would make it that he was from

20    Fort Stockton?

21    A    When I got his paperwork on that --

22    Q    I mean before that, when you just saw him without knowing

23    anything about him.

24    A    Just, I mean, like I say, the way he was dressed up.

25    Q    And the instruction, in the Exhibit 1, that's the firearms

Portillo - Cross                                    112

1  transaction record.

2  A    Yes, sir.

3  Q    You said that you only filled out Section C on Page 2.  Is

4  that right?

5  A    Yes, sir.  The Section C?

6  Q    Yes.

7  A    Yes, sir.

8  Q    You didn't fill out any of the other parts of that?

9  A    The top part at Section A.

10 Q    You wrote in the type of gun it is?

11 A    Yes, sir.  That's our part.

12 Q    Okay.

13 A    Because we're the ones that have the serial number and

14 everything there.

15 Q    So you do Section A and C, but the purchase -- the buyer

16 does Section B.  Is that what you're saying?

17 A    Yes, sir.

18 Q    And it has the -- the form has a couple pages of

19 instructions after the part that you fill out.  Is that right?

20 A    Yes, sir.

21 Q    Did you go over those instructions with Mr. -- with Jose?

22 A    No, sir.

23 Q    Does the True Value gun section have videotape?

24 A    Yes, sir.

25 Q    Was this video recorded?

1    A    I mean, it would have been.  Yes, sir.

2    Q    And what happened to that video?

3    A    I don't know how long they keep it.

4    Q    But after a certain time, they get rid of them?

5    A    Well, I don't know how that video stuff works.

6    Q    So you don't know if there's still a video of what happened?

7    A    No, sir.

8    Q    In terms of the delay notification, you gave him a return

9    date of December 30th of 2021.  Is that right?

10   A    Yes, sir.

11   Q    And he actually did what you told him.  He came back on that

12   day.  Is that right?

13   A    Yes, sir.

14   Q    And you didn't call him to come in because you already told

15   him when he could come in and get it.  Is that right?

16   A    What was that?  Excuse me?

17   Q    No one had to call him to come get it because you'd already

18   told him when he could come get it.

19   A    Yes, sir.

20              MR. MEREDITH:  Pass the witness.

21              THE COURT:  Redirect.

22              MR. ELLIS:  Nothing further, Your Honor.

23              THE COURT:  Thank you, sir.  We appreciate you coming

24   over.

25              THE WITNESS:  Yes, sir.

1          THE COURT:  Mr. Meredith, may this witness be excused?

2          MR. MEREDITH:  Yes.

3     (Witness excused)

4          THE COURT:  Your next witness, Mr. Ellis?

5          MR. ELLIS:  United States calls Nate Anderson, Your

6     Honor.

7          THE COURT:  All right.  If you'll have him come on in.

8          MR. PORTILLO:  May I leave?

9          THE COURT:  Thank you, sir.

10         MR. PORTILLO:  Yes, sir.

11         THE COURT:  Sir, if you'd come on up.

12         Mr. Calve, you may proceed whenever you're ready.

13      NATE ANDERSON, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

14                      DIRECT EXAMINATION

15    BY MR. CALVE:

16    Q    Good morning, sir.  Could you introduce yourself to the

17    jury, please?

18    A    Good morning.  My name is Nate Anderson.  I'm a Special

19    Agent with the Bureau of Alcohol, Tobacco, Firearms, and

20    Explosives.

21    Q    And, sir, if you could just sit back just a little bit from

22    the mic.  Sorry.  Appreciate that.  So, and what did you say you

23    do for a living, sir?

24    A    I'm a Special Agent with the bureau of Alcohol, Tobacco,

25    Firearms, and Explosives.

Anderson - Direct/Calve                     115

1    Q    How long have you been in that position?

2    A    Since June of 2016.

3    Q    Okay.  And in addition to being a special agent, do you have

4    any particular role within the ATF?

5    A    Yes.  I'm assigned to the Firearms Trafficking Group.  I'm

6    also a Certified Interstate Nexus Agent, and also a firearms

7    instructor for ATF.

8    Q    What's an interstate nexus agent?

9    A    So we attend a certification course where we're trained in

10   how to properly examine to identify firearms and ammunition to

11   determine the classification and origin of the firearms and

12   ammunition.  And that goes towards determining a nexus if the

13   firearm and ammunition affected or traveled in interstate

14   commerce.

15   Q    Okay.  Well, let's break that down just a little bit.  What

16   does it mean for a gun to have affected interstate commerce?

17   A    Okay.  So interstate commerce is commerce between any place

18   in a state and any place outside of that state.

19        So for example, if a firearm's manufactured in the State of

20   Connecticut and then was purchased in Tennessee, that firearm

21   would have had to travel in interstate commerce for it to have

22   arrived in Tennessee.

23   Q    So for example, if I have a gun here in Texas, and it was

24   manufactured in the State of Georgia, does that mean that that

25   gun would have had to cross state lines in order to get here?

1   A    Yes, sir, it does.

2   Q    Does that mean, in your training and experience, that it

3   affected interstate commerce?

4   A    That's correct.  Yes, sir.

5   Q    Is that what you call the nexus?

6   A    Yes, sir.

7   Q    And you said -- did you say you completed the certification

8   course in order to get that role?

9   A    Yes, sir.  The course is an ATF course.  And on the very

10  first day, you're required to take an exam, the very first thing.

11  That goes over your knowledge of firearms and firearms laws.  You

12  have to pass that test in order to stay in the course.  Once you

13  complete the course, before graduation you have to take a more

14  extensive examination which I passed and graduated from.

15  Q    All right.  And have you testified in federal court before

16  as an expert in this area?

17  A    Yes, sir, I have.

18           MR. CALVE:  Thank you, sir.  Your Honor, we offer this

19  witness as an expert in the field of interstate nexus.

20           THE COURT:  Mr. Meredith?

21           MR. MEREDITH:  No objection.

22           THE COURT:  The Court so finds.

23           MR. CALVE:  Thank you, Your Honor.

24  BY MR. CALVE:

25  Q    So, sir, I just want to talk to you briefly about your

Anderson - Direct/Calve                    117

1   involvement in this case --

2   A    Yes, sir.

3   Q    -- the case against the defendant, Mr. Quiroz.  At some

4   point were you asked to conduct a nexus examination of some

5   identifying information about a gun in connection with that case?

6   A    Yes, I was.

7   Q    What were you asked to do?

8   A    I was asked to examine a report written by another ATF

9   interstate nexus expert as well as the ATF form 4473 firearms

10  transaction record which contained the identifying information of

11  a firearm.

12  Q    And what were you looking for when you did that?  What were

13  you trying to see?

14  A    So we identified a firearm.  In this instance, it was just

15  the information we had.  We didn't have the actual firearm to

16  look at.  It was the manufacturer's name, the model, the caliber,

17  and the serial number.

18  Q    Okay.  And you said you reviewed the findings of another ATF

19  nexus agent.  Where is that person?

20  A    He's currently on family leave.

21  Q    Is that why you were asked to come in --

22  A    Yes, sir.

23  Q    -- and do this?

24  A    Yes, sir.

25  Q    Okay.  So did you actually get the identifying information

1  for the gun involved in this case?

2  A    Yes, sir.  Yes, sir, I did.

3  Q    What was that gun?

4  A    It was a GSG or German Sports Gun, 1911, 22 caliber pistol.

5  It's manufactured in Germany and imported into the United States

6  by American Tactical Inc., or ATI.

7  Q    Was the serial number A907700?

8  A    Yes, sir.  Sounds correct.

9  Q    Are you personally familiar with that kind of gun?

10 A    Yes, sir, very familiar.

11 Q    Why is that?

12 A    I personally own one.  And I've also examined these before

13 in other investigations.

14 Q    So based on your examination, did you determine whether if

15 there's one of those guns here in Texas, it had to cross state

16 lines in order to get here?

17 A    Yes, sir.

18      All firearms, all 1911, 22 caliber pistols marketed and sold

19 by American Tactical are manufactured in Germany.  ATI, American

20 Tactical, they do not manufacture 22 caliber 1911s themselves.

21      The company's located currently in Summerville, South

22 Carolina.  They manufacture 1911s in 9mm and 45 ACP.  But all of

23 their 22 caliber are imported from Germany through GSG.  Once

24 this firearm was imported, I communicated with the company I

25 believe it was in November of 2021.

Anderson - Cross                    119

1      It was received in South Carolina.  And they then

2  transferred it to RSR Group which is a large wholesale firearms

3  corporation out of the State of Florida.

4  Q    Thank you, sir.

5      So in your opinion, did you find that that gun, if it was in

6  Texas, affected interstate commerce, the nexus you were talking

7  about earlier?

8  A    Yes, sir, I did.

9            MR. CALVE:  Thank you.  Pass the witness, Your Honor.

10           THE COURT:  Mr. Meredith, your witness.

11                        CROSS-EXAMINATION

12  BY MR. MEREDITH:

13  Q    And -- Morning, Agent.

14  A    Good morning, sir.

15  Q    Why is moving or affecting interstate commerce important for

16  someone, for federal gun legislation?

17           MR. CALVE:  Objection, beyond the scope of direct.

18           THE COURT:  I agree.  Objection sustained.

19  BY MR. MEREDITH:

20  Q    You said that you testified multiple times before as your

21  expertise and experience on interstate commerce?

22  A    Yes, sir, I have.

23  Q    With firearms?

24  A    Yes, sir.

25  Q    How many times did you testify on -- where you were called

120

1   by the defense to testify?

2   A    I never have.

3            MR. MEREDITH:  Pass the witness.

4            MR. CALVE:  Nothing further, Your Honor.

5            THE COURT:  Thank you, sir.

6            Mr. Meredith, may this witness be excused?

7            MR. MEREDITH:  Yes, Your Honor.

8            THE COURT:  Thank you very much.

9            THE WITNESS:  Thank you.

10        (Witness excused)

11            THE COURT:  Your next witness?

12            MR. CALVE:  Your Honor, may we briefly approach?

13            THE COURT:  Sure.

14        (Bench conference at 11:18 a.m.)

15            THE COURT:  Outside the presence of the jury.  Yes,

16   sir?

17            MR. CALVE:  Your Honor, the only other witness we have

18   is the agent who actually administered the photo lineup to the

19   gun store worker.  But if we can get a stipulation that -- yes,

20   sir.  But if we can get a stipulation that actually the defendant

21   was the one who went into the store, if there's no dispute about

22   that, then we don't have to call him.  We're just trying to speed

23   this up.

24            MR. MEREDITH:  We'll stipulate to that.

25            THE COURT:  Okay.

1    MR. CALVE:  And that he was the one who signed the form

2    and filled it out.

3    MR. MEREDITH:  Yes.

4    THE COURT:  So do y'all want to --

5    MR. MEREDITH:  Not that he filled it out.

6    MR. CALVE:  Well, that he answered the questions on the

7    form.

8    MR. MEREDITH:  Some of it was filled out by him.

9    THE COURT:  We'll go on break and y'all work on that

10   because it needs to be I think in writing.  So y'all can read it

11   or whatever you want.  But it needs to be in writing so that

12   everybody knows exactly what the stipulation is because I already

13   hear some --

14   MR. CALVE:  Okay.

15   THE COURT:  So I'll give you, like, a ten-minute break

16   and y'all bang that out.

17   MR. MEREDITH:  Okay.

18   THE COURT:  And you can call your witness.

19   MR. CALVE:  Okay.  Thank you, Your Honor.

20   THE COURT:  Thank you.

21   (Bench conference ends at 11:19 a.m.)

22   THE COURT:  All right.  So, ladies and gentlemen of the

23   jury, what I'm going to do is the attorneys are going to work on

24   something for the next ten minutes or so.  It's going to take

25   them a little time.  I don't want you all, and I don't want me to

1   be sitting here waiting on them.  And so I'm going to give you

2   that short break and we'll be back in here, I plan for 11:30.

3        Remember your instructions.  You're going to leave your

4   notebooks here of course.  You're not talking about the case at

5   all.  Talk about how good the Cowboys are going to be next year

6   because that's what I always talk about at this time of year is

7   how good we're going to be next year.  Thank you.

8        All right.  Let's rise for the jury, please.

9      (Jury out at 11:20 a.m.)

10       THE COURT:  All right.  Outside the presence of the

11   jury.  We're going to take a short break.  And the attorneys are

12   going to work on this quick, very short stipulation.  If y'all

13   can agree to it, great.  We'll do it.  If you can't, you got a

14   witness to call and I'll be back in ten minutes.  Okay?

15       MR. CALVE:  Understood, Your Honor.

16       THE COURT:  Thank you.  And you can -- as long as you

17   all write it out and agree to it, sign it, initial it, whatever,

18   to me y'all can read that, introduce it, read it, whatever you

19   want to do.  It's whatever the parties want, just so y'all agree.

20   If somebody disagrees as to one thing, even if it's a, you know,

21   the word the in the wrong place, you know, let's just do it the

22   old fashioned way.  All right.  Thank you, all.

23       THE DEPUTY:  All rise.

24      (Recess at 11:21 a.m./Reconvened at 11:32 a.m.)

25      (Outside the presence of the jury; defendant present)

123

1          THE CLERK:  All rise.

2          THE COURT:  All right.  Outside the presence of the

3    jury.  Mr. Ellis, Mr. Calve, Mr. Meredith, we have a stipulation?

4          MR. CALVE:  Yes we do, Your Honor.

5          THE COURT:  Okay.

6          MR. CALVE:  We are just finishing signing it, and then

7    we're going to give it to the Defense for them to sign.

8          THE COURT:  Go right ahead.

9        (Pause)

10          MR. CALVE:  Apologies, Your Honor.  We're just --

11          THE COURT:  That's okay.  No, y'all are almost done.

12        (Pause)

13          MR. CALVE:  We're good, Your Honor.

14          THE COURT:  Who do y'all want me to call on, Mr. Calve

15    or Mr. Ellis?

16          MR. CALVE:  I can read it, Your Honor.

17          THE COURT:  Okay.  Let's have the jury come in.

18        (Jury in at 11:37 a.m.)

19          THE COURT:  Thank you.  Let's be seated.

20          Mr. Calve, your next witness?

21          MR. CALVE:  Your Honor, at this time, the United States

22    will read a stipulation of fact that's been agreed to by both the

23    parties in this case, Government's Exhibit 23 or Joint Exhibit 1.

24          THE COURT:  Mr. Meredith, any objection?

25          MR. MEREDITH:  No, Your Honor.

1          THE COURT:  Defense joins in this stipulation?

2          MR. MEREDITH:  Yes, Your Honor.

3          THE COURT:  Mr. Calve, is it Government's Exhibit 23?

4          MR. CALVE:  Government's Exhibit 23, yes.

5          THE COURT:  That's admitted without objection and by

6   agreement.

7       (Government's Exhibit 23 admitted into evidence)

8          THE COURT:  And you may read it, if you come on up.

9          MR. CALVE:  Stipulation of fact.  The United States and

10  the defendant, Jose Gomez Quiroz, stipulate and agree to the

11  following facts.  Number one, defendant is the individual who

12  came to Morrison True Value in connection with the acquisition of

13  a firearm.

14          Number two, defendant signed the ATF Form 4473 in

15  connection with the acquisition of the weapon.  And number three,

16  Morrison True Value employee Michael Portillo identified the

17  defendant as the individual described herein.  And it's signed by

18  the parties and the defendant.

19          THE COURT:  Thank you.  Your next witness?

20          MR. ELLIS:  The Government rests, Your Honor.

21          THE COURT:  All right.  Ladies and gentlemen of the

22  jury, I know you just got back in here, but the Government's

23  rested their case in chief.  Now that means you've gotten all

24  their case in chief evidence.  That doesn't mean the trial is

25  over.  It doesn't mean you're receiving the case for deliberation

125

1    yet.

2            So I'm going to ask you to leave your notebooks here.

3    Remember your instructions.  I'm going to ask you to retire to

4    the jury room.  It won't be for very long, but I've got some

5    quick business we have to take up and I don't want you sitting

6    there waiting on us.

7            It will take five to ten minutes at the most.  We'll

8    have you right back in here.  Thank you.  Let's rise for the

9    jury, please.

10        (Jury out at 11:39 a.m.)

11            THE COURT:  Let's have a seat, please.  Outside the

12   presence of the jury.

13            The Government having rested, Mr. Meredith, does the

14   Defense have a motion?

15            MR. MEREDITH:  Move under Rule 29 for a judgment of

16   acquittal, Judge.

17            THE COURT:  Thank you.

18            The Court, reviewing the evidence in the light most

19   favorable to the Government, taking all inferences in favor of

20   the Government, resolving all issues of credibility in favor of

21   the Government which is the standard of proof in a Rule 29

22   motion, at this time finds that a reasonable and rational juror

23   could find the defendant guilty beyond a reasonable doubt of each

24   of the elements set forth in the indictment.  That would be in

25   both counts.  And I respectfully deny the motion.

126

1          Mr. Quiroz, if you and Mr. Meredith would come on up to

2    the podium here, the lectern.  Yeah, come on up.

3          MR. MEREDITH:  Can I have one second, Judge?

4          THE COURT:  Absolutely.

5          MR. MEREDITH:  Thank you, Your Honor.

6          THE COURT:  Thank you.  And, sir, you are Jose Gomez

7    Quiroz, the defendant in this cause, right?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  And you've been here for the trial that

10   started this morning?  You've been here for the entirety and --

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  -- you've heard and listened to everything?

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  All right.  Very good.  As you have a right

15   to do, and glad you were here.  Every criminal defendant is

16   privileged to testify in his own defense.  Even though you have

17   competent counsel, I advise you that the law provides that you as

18   the accused in this case do not have to testify.  If you choose

19   not to testify, no one can or will hold that against you.

20         Likewise, you have the right to testify.  And no one

21   can keep you from testifying if that's what you choose to do.  Do

22   you understand, sir?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  If you choose to testify, the Government's

25   allowed to cross-examine you just the same as any other witness,

127

1    of course.  Do you understand that?

2                 THE DEFENDANT:  Yes, sir.

3                 THE COURT:  If you have previous convictions in the

4    nature of a felony or misdemeanor involving moral turpitude

5    that's not remote, then the Government would be entitled to ask

6    you about those convictions, and in effect disclose those

7    convictions to the jury.  Do you understand, sir?

8                 THE DEFENDANT:  Yes, sir.

9                 THE COURT:  In the event that you choose to testify and

10   you have previous convictions that are made known to the jury,

11   I'll instruct the jury they are not to consider those convictions

12   for any purpose except as they may bear on your credibility as a

13   witness.  Do you understand?

14                THE DEFENDANT:  Yes.

15                THE COURT:  Likewise, you also have the right to remain

16   silent, as I stated.  In other words, you do not have to testify

17   if you don't want to.  And if you choose to remain silent, the

18   Government cannot make you testify.  They cannot call you as a

19   witness or in any way force you to bear witness against yourself,

20   nor can they do anything to call upon you to account for your

21   failure to testify.  Do you understand that?

22                THE DEFENDANT:  Yes, sir.

23                THE COURT:  Now, if you choose not to testify, I'll

24   instruct the jury they cannot use that against you in any way.

25   They cannot speculate as to why you didn't testify or what you

128

1    might have said had you chosen to do so.  Do you understand?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  Now, Mr. Quiroz, having gone over this

4    right with you, do you have any questions concerning your right

5    to testify or remain silent?

6              THE DEFENDANT:  No, sir.

7              THE COURT:  Thank you.  You may have your seat, take

8    your seat.

9              Mr. Meredith, your first witness will be?

10             MR. MEREDITH:  Defense rests, Your Honor.

11             THE COURT:  Okay.  I'm going to bring them in.  Defense

12   will rest on the record.  Mr. Ellis, I'll ask you and you'll

13   close.  Mr. Meredith, you'll close, and then I'll give them

14   instructions and send them to lunch.  And we'll be looking at --

15   so be looking at your -- Mr. Quiroz, you can sit down.  Well, I

16   guess you're going to stand right back up.

17             Yes, sir?

18             MR. MEREDITH:  I was just going to ask you, do I need

19   to do another Rule 29 when we don't have witnesses?  I guess I'll

20   do it just in --

21             THE COURT:  Right.

22             MR. MEREDITH:  -- caution.

23             THE COURT:  Once I send them out of here, that's when I

24   would do it again.  Either then or before we argue.  I mean,

25   that's up to you, though.  I'm not trying to advise you.  I'm

129

1    just saying I think --

2              MR. MEREDITH:  I'll do it whenever --

3              THE COURT:  I just don't want you to do it in front of

4    te jury.  That's all.

5              MR. MEREDITH:  That's what I'm --

6              THE COURT:  Yeah, because I'm going to take -- I'm

7    going to send them right back out of here to go to lunch.

8              MR. MEREDITH:  Okay.

9              THE COURT:  And then after that, we're going to stay

10   here for a few minutes.  You'll be able to do it then.

11             MR. MEREDITH:  Will we get a few minutes to write some

12   closing stuff before --

13             THE COURT:  Yeah, of course.

14             MR. MEREDITH:  -- we go straight into closing?  Okay.

15   I didn't want to do it right then.

16             MR. ELLIS:  No, I thought we were doing it right now.

17             THE COURT:  I'm going to send them to lunch.  I'm not

18   going to make y'all go into closing.

19             MR. MEREDITH:  Okay.

20             THE COURT:  All right.  Let's rise for the jury,

21   please.

22        (Jury in at 11:44 p.m.)

23             THE COURT:  All right.  Please be seated.  Thank y'all.

24             All right.  The Government having rested their case,

25   Mr. Meredith, your first witness, sir?

130

1          MR. MEREDITH:  Defense rests, Your Honor.

2          THE COURT:  Defense having rested, Mr. Ellis?

3          MR. ELLIS:  Government closes.

4          THE COURT:  Mr. Meredith?

5          MR. MEREDITH:  The Defense closes.

6          THE COURT:  All right.  Ladies and gentlemen of the

7   jury, so we're not just trying to help you get your steps in

8   today going back and forth because I just have to react to what

9   the attorneys decide to do.  So both sides have rested and closed

10  their case.

11          What that means is they've now given you everything.

12  You have everything to deliberate.  But you're not going to

13  deliberate yet.  And the reason for that, of course, is I'm going

14  to give you the lunch break.  We're not going to starve you to

15  death.  You look hungry, and I think you ought to go eat lunch.

16          And then when you come back -- and we're going to stay

17  here and work while y'all are gone.  Now, we're going to take a

18  lunch break too, but I'm going to work them a little while early,

19  and I might have them come back early.  So we'll be out of your

20  way.

21          When you're coming and going, there won't be lawyers,

22  you know, in the hallways or anything.  If there are, just look

23  the other way when y'all pass each other.  Don't make it look

24  like you are talking.

25          Couple of things.  You're going to, of course, leave

1  your notebooks here.  You're going to remember your instructions.

2  You're going to, when you leave, you're going to take off your

3  juror buttons, badges.  You can leave them in your chair here, or

4  you can leave them back in the jury room.

5          We want to be able to identify you as jurors here in

6  the building.  But I don't want people at restaurants targeting

7  you because you're a juror in a case.  I mean, obviously that

8  wouldn't be smart.  So be sure and, you know, put them back on

9  when you come back.  And like I said, if you want to secure --

10  anything you leave here will be secure.  Anything you leave in

11  the jury room will be secure.

12          You can go to lunch.  You can go to lunch together

13  even.  That's okay.  You can talk about just about anything.  You

14  just can't talk about the case yet.  Don't even talk about how

15  good-looking the judge is because -- I finally got y'all to

16  laugh.  Well, some of you.  Some of you didn't laugh.  Some of

17  you still said that's just silly.

18          But I will say the only reason I say that, and I tell

19  every jury that, and my staff gets sick of hearing it.  But the

20  point is if you say something even that silly and assumingly

21  innocuous, the next thing you know you're talking about the

22  trial.  So don't even go there.  Like I say, I always talk about

23  how good the Cowboys are going to be next year, or the Rangers,

24  any teams that I like they're going to be good next year because

25  they're not presently good.

1          Couple of things.  Remember until the trial is over,

2     you're not to discuss the case with anyone, including your fellow

3     jurors.  If anyone approaches you and tries to talk to you about

4     the case, advise me about it immediately.  Do not read or listen

5     to any news reports of the trial o ruse any technology tools to

6     do independent research.

7          That's never happened here where people have posted on

8     social media or texted people about the case or anything like

9     that.  Let's don't have a first.  We don't need to do that.

10    That's happened elsewhere.  I don't want it to happen here.

11    There's no reason for it.  This trial's almost over.  Let's get

12    to the end of it, and when you're released from your oath then

13    you can talk to anybody and everybody you want to.

14          And I know you all were selected a few days ago, and

15    you came back.  So you've already told the people who need to

16    know where you are.  It's not like you need to call and tell

17    them.  If we had jury selection this morning I'd say look, if you

18    need to tell some people where you are, that's fine.  But

19    everybody knows not to bother you until the trial's over.  We all

20    know that, about the facts.

21          Remember to keep an open mind until the -- until I tell

22    you you're retiring to deliberate.  Finally, don't speak to

23    anyone around the courthouse anywhere around the courthouse other

24    than your fellow jurors or court personnel.  If I see you, I'm

25    going to say hi.  And that's okay.

1          So I'm going to give you a little extra time because we

2    do have some work to do.  I don't want you all sitting here

3    waiting on.  You can come back any time you want.  In fact, you

4    don't have to leave.  You can stay in the jury room, it's up to

5    you.  But we got snacks and stuff in there I think.  I'm not sure

6    how good the snacks are.

7          Felix, have you tried them?  You haven't tried them?

8    The snacks, you haven't tried them?  Okay.  All right.  So it's

9    ten 'til 12.  Yes, ma'am?  Were you going to say something?

10          UNIDENTIFIED SPEAKER:  I was just looking at the time.

11          THE COURT:  Now yesterday we had the parade.  And so I

12    know that the restaurants were jammed.  People were telling me

13    they were waiting to get out, but I heard they were bad.  If

14    you'll be back -- I'll give you to 1:30.  Okay?  That seems like

15    a long time, I know.  That's not too bad.  That's really not too

16    bad because we're going to be rolling.

17          Once you all get back, we're going to be ready to go.

18    We got to have all 14 of you.  So if you're number 13 of 14, you

19    know, whatever, if you're thinking oh I'm late but they can start

20    without me, we cannot.  The 14 of you and me all have to be here

21    to start, to start back up.

22          So what we'll do when we come back, just real quick,

23    when you come back, you'll find in your chair, in addition to

24    your notebook if that's where you've left it, a copy of the

25    Court's charge.  It will say Court's instruction to the jury.

134

1    Pick it up, sit down.  Don't start reading it yet.  I'll give you
2    some -- I'm going to read it to you.
3          I'm required to read it to you.  I know you know how to
4    read.  But you're also going to have your copy.  You can read
5    along with me if you want.  It's your copy meaning you can
6    highlight, circle, mark, x out, whatever you want to do.  And you
7    can take that back to the jury room when you go to deliberate.
8          We'll take all that stuff up before you leave.  We'll
9    shred all that so there's no sensitive information that gets out.
10   But that way, you can do that.  Some people don't like to read
11   along, and they like to just auditory listen, you know, auditory
12   learner, is that what they call it?  And they set it aside and
13   just sit there and listen.  Whatever's good for you.
14         Nobody's going to tell you how to do it.  It's your
15   decision.  So I'll read through it.  When I'm done, the attorneys
16   are going to argue their case, different from the opening
17   statement this morning which is just to tell you what we expect
18   and what the parties expect the evidence to be, sort of the
19   roadmap.
20         This is going to be argument.  This is their final
21   summation.  They get to argue and they get to try and persuade
22   you certain points and areas and things.  The Government, by
23   virtue of having the burden of proof, has the right to open and
24   then do a rebuttal argument.  Mr. Meredith will be in the middle.
25         So the Government will open their arguments first, and

1   then Mr. Meredith will make his argument, and in doing so will

2   rebut what the Government -- attempt to rebut what the Government

3   said.  And then the Government gets a much shorter time to rebut,

4   you know, the final things.  They each have, each side has the

5   same amount of time total.  It's just that the Government gets to

6   split theirs up because they have the burden of proof.  All

7   right.  Some preliminary thoughts on that.

8           Have a good lunch.  We'll be back here waiting whenever

9   you're ready and lined up.  Felix, you all let me know.  At 1:30,

10  we plan to start again.  Any questions?  Anybody have any issues?

11  No questions?  All right.  Let's rise for the jury.  You have a

12  great lunch.

13      (Jury out at 11:51 a.m.)

14          THE COURT:  Let's be seated, please.

15          All right.  The Government and Defense having closed

16  their cases, Mr. Meredith, do you want to make another motion?

17          MR. MEREDITH:  The Defense moves for judgment of

18  acquittal under Rule 29, Judge.

19          THE COURT:  Thank you.  The Court will continue its

20  ruling denying that motion for the same reasons given.

21          All right.  Ms. Salas has the most current charge.

22  She's going to hand them out to you.  This shouldn't take us very

23  long.  So I want you all to take a few minutes and look at it.

24  It's the same thing she sent you on June 9th.  This is June 23rd.

25  So you all have had a couple of weeks.

1          A few different things on there.  We've got the

2     stipulation, the statement that the defendant did not testify.

3     We've got an expert, we've got some expert language.  Let's see.

4     And I think it's pretty similar to what -- except for that, I

5     think it's pretty similar to what you've had, what you have.

6          So take a few minutes and let me know when you're ready

7     to discuss it, and we'll go forward with the charge conference.

8          (Pause)

9          THE COURT:  Everybody ready?  Everybody looks ready.

10    All right.  Who's going to argue for the Government?  Anybody?

11    Mr. Ellis or Mr. Calve, who's going to argue?  Mr. Ellis?

12          MR. ELLIS:  No, Your Honor.

13          THE COURT:  I guess my question of you would be you've

14    read the Court's proposed to instructions.  Any objection to it?

15          MR. ELLIS:  No, Your Honor.

16          THE COURT:  Any additions you'd request?

17          MR. ELLIS:  The Government was discussing if it would

18    be proper to instruct the jury as to what an indictment actually

19    is since we felt it was as if we tried to explain it would be

20    explaining the law.  And we --

21          THE COURT:  Do you have any authority that tells me I

22    -- or a pattern or anything, anything written up that I can give

23    them that you propose?

24          MR. ELLIS:  Not right this second, Your Honor.

25          THE COURT:  Mr. Meredith, what do you think of that?

137

1        MR. MEREDITH:  We would object to that, Judge.

2        THE COURT:  Okay.  I'll sustain the objection.  Also,

3   Government had filed a motion, I'm not sure when it was filed,

4   for a proposed jury instructions as to arraignment.  Basically

5   the Texas Code of Criminal Procedure provisions for as to

6   arraignment, waiver of arraignment, time of arraignment.  Is the

7   Government still pushing that --

8        MR. ELLIS:  No, Your Honor.

9        THE COURT:  -- pursuing that?  I shouldn't say pushing.

10  So those are withdrawn.  Government seems to be happy then?

11       MR. ELLIS:  Yes, Your Honor.

12       THE COURT:  Mr. Meredith, what about you?

13       MR. MEREDITH:  Defense is happy with the instructions.

14       THE COURT:  Okay.  No requests, additions, and no

15  objections?

16       MR. MEREDITH:  None, Your Honor.

17       THE COURT:  Excellent.  Okay.  How much time do you all

18  want to argue?

19       MR. ELLIS:  Twelve minutes, Your Honor.

20       THE COURT:  Mr. Meredith, do you agree with that, or do

21  you want 15?

22       MR. MEREDITH:  I'll do 12 or less, Judge.

23       THE COURT:  Twelve?  Okay.  All right.  So, Mr. Ellis,

24  how are you breaking yours up?  If you are.  You don't have to

25  break it up.

1          MR. ELLIS:  The Government won't break it up.  Six and

2     six.

3          THE COURT:  Okay.  Six and six.  And who's going to do

4     -- are you going to do both?

5          MR. ELLIS:  I'll do both.

6          THE COURT:  Okay.  Do you want a warning on that first

7     six?

8          MR. ELLIS:  Yes.  Yes, I would appreciate that, Your

9     Honor.

10         THE COURT:  Okay.  I'll give you a warning at five.

11    That's pretty quick.  And then when you stand up to rebut -- I'll

12    tell you what.  I think you got to fully open, so you got to go

13    at least six, okay, or I take it off of your other end because

14    I'm not going to let you, you know, some prosecutors in your past

15    might have tried to do two and then ten, you know, put all their

16    meat in the rebuttal which isn't fair.

17         And so I'd say you're probably better off going seven

18    and five because if you take off -- if you're short of six,

19    you're going to lose minutes on the other end or seconds on the

20    other end.

21         MR. ELLIS:  That works for the Government, Your Honor.

22         THE COURT:  Seven and five.  I'm just thinking out

23    loud.  And so with seven, I'll give you a notice at six.  So

24    you'll know you got a minute left.  And you'll know too once I

25    give you that warning that you're past your halfway point and

139

1    you're not going to get anything deducted.

2            When you stand back up, I'll do my best to remember to

3    tell you exactly how much time you have left.  Okay?

4            MR. ELLIS:  Yes, Your Honor.

5            THE COURT:  And that way I think that'll be the way

6    that works.  Mr. Meredith, do you want a warning at, like, ten

7    minutes or eleven?  Or none at all?

8            MR. MEREDITH:  Better to have one at one minute before.

9            THE COURT:  One minute?  Yes, sir.

10           MR. MEREDITH:  It probably won't be necessary, but just

11   in case.

12           THE COURT:  So I'll warn you at 11.  And y'all know how

13   this works.  On the front end, Mr. Ellis, if you just keep going,

14   say you decide to just keep going and you can't stop yourself or

15   you can't help yourself and you get to 12 and you're done, that's

16   up to you.  You can use it however you want.  Once I warn you,

17   I'm not going to stop you.  It just comes off of your other end.

18           But once we get to the end, I'll give you all a

19   ten-second countdown.  And then once we get to the -- when I say

20   stop, we stop.  Not a syllable more.  Some people don't

21   understand what a syllable is I think, but not a syllable more.

22   It's the only way I can make it fair which is my only purpose

23   here is to have a fair trial.

24           So we're going to stop at that.  I used to be able to

25   say I only had one person ever violate that.  Now I've had two.

1    And it's particularly upsetting to the jury I think when that

2    happens because I get mad, and they see how mad I get and they

3    don't like it I've been told.  But that's up to you all, though.

4            All right.  With that, let's make sure we give Mr.

5    Quiroz something to eat.  I hope you all do, too.  I would like

6    you all back at 1:20.  That gives you an hour and 20 minutes.

7    That's a long lunch.  This is a luxury y'all don't usually have,

8    none of you usually have.

9            Back at 1:20 just in case we have any issues, and then

10   no later than 1:30.  So whenever we have all 14 after 1:20.  I

11   know I told them 1:30, but if they're all back, we're going to

12   start.  Okay?  So 1:20 on, be prepared to go.  Okay?

13           Anything, Mr. Ellis, anything more you want to take up?

14           MR. ELLIS:  Not from the Government, Your Honor.

15           THE COURT:  Mr. Meredith?

16           MR. MEREDITH:  No, Your Honor.

17           THE COURT:  Great.  Thank you, all.  See you after

18   lunch.

19           THE DEPUTY:  All rise.

20       (Recess at 12:02 p.m./Reconvened at 1:24 p.m.)

21       (Outside the presence of the jury; defendant present)

22           THE COURT:  All right.  So we're outside the presence

23   of the jury.  We're waiting on them to get back from lunch.  I

24   think we had 11.  We're still waiting on three.

25           Mr. Ellis, did you need to take up anything before we

141

1  begin?

2          MR. ELLIS:  Nothing from the Government, Your Honor.

3          THE COURT:  Mr. Meredith?

4          MR. MEREDITH:  No, Your Honor.

5          THE COURT:  All right.

6      (Pause)

7          THE COURT:  One person's on the way.  We ready?  We got

8  them all?  All right.  Let's rise for the jury, please.

9      (Jury in at 1:29 p.m.)

10          THE COURT:  All right.  Let's be seated, please.

11  Thanks.

12          You'll notice in your chair, as I told you you would

13  have, you've got a copy of the Court's instructions to the jury.

14  And put your badges back on please and get ready to go.  This is

15  a reading test for me.  I can see how I'm doing.  And I'll be as

16  efficient as I can.

17          Members of the jury, in any jury trial there are in

18  effect two judges.  I'm one of the judges.  The other's the jury.

19  It's my duty to preside over the trial and to decide what

20  evidence is proper for your consideration.  It's also my duty at

21  the end of the trial to explain to you the rules of law that you

22  must follow and apply at arriving at your verdict.

23          First I'll give you some general instructions which

24  apply in every case, for example instructions about burden of

25  proof and how to judge the believability of witnesses.  Then I'll

1   give you some specific rules of law about this particular case.

2   And finally, I'll explain to you the procedures you should follow

3   in your deliberations.

4          You as jurors are the judges of the facts.  But in

5   determining what actually happened, that is in reaching your

6   decision as to the facts, it is your sworn duty to follow all the

7   rules of law as I explain them to you.  You have no right to

8   disregard or give special attention to any one instruction, or to

9   question the wisdom or correctness of any rule I may state to

10  you.

11         You must not substitute or follow your own notion or

12  opinion as to what the law is or ought to be.  It is your duty to

13  apply the law as I explain it to you regardless of the

14  consequences.  It's also your duty to base your verdict solely

15  upon the evidence without prejudice or sympathy.

16         You are to decide this case only on the evidence which

17  has been admitted into court during trial.  That was the promise

18  you made, the oath you took before being accepted by the parties

19  as jurors, and they have the right to expect nothing less.

20         The indictment or formal charge against the defendant

21  is not evidence of guilt.  Indeed, the defendant is presumed by

22  the law to be innocent.  The defendant begins with a clean slate.

23  The law does not require the defendant to prove his innocence or

24  produce any evidence at all, and no inference whatever may be

25  drawn from the election of the defendant not to testify.

1          The Government has the burden of proving the defendant

2     guilty beyond a reasonable doubt, and if it fails to do so you

3     must acquit the defendant.  While the Government's burden of

4     proof is a strict or heavy burden, it is not necessary that the

5     defendant's guilt be proved beyond all possible doubt.

6          It's only required that the Government's proof exclude

7     any reasonable doubt concerning the Defendant's guilt.  A

8     reasonable doubt is a doubt based upon reason and common sense

9     after careful and partial consideration of all the evidence in

10    the case.  Proof beyond a reasonable doubt, therefore, is proof

11    of such a convincing character that you would be willing to rely

12    and act upon it without hesitation in making the most important

13    decisions of your own affairs.

14          As I told you earlier, it's your duty to determine the

15    facts.  To do so, you must consider only the evidence presented

16    during the trial.  Evidence is the sworn testimony of the

17    witnesses including stipulations and the exhibits.  The

18    questions, statements, objections, and arguments made by the

19    lawyers are not evidence.

20          The function of the lawyers is to point out those

21    things that are most significant or most helpful to their side of

22    the case, and in so doing to call your attention to certain facts

23    or inferences that might otherwise escape your notice.  In the

24    final analysis, however, it is your own recollection and

25    interpretation of the evidence that controls in the case.  What

144

1    the lawyers say is not binding upon you.

2           During the trial, I sustained objections to certain

3    questions.  You must disregard those questions entirely.  Do not

4    speculate as to what the witness would have said if permitted to

5    answer the question.  Your verdict must be based solely on the

6    legally admissible evidence and testimony.

7           Also, do not assume from anything I may have done or

8    said during the trial that I have any opinion concerning any of

9    the issues in the case.  Except for the instructions to you on

10   the law, you should disregard anything I may have said during the

11   trial in arriving at your own verdict.

12          In considering the evidence, you're permitted to draw

13   such reasonable inferences from the testimony and exhibits as you

14   feel are justified in the light of common experience.  In other

15   words, you may make deductions and reach conclusions that reason

16   and common sense lead you to draw from the facts which have been

17   established by the evidence.

18          Do not be concerned about whether the evidence is

19   direct evidence or circumstantial evidence.  You should consider

20   and weigh all the evidence that was presented to you.  Direct

21   evidence is the testimony of one who asserts actual knowledge of

22   a fact such as an eyewitness.  Circumstantial evidence is proof

23   of a chain of events and circumstances indicting that something

24   is or is not a fact.

25          The law makes no distinction between the weight to be

145

1   given to either direct or circumstantial evidence.  But the law

2   requires that you, after weighing all of the evidence whether

3   direct or circumstantial, be convinced of the guilt of the

4   defendant beyond a reasonable doubt before you can find him

5   guilty.

6        I'll remind you that it's your job to decide whether

7   the Government has proved the guilt of the defendant beyond a

8   reasonable doubt.  In doing so, you must consider all of the

9   evidence.  This does not mean, however, that you must accept all

10  of the evidence as true or accurate.

11       You are the sole judges of the credibility or

12  believability of each witness and the weight to be given to each

13  witness' testimony.  An important part of your job will be making

14  judgments about the testimony of the witnesses who testified in

15  this case.  You should decide whether you believe all, some part,

16  or none of what each person had to say and how important that

17  testimony was.

18       In making that decision, I suggest that you ask

19  yourself some questions.  Did the witness impress you as honest.

20  Did the witness have any particular reason not to tell the truth.

21  Did the witness have a personal interest in the outcome of the

22  case.  Did the witness have any relationship with either the

23  Government or the Defense.

24       Did the witness seem to have a good memory.  Did the

25  witness clearly see or hear the things about which he or she

1   testified.  Did the witness have the opportunity and ability to

2   understand the questions clearly and answer them directly.  Did

3   the witness' testimony differ from the testimony of other

4   witnesses.  These are a few of the considerations that will help

5   you determine the accuracy of what each witness said.

6           Your job is to think about the testimony of each

7   witness you have heard, decide whether -- and decide, I'm sorry,

8   and decide how much you believe of what each witness had to say.

9   In making up your mind and reaching a verdict, do not make any

10   decisions simply because there were more witnesses on one side

11   than on the other.

12           Do not reach a conclusion on a particular point just

13   because there were more witnesses testifying from one side on

14   that point.  You will always bear in mind that the law never

15   imposes upon a defendant in a criminal case the burden or duty of

16   calling any witnesses or producing any evidence.

17           During the trial you heard the testimony of Special

18   Agent Nate Anderson who expressed opinions concerning the

19   examination of the firearm identifiers in this case and

20   interstate nexus.  Scientific, technical, or other specialized

21   knowledge might assist the jury in understanding the evidence or

22   in determining a fact in issue.  A witness qualified by

23   knowledge, skill, experience, training, or education may testify

24   and state an opinion concerning such matters.

25           Merely because such a witness has expressed an opinion

1    does not mean, however, that you must accept this opinion.  You

2    should judge such testimony like any other testimony.  You may

3    accept it or reject it and give it as much weight as you think it

4    deserves, considering the witness's education and experience, the

5    soundness of the reasons given for the opinion, and all other

6    evidence in the case.

7          You are here to decide whether the Government's proven

8    beyond a reasonable doubt that the defendant is guilty of any of

9    the crimes charged.  The defendant is not on trial for any act,

10   conduct, or offense not alleged in the indictment.  Neither are

11   you called upon to return a verdict as to the guilt of any other

12   person or persons not on trial as a defendant in this case except

13   as you are otherwise instructed.

14         A separate crime is charged in each count in the

15   indictment.  Each count and the evidence pertaining to it should

16   be considered separately.  The fact that you may find the

17   defendant guilty or not guilty as to one of the crimes charged

18   should not control your verdict as to any other.

19         If the defendant's found guilty, it will be my duty to

20   decide what the punishment will be.  You should not be concerned

21   with punishment in any way.  It should not enter your

22   consideration or discussion.

23         You will note that the indictment charges that the

24   offenses were committed on or about a specified date.  The

25   Government does not have to prove that the crimes were committed

148

1    on those exact dates so long as the Government proves beyond a

2    reasonable doubt that the defendant committed the crimes on dates

3    reasonably near December 23rd, 2021 and December 30th, 2021, the

4    dates stated in the indictment.

5          The indictment contains multiple counts which read as

6    follows.  Count 1, that on or about December 23rd, 2021, in the

7    Western District of Texas, Defendant Jose Gomez Quiroz, in

8    connection with the acquisition of a firearm, to wit an American

9    Tactical Imports model M1911 semiauto 22 caliber firearm serial

10   number A907700 from DBA Morrison True Value, a licensed dealer of

11   firearms within the meaning of Chapter 44 Title 18 United States

12   Code, knowingly made a false and fictitious written statement to

13   DBA Morrison True Value located at 301 North 5th Street, Alpine,

14   Texas 79830 which statement was intended and likely to deceive

15   DBA Morrison True Value as to the fact -- to a fact material to

16   the unlawfulness of such acquisition of the firearm to the

17   defendant under Chapter 44 of Title 18 in that the defendant did

18   execute a Department of Justice Bureau of Alcohol, Tobacco,

19   Firearms, and Explosives Form 4473, Firearms Transaction Record

20   to the effect that on Question 21B, defendant indicated he was

21   not under indictment for a felony when in fact he knew he was

22   under two Pecos County, Texas felony indictments in violation of

23   Title 18 United States Code Sections 922(a)(6) and 924(a)(2).

24         Count 2, that on or about December 30th, 2021, in the

25   Western District of Texas, the Defendant Jose Gomez Quiroz,

149

knowingly was under indictment for a crime punishable by imprisonment for a term exceeding one year did willfully receive a firearm, that is an American Tactical Imports Model M1911 semiauto 22 caliber firearm serial number 8907700, said firearm having been shipped and transported in interstate commerce in violation of Title 18 U.S. Code Section 922(n) and 924(a)(1)(B).

Title 18 United States Code Sections 922(a)(6) and 924(a)(2) make it a crime for anyone to knowingly make a false statement to a firearms dealer in order to buy a firearm. For you to find the defendant guilty of Count 1, you must be convinced that the Government has proved the following beyond a reasonable doubt.

First, that the defendant made false or fictitious written statement. Second, that the defendant knew the statement was false. Third, the defendant's statement was made in connection with the acquisition of a firearm from a licensed firearm dealer. Fourth, that the statement was intended or was likely to deceive a licensed firearm dealer. And fifth, that the alleged false statement was material to the lawfulness of the sale or disposition of the firearm.

The term firearm means any weapon that will or is designed to or may readily be converted to expel a projectile by the action of an explosive. The term firearm also includes the frame or receiver of any such weapon or any firearm muffler or firearm silencer or destructive device.

1          A statement is false or fictitious if it was untruly

2    made and was then known to be untrue by the person making it.  A

3    false statement is likely to deceive if the nature of the

4    statement, considering all of the surrounding circumstances at

5    the time it is made, is such that a reasonable person of ordinary

6    prudence would have been actually deceived or misled.

7          Title 18 United States Code Sections 922(n) and

8    924(a)(1)(D) make it a crime for anyone who is under indictment

9    for a crime punishable by imprisonment for a term exceeding one

10   year to receive a firearm which has been shipped or transported

11   in interstate or foreign commerce.

12         For you to find the defendant guilty of Count 2, you

13   must be convinced that the Government has proved each of the

14   following beyond a reasonable doubt.

15         First, that the defendant knowingly received a firearm

16   as charged.

17         Second, that before the Defendant received the firearm,

18   the defendant had been indicted in a court of a crime punishable

19   by imprisonment for a term in excess of one year.

20         Third, that at the time the defendant knowingly

21   received a firearm, the defendant knew he was under indictment

22   for a crime punishable by imprisonment for a term in excess of

23   one year.

24         Fourth, that the defendant acted wilfully, that is with

25   knowledge that his conduct was unlawful.

1          And fifth, that the receipt of the firearm was in and

2     affecting interstate commerce, that is that before the defendant

3     received the firearm, it had traveled at some time from one state

4     to another or from a foreign country to the United States.

5          The word knowingly, as that term has been used from

6     time to time in these instructions, means that the act was done

7     voluntarily and intentionally, not because of mistake or

8     accident.  It is reasonable to infer that a person ordinarily

9     intends the natural and probable consequences of his knowing

10    acts.

11         The jury may draw the inference that the accused

12    intended all the consequences which one standing in like

13    circumstances and possessing like knowledge should reasonably

14    have expected to result from any intentional act or conscious

15    omission.  Any such inference drawn is entitled to be considered

16    by the jury in determining whether or not the Government has

17    proved beyond a reasonable doubt that the defendant possessed the

18    required criminal intent.

19         To reach a verdict, whether it's guilty or not guilty,

20    all of you must agree.  Your verdict must be unanimous on each

21    count of the indictment.  Your deliberations will be secret.  You

22    will never have to explain your verdict to anyone. It's your duty

23    to consult with one another and to deliberate in an effort to

24    reach agreement if you can do so.

25         Each of you must decide the case for yourself, but only

1   after an impartial consideration of the evidence with your fellow

2   jurors.  During your deliberations, do not hesitate to reexamine

3   your own opinions and change your mind if convinced that you were

4   wrong.  But do not give up your honest beliefs as to the weight

5   or effect of the evidence solely because of the opinion of your

6   fellow jurors or for the mere purpose for returning a verdict.

7        Remember at all times you are the judges of the facts.

8   Your duty is to decide whether the Government has proved the

9   defendant guilty beyond a reasonable doubt.  When you go to the

10  jury room, the first thing that you should do is select one of

11  your number as your foreperson who will help to guide your

12  deliberations and will speak for you here in the courtroom.

13       A verdict form has been prepared for your convenience.

14  The foreperson will write the unanimous answer of the jury in the

15  space provided for each count of the indictment, either guilty or

16  not guilty.  At the conclusion of your deliberations the

17  foreperson should date and sign the verdict.

18       One document, one sheet that you do not have that I

19  have that we will send it, we'll send in one verdict form.  So

20  you don't have that in your instructions.  We'll send this in

21  after when y'all go in there.  And it says, basically a very

22  simple verdict form, answer not guilty or guilty.

23       Count 1, we the jury find that defendant Jose Gomez

24  Quiroz is, and there's a blank.  And underneath it says not

25  guilty or guilty.  The foreperson will write in not guilty or

153

1    guilty, whatever the unanimous verdict of the jury is.  And to

2    finish that sentence, it says of the offense charged in Count 1

3    of the indictment.

4         Count 2 says exactly the same thing, we the jury find

5    that defendant Jose Gomez Quiroz is blank, not guilty or guilty

6    which will be written by the foreperson, of the offense charged

7    in Count 2 of the indictment.

8         There's a place to date and sign for the foreperson.

9    When that's completed, there will be an envelope in there just a

10   bit larger than the verdict form.  You slide that one verdict

11   form into the envelope.  Not the entire instructions, just the

12   verdict form.  Slide that in there and seal the envelope.

13        The foreperson will then maintain control and

14   possession of the envelope that has the verdict form in it.

15   You'll notify the court security officer standing outside the

16   door that the jury has reached a unanimous verdict.  We'll get

17   everybody back in here.  We'll bring you in once we're all here

18   and ready, and the foreperson would carry in, bring in the

19   verdict form in the envelope, sealed envelope.

20        With that, I'm going to recognize Mr. Ellis to begin

21   our closing arguments.  Mr. Ellis?

22             CLOSING ARGUMENT BY THE GOVERNMENT

23        MR. ELLIS:  Thank you, Your Honor.

24        Ladies and gentlemen of the jury, remember why we're

25   here.  We're here because of a lie and then a buy.  We're here

154

1    because the defendant lied on the ATF Form 4473 in an attempt to

2    acquire a firearm when he knew he was under indictment.  And he

3    willingly and knowingly accepted the firearm.

4            Count 1 of the first charge charges, or requires that

5    the Government prove beyond a reasonable doubt the following

6    elements.  And the Government has given you the evidence to prove

7    beyond a reasonable doubt that the defendant did commit this

8    crime.

9            Count 1 charges the defendant with making a false

10   statement to a firearms dealer.  The Government has proved in

11   each of these elements as such.  First, the defendant made a

12   false or fictitious written statement.  How do we know?  We've

13   provided you multiple copies of the 112th Judicial District's

14   Clerk of Court paperwork showing that the defendant was in fact

15   under two felony indictments.

16           That's a fact.  He was under indictment.  This element

17   does not include a knowing aspect.  This is was he under

18   indictment.  And he was under indictment.  Additionally, we read

19   to the jury a stipulation of fact that the defendant admits that

20   he was the person that was in the true value store.

21   Additionally, he admits that he signed the form.

22           And you know because you've seen the form and you'll

23   have it during your deliberations that the form states I certify

24   that all my responses in Section b of this form are still true,

25   correct, and complete.

1          Second, the defendant knew the statement was false.

2    How do we know?  We've provided you documentation showing the

3    arraignment transcript from the 112th Judicial District Court.

4    And in that transcript, he is admonished by the Court that he

5    faces a sentence of 2 to 20 years.  And he stated on the record

6    that he understood that.  That's a fact.  And it's been shown to

7    you, and you will have the transcript to review.

8          Third, the statement was made in connection with the

9    acquisition of a firearm from a licensed firearm dealer.  How do

10   we know that's true?  You heard the testimony from the True value

11   employee that True Value is indeed a licensed firearm dealer.

12   You also heard testimony from Agent Armendariz that they are

13   indeed a licensed firearm dealer.

14         Fourth, the statement was intended or was likely to

15   deceive a licensed firearm dealer.  How do we know this is true?

16   Because the only reason why the defendant was able to actually

17   receive this firearm is because he was untruthful in answering

18   that question.  Had he put yes, there would have been no delay.

19   There would have been no waiting period.  He would have

20   immediately been told he could not get the firearm.  By saying

21   no, he was allowed to wait the three-day period and come back and

22   receive the firearm.

23         Fifth, the alleged false statement was material to the

24   lawfulness of the sale or disposition of the firearm.  And how do

25   we know this?  As I previously stated, the false statement alone

156

1    is why he was able to take possession of the firearm before the

2    FBI background check could deny him.  And the employee relied on

3    that statement on question 21B when he allowed him to take

4    possession of the firearm after the three-day waiting period.

5              Count 2 charges the defendant with receipt of a firearm

6    by a person under indictment.  And the Government has again

7    proven all of these elements beyond a reasonable doubt.  First,

8    the defendant knowingly received a firearm.  How do we know this?

9    This is a fact.  There's no interpretation here.

10             Three days later, the defendant returns to the store

11   and signs a second time on the ATF form when he received the

12   firearm.  And again, above his signature, it says I certify that

13   all my responses in Section B of this form are still true,

14   correct, and complete.  He received the firearm on that date and

15   there is his signature proving it.

16             Second, before the defendant received the firearm, the

17   defendant had been indicted in a court for a crime punishable for

18   a term in excess of one year.  How do we know this?  Again, we

19   have provided multiple court documents showing that he was in

20   fact indictment for two separate felonies in the State of Texas.

21             And again, that Court transcript, he stated on the

22   record that he understood that he was facing a sentence of 2 to

23   20 years.  Two to twenty years is longer than one year.  The

24   Government has proven that.

25             Third, at the time the defendant knowingly received the

1    firearm, the defendant knew he was under indictment for a crime

2    punishable by imprisonment for a term in excess of one year.

3    Sounds very similar to the last one.  He had to know before he

4    did it, and he had to know after he did it at the time that he

5    did it.

6            Again, how do we know?  The same exact facts for the

7    second element apply to the third.  The arraignment transcript,

8    it's black and white.  It's recorded.  A reporter is typing it as

9    he says it.  And it's certified from the State of Texas that he

10   was there, he was present, and he stated he understood the type

11   of sentence that he was facing, 2 to 20 years.

12           THE COURT:  Mr. Ellis, you're at six minutes.

13           MR. ELLIS:  Fourth, the defendant acted willfully, that

14   is with knowledge that his conduct was unlawful.  How do we know

15   that?  You heard testimony from the agents that they spoke with

16   his mother.  And his mother told them that he had their business

17   card.  When he offered the business card for him to reach out,

18   she said he already has it.

19           He never answered his phone call, any of the phone

20   calls.  He was never at the residence when they went by to visit

21   him.  And based on the training and experience of law enforcement

22   officers, they believe he was trying to evade law enforcement.

23   That shows he knew he had done something wrong.

24           A reasonable person would want to find out why the ATF

25   is coming, knocking on their door.  Why is this guy looking for

1   me.  A simple phone call could have cleared it up, and he refused

2   to do it.

3          Fifth, the receipt was in and affecting interstate

4   commerce.  How do we know this?  You heard the testimony of the

5   ATF expert nexus witness that the gun was manufactured in Germany

6   and was imported and shift to the State of Texas.  That's a fact.

7          Therefore, the Government respectfully requests you to

8   find the defendant guilty for Count 1 and guilty for Count 2.

9   Thank you.

10          THE COURT:  Thank you, Mr. Ellis.

11          Mr. Meredith?

12                 CLOSING ARGUMENT BY THE DEFENSE

13          MR. MEREDITH:  Judge, ladies and gentlemen.  So this is

14   a federal case.  It's not a state case.  This is a case about

15   someone who is under indictment and receives a firearm while

16   they're under indictment or lies about it on the documents

17   required to be able to get the firearm.

18          He isn't -- it' snot about a person who was convicted

19   of anything.  This is just about a person who's been indicted.

20   I'm not going to go through too much detail to the jury

21   instructions.  I just wanted to highlight a couple of things that

22   Mr. Ellis also mentioned.

23          And in the false statement to arms dealer, when you get

24   to looking at the different elements in that section, it's going

25   to say the defendant made a false or fictitious written

1    statement.  And that's defined at the bottom as that it was known

2    to be untrue by the person who's making it.  So there's that word

3    known.  The second thing is that the defendant knew the statement

4    was false, which is kind of another way of saying the other part

5    of it.

6          The receipt of a firearm, you notice it's not

7    possession of a firearm because under this law if you already

8    possess a firearm and it's in your closet, and then you get

9    indicted, it's not illegal for you to still have it.  It's

10   illegal for you to receive it anew.  It's illegal for you to

11   transport it.  But it's not illegal for you to just possess it.

12   So that's why it makes it this is a kind of a unique law that

13   they have.

14         The knowing aspects of the receipt of a firearm by a

15   person under indictment was that he knowingly received the

16   firearm, and that he knew he was under indictment by a crime, a

17   felony, basically a sentence up to over one year.  The other part

18   is that it was willful and he had the knowledge that the conduct

19   was unlawful.  And I'm going to come back to that.  I think

20   that's a key part of it.

21         The Government went through the exhibits, and I'm just

22   going to do it, skim over them.  You've heard them talked about

23   four or five times already.  The basic problem with the

24   Government's case is the documents that they have that mention

25   the word indictment don't have any evidence that my client

160

1    received that document.

2          The documents that my client signed don't use the word

3    indictment.  They don't have any documents in which my client

4    signed a document that has the word indictment on it.  The bond

5    papers, the two bond papers that were filled out that my client

6    did sign, they never said indicted or under indictment.  They say

7    charged with.

8          The discovery letters, that's the letters to the lawyer

9    in the state cases say that it's carrying the indictment in those

10   letters, but it just says that it was delivered to my client's

11   lawyer, not that he ever gave my client a copy of it or that they

12   ever had any communication at all.  The notice of setting of the

13   trial for the state cases doesn't have anything about indictment

14   on it, or that my client ever got a copy of that either.

15         The transcript of the arraignment which we talked about

16   a lot, and the reason that it's important is that this is a judge

17   advising a person accused of a crime what his crime is.  And I

18   think it's really significant that the Judge Gomez in this case

19   chose not to use the word indictment.

20         He never uses the word indictment.  So there's really

21   no -- or difficult for me to infer from that that this is

22   something that would make either my client Mr. Quiroz aware that

23   he was under indictment, or even much less likely that he knew

24   what that meant.

25         There are two documents, the one is the capias.  That's

1  the arrest warrant.  And the other one is the precept to serve

2  which were by the gentlemen who worked at the Pecos County Jail.

3  And he had no direct experience about that indictment ever being

4  handed to my client.

5          And basically, he said, his testimony was that's the

6  way we do it, but that he didn't give him a copy or see anyone

7  else give him a copy of the indictment.  And this is really only

8  like half of the equation whether he got an indictment or not.

9  I'd argue that there's not sufficient evidence to say that he

10  ever was in possession of an indictment.

11          But the other half of it is that he had to know what

12  indictment meant.  And the Government didn't produce one word on

13  one document or one statement by any witness that would give the

14  idea that my client knew what the word indictment meant.

15          He went to pick up the gun after he bought it online.

16  He filled out the form.  He put his address on there, his real

17  address on there.  He was told come back in three days.  He

18  waited three days, he came back, and he got the gun.  He did what

19  he was told, and he got the gun.

20          And so back to when we first saw each other and we

21  talked about presumption of innocence and reasonable doubt.  This

22  is where we're back to that.  Reasonable doubt is the highest of

23  all the standards that a jury will get in terms of levels of

24  proof.

25          There's preponderance of the evidence which is

1    basically how people make decisions in their lives with things

2    that aren't super important that will say oh yeah, okay, probably

3    that happened.  I'll do that.  Let's go that way.  There's clear

4    and convincing evidence which is higher than preponderance.  And

5    that's something that's highly probable that it happened.

6            And then above that, above everything else is beyond a

7    reasonable doubt.  And I think after looking at the evidence that

8    the Government presented, and especially the lack of evidence

9    that the Government presented, you'll return verdicts of not

10   guilty in both counts.

11           THE COURT:  Thank you, Mr. Meredith.

12           Mr. Ellis, you have four and a half minutes if you

13   choose to take it.

14           MR. ELLIS:  Thank you, Your Honor.

15           THE COURT:  Certainly.

16            REBUTTAL CLOSING ARGUMENT BY THE GOVERNMENT

17           MR. ELLIS:  Ladies and gentlemen, I just wanted to

18   touch on one note.  The evidence that the defendant received the

19   indictments is in the officer's return on the precepts to serve.

20   We showed it to you.  We have it.  Exhibit 13.  Make sure you

21   review this when you go back.  In the officer's return it states,

22   and it's attested to by the deputy, a certified copy of the

23   indictment was served.  It was given.

24           The Defense wants you to believe that the only way a

25   person can acknowledge of something is if he signs a document

163

1    showing he received it.  That's not true.  You can be told you're

2    under indictment.  You can be in court.  You can be read an

3    indictment.  You don't have to sign anything.  But you would have

4    knowledge that you are under indictment.

5              Government rests, Your Honor.

6              THE COURT:  Thank you.  If you need to communicate with

7    me during your deliberations, the foreperson should write the

8    message and give it to the Court security officer.  I'll either

9    reply in writing or bring you back into court to answer your

10   message.

11             Bear in mind that you're never to reveal to any person,

12   not even to the Court, how the jury stands, numerically or

13   otherwise, on any count in the indictment until after you have

14   reached a unanimous verdict.

15             As you go, I ask all 14 of you to go back into the jury

16   room.  We're going to end up saying goodbye to our alternates.

17   And we can never get to this point without you, and we typically

18   have to use one or both of you.  So, or oftentimes at least.  So

19   I'm going to ask you if you'd go back into the jury room with the

20   jury, collect any personal belongings that you have, and then

21   come out the other side and I'll have you come back into chambers

22   and just visit with you for two, three short minutes.

23             Now you may take your notebooks if you wish to do so.

24   And let's rise as this jury retires to deliberate.  Thank you.

25        (Jury retires to deliberate at 2:04 p.m.)

1          THE COURT:  All right.  Outside the presence of the

2    jury.  Mr. Ellis, anything you want to take up?

3          MR. ELLIS:  Nothing from the Government, Your Honor.

4          THE COURT:  Mr. Meredith?

5          MR. MEREDITH:  No, Your Honor.

6          THE COURT:  All right.  Thank you all.  If you'd stay

7    pretty close, please.

8       (Recess at 2:04 p.m./Reconvened at 2:25 p.m.)

9       (Outside the presence of the jury; defendant present)

10          THE CLERK:  All rise.

11          THE COURT:  All right.  I'm told we have a verdict.

12   We've got all the parties.  Mr. Quiroz is here.  Regardless of

13   the verdict, no outward display of emotion.  Let's bring the jury

14   in please.

15       (Jury in at 2:25 p.m.)

16          THE COURT:  All right.  Let's be seated, please.  Thank

17   you.

18          Speaking through your foreperson, sir, if you'd rise.

19   Has the jury reached a verdict?

20          JURY FOREPERSON:  They have reached a verdict, Your

21   Honor.

22          THE COURT:  If you'll hand that to the court security

23   officer.  You may have a seat.  Thank you very much.

24          Would the defendant please rise?

25          THE CLERK:  In PE:22-CR-104, the United States of

1   America vs. Jose Gomez Quiroz, verdict form.  Count 1, we the

2   jury find that defendant Jose Gomez Quiroz is guilty of the

3   offense charged in Count 1 of the indictment.

4            Count 2, we the jury find that defendant Jose Gomez

5   Quiroz is guilty of the offense charged in Count 2 of the

6   indictment.  Signed today's date, foreperson of the jury.

7            THE COURT:  You all may have a seat.  Thank you.  Mr.

8   Meredith, does the Defense wish the Court to poll the jury?

9            MR. MEREDITH:  No, Your Honor.

10           THE COURT:  Thank you.  Ladies and gentlemen of the

11  jury, we thank you for your service.  You're released from your

12  oath now.  That means you can talk to anybody you want to about

13  the case.  That also means you don't have to talk to anybody if

14  you don't want to at all.  It's completely up to you.  We can't

15  do these without you, and we are very appreciative of you being

16  here.

17           I want to speak with you privately just for a few

18  minutes.  I've got about two minutes worth of work to do with the

19  lawyers before I come back and join you in the jury room.  If you

20  all would retire one last time, I promise I won't take long and I

21  won't keep you long.

22           Thank you very much for your service.  I'll see you in

23  just a few minutes.  Let's rise for the jury as they retire for

24  the last time.

25           (Jury excused at 2:28 p.m.)

1          THE COURT:  Let's be seated, please.  So, Mr. Quiroz,

2    I'm going to refer your case now since there has been a guilty

3    verdict returned in Counts 1 and 2, I'm going to refer your case

4    to the U.S. Probation Office for the preparation of a presentence

5    investigation report.

6          Mr. Meredith is going to guide you through that

7    process.  Mr. Meredith then will receive a copy of the report

8    well before your sentencing hearing.  He'll go over it carefully,

9    and he'll go over it with you.  He'll file objections if there

10   are objections he's able to file on your behalf.  The Government

11   has the same right.

12         If there are any objections that remain outstanding at

13   the time of sentencing, then we'll take those up at your

14   sentencing hearing.  Mr. Meredith will also speak on your behalf

15   at your sentencing hearing.  You have the right and will have the

16   opportunity to speak before I sentence you as well.  I'm going to

17   set your sentencing for September 26th at 8:00 a.m. in Alpine.

18         Mr. Ellis, anything further from the Government today?

19         MR. ELLIS:  Nothing from the Government, Your Honor.

20         THE COURT:  Mr. Meredith, anything further on behalf of

21   the defense?

22         MR. MEREDITH:  Just to be overly safe, Judge, I would

23   object to the Court's denial of the objection on the admission of

24   exhibits.  And I'm going to object all the way to the denial of

25   the motion to dismiss in case that has any bearing on future

167

1    aspects of the case.

2           THE COURT:  Thank you all.

3           Mr. Quiroz, I remand you to the custody of the United

4    States Marshals.  I'll see you at sentencing, sir.  Thank you.

5           (Proceedings concluded at 2:30 p.m.)

6                            ---oOo---

7

8

9

10

11                    **C E R T I F I C A T E**

12        I, DIPTI PATEL, court-approved transcriber, certify that the

13   foregoing is a correct transcript from the official electronic

14   sound recording of the proceedings in the above-entitled matter.

15

16

17   *Dipti Patel*

18   _____

19   DIPTI PATEL, CET-997

20   LIBERTY TRANSCRIPTS                    Date: October 7, 2022

21

22

23

24

25